1  Howard A. Sagaser 072492
   Michael S. Helsley 199103
2  **SAGASER, JONES & HELSLEY**
   2445 Capitol Street, 2nd Floor
3  Post Office Box 1632
   Fresno, California 93717-1632
4  Telephone: (559) 233-4800
   Facsimile: (559) 233-9330
5
   William C. Hahesy 105743
6  **LAW OFFICES OF WILLIAM C. HAHESY**
   225 West Shaw Avenue, Suite 105
7  Fresno, California 93704
   Telephone: (559) 579-1230
8  Facsimile: (559) 579-1231
9  e-mail: bill@hahesylaw.com

10 Attorneys for: Defendant NIBCO, INC.

11                    **UNITED STATES DISTRICT COURT**

12                 **EASTERN DISTRICT OF CALIFORNIA**

13

14 MARTHA RIVERA, MAO HER, ALICIA          )   Case No. CIV F-99 6443 OWW SMS
   ALVAREZ, EVA ARRIOLA, PEUANG            )
15 BOUNNHONG, CHHOM CHAN, BEE             )
   LEE, PAULA MARTINEZ, MARIA             )   **DECLARATION OF WILLIAM C.**
16 MEDINA, MAI MEEMOUA,                   )   **HAHESY IN SUPPORT OF**
   MARGARITA MENDOZA, BAO NHIA            )   **DEFENDANT'S MOTION IN**
17 MOUA, ISIDRA MURILLO, MARIA            )   **LIMINE NO. 10**
   NAVARRO, VATH RATTANATAY,              )
18 OFELIA RIVERA, SARA RIVERA,            )   **[To Exclude Testimony of Dr. Roseann**
   MARIA RODRIGUEZ, MARIA RUIZ,           )   **Duenas González, Ph.D. Regarding the**
19 MARIA VALDIVIA, SY VANG, YOUA          )   **Validity of the Z tests and/or NIBCO's**
   XIONG, and SEE YANG,                   )   **Employee Selection Procedures.]**
20                                        )
          Plaintiffs,                     )
21                                        )
        v.                                )
22                                        )
   NIBCO, INC., an Indiana corporation,   )
23                                        )
          Defendant.                      )
24                                        )

25     I, WILLIAM C. HAHESY, declare:

26     1.     I am an attorney at law duly admitted to practice before all the courts in the

27 State of California, including the United States District Court for the Eastern District of

28 California and I am an attorney for Defendant NIBCO, Inc. ("NIBCO") in the above-captioned

1

2   action.

3      2.      I am submitting this Declaration in support of NIBCO's Motion in Limine No.

4   10 To Exclude Testimony of Dr. Roseann Duenas González , Ph.D. regarding the validity of

5   the Z tests and/or NIBCO's employee selection procedures.

6      3.      I have personal knowledge of the following matters, except those stated on

7   information and belief and as to those matters, I believe them to be true and if called as witness

8   in this case I could and would competently testify thereto.

9      4.      Attached hereto as Exhibit A is a true and correct copy of Plaintiffs'

10  Designation of Expert Witnesses in the above captioned action.

11     5.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the

12  March 14, 2003 Report of Dr. Roseann Duenas González , Ph.D. produced by Plaintiffs'

13  pursuant to Rule 26.

14     6.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the July

15  7, 2003 Report of Dr. Roseann Duenas González , Ph.D. produced by Plaintiffs' pursuant to

16  Rule 26.

17     7.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the

18  deposition testimony of Dr. Roseann Duenas González , Ph.D. pursuant to Rule 26.

19     8.      Attached hereto as Exhibit E is a true and correct copy of the most recently

20  provided Curriculum Vitae of Dr. Roseann Duenas González, Ph.D., produced by Plaintiffs'

21  pursuant to Rule 26.

22     9.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the

23  deposition testimony of Connie Hitt.

24     10.     Attached hereto as Exhibit G is a true and correct copy of excerpts from the

25  deposition testimony of Paula Martinez.

26     11.     Attached hereto as Exhibit H is a true and correct copy of excerpts from the

27  deposition testimony of Youa Xiong.

28     12.     Attached hereto as Exhibit I is a true and correct copy of excerpts from the

1    deposition testimony of William Lepowsky.

2         I declare under penalty of perjury under the laws of the United States of America that

3    the foregoing is true and correct and that this Declaration was executed on this ___4___ day of

4    August, 2008 at Fresno, California.

5                                                    _____

6                                                    William C. Hahesy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF WILLIAM C. HAHESY IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 10

# DECLARATION OF WILLIAM C. HAHESY
# IN SUPPORT OF
# MOTION IN LIMINE NO. 10

## EXHIBIT A

COPY

Christopher Ho, SBC No. 129845
William N. Nguyen, SBC No. 215259
The LEGAL AID SOCIETY --
    EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California 94107
Telephone: (415) 864-8848
Facsimile: (415) 864-8199

William J. Smith, SBC No. 056116
Melvin M. Richtel, SBC No. 056036
RICHTEL & SMITH
2350 West Shaw Avenue, Suite 132
Fresno, California 93711
Telephone: (559) 432-0986
Facsimile: (559) 432-4871

Marielena Hincapié, SBC No. 188199
NATIONAL IMMIGRATION LAW CENTER
405 14th Street, Suite 1400
Oakland, California 94612
Telephone: (510) 663-8282
Facsimile: (510) 663-2028

Attorneys for Plaintiffs
(additional counsel listed on following page)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

MARTHA RIVERA, MAO HER, ALICIA
ALVAREZ, EVA ARRIOLA, PEUANG
BOUNNHONG, CHHOM CHAN, BEE LEE,
PAULA MARTINEZ, MARIA MEDINA, MAI
MEEMOUA, MARGARITA MENDOZA, BAO
NHIA MOUA, ISIDRA MURILLO, MARIA
NAVARRO, VATH RATTANATAY, OFELIA
RIVERA, SARA RIVERA, MARIA
RODRIGUEZ, MARIA RUIZ, MARIA
VALDIVIA, SY VANG, YOUA XIONG, and
SEE YANG,

       Plaintiffs,

       v.

NIBCO, INC., an Indiana corporation

       Defendant.

No. CIV F-99-6443 AWI SMS

**PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES**

[Fed.R.Civ.P 26(a)(2)]

**EXHIBIT A**

Joannie C. Chang, SBC No. 187749
ASIAN LAW CAUCUS
939 Market Street, Suite 201
San Francisco, California 94103
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

Lisa Duarte, SBC No. 169750
MINAMI, LEW & TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
Telephone: (415) 788-9000
Faccimile: (415) 398-3887

PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES
Case No. CIV-F-99-6443-AWI

Page 2

Plaintiffs hereby designate the following expert witnesses in the above-referenced matter:[1]

    1.  Karen Dill Bowerman, Ph.D
        7405 North Paula
        Clovis, CA 93611-8331

Dr. Bowerman will provide testimony regarding general management and human resources management practices regarding layoff and/or termination; business necessity relative to terminations in this particular case; the relation of corporate losses to individual performance on the manufacturing floor; and general management practices in a multilingual workforce. Please find Dr. Bowerman's Rule 26 report attached as Exhibit A to this Designation. Dr. Bowerman will be compensated at a rate of $125.00 per hour for preparation and evaluation, and $245.00 per hour for deposition and trial testimony.

    2.  Roseann Dueñas González, Ph.D.
        825 E. Via Entrada
        Tucson, AZ 85718

Dr. González will provide testimony regarding the validity of the Z-level Test, as well as its underlying assumptions; the lack of relation between "English as a second language" courses either to the communication needs at the Fresno facility or to one's ability to pass the Z-level Test; the nexus between language and national origin; and the existence of non-discriminatory means of achieving any aims that the Z-level Test was asserted to have been intended to serve. Please find Dr. González's Rule 26 report attached as Exhibit B to this Designation. Dr. González's fees for report, deposition, and trial preparation are $125.00 per hour. Dr. González's rate for deposition and trial testimony is $150.00 per hour.

    3.  Earnest F. Harper, CSP, BCFE, DACFET
        11263 West Bodley Drive
        Boise, ID 83709

---

[1] Pursuant to an order of the Court dated September 17, 2002, plaintiffs do not now disclose experts who will testify with respect to the damages suffered by the plaintiffs, and such testimony is not addressed here.

1  Mr. Harper will provide testimony regarding whether plaintiffs' limited English proficiency

2  posed any health, safety or operational risk at the Fresno facility, and whether the Z-level Test

3  adequately measured any such risk. Please find Mr. Harper's Rule 26 report at Exhibit C to this

4  Designation. Mr. Harper's fee is $100.00 per hour for report preparation and $600.00 *per diem* for

5  deposition and trial testimony.

6

7                  4  William L. Lepowsky. M.A.
                   544 Santa Clara Avenue

8                     Berkeley, CA 94707

9  Mr. Lepowsky will provide testimony regarding whether the Z-level Test given by defendant

10  and other practices of defendant had a disparate impact based upon national origin and/or race which

11  adversely affected plaintiffs. Please find Mr. Lepowsky's Rule 26 report attached as Exhibit D to

12  this Designation. Mr. Lepowsky's fee for consultation, research, preparation, and travel is $175.00

13  per hour. Mr. Lepowsky will be compensated at a rate of $250.00 per hour for deposition and trial

14  testimony.

15                 5.  M. Peter Scontrino, Ph.D

16                   21832 S.E. 28th Street
                 Sammamish, WA 98075-7123

17

18  Dr. Scontrino will provide testimony regarding his determination of the validity and

19  reliability of the Z-level Test, and regarding the job analysis he conducted, and whether the

20  plaintiffs' performances on the Z-level Tests were valid predictors of their ability to perform A-level

21  jobs. Please find Dr. Scontrino's Rule 26 report attached as Exhibit E to this Designation. Dr.

22  Scontrino's fee for report preparation, deposition and trial testimony, is $250.00 per hour.

23

24  Dated:  March 14, 2003             Christopher Ho
                               William N. Nguyen

25                                 The LEGAL AID SOCIETY –
                                  EMPLOYMENT LAW CENTER

26

27                             William J. Smith

28  PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES          Page 4
   Case No. CIV-F-99-6443-AWI

Melvin M. Richtel
LAW OFFICES OF RICHTEL & SMITH

Marielena Hincapié
NATIONAL IMMIGRATION LAW CENTER

Joannie C. Chang
ASIAN LAW CAUCUS

Lisa Duarte
MINAMI, LEW & TAMAKI, LLP

By: _____
                CHRISTOPHER HO

Attorneys for Plaintiffs

## PROOF OF SERVICE

### VIA U.S. MAIL

I, Ann Blankenship, declare:

I am a citizen of the United States, over the age of 18 years, and not a party to or interested in the within entitled action, and further declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I am an employee of THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER, and my business address is 600 Harrison Street, Suite 120, San Francisco, California 94107.

On, March 14, 2003 I served the within

**PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES**

on all parties in said action:

X___ by placing a true copy thereof enclosed in a sealed envelope and causing it to be sent by U.S. Mail to the addresses listed below:

> **William Hahesy**
> **Sagaser, Franson & Jones**
> **2445 Capitol St., 2ᵈ Floor**
> **Fresno, CA 93717-1632**

I declare under penalty of perjury of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 14, 2003 in San Francisco, California.

ANN BLANKENSHIP

PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES
Case No. CIV-F-99-6443-AWI

Page 6

# DECLARATION OF WILLIAM C. HAHESY
## IN SUPPORT OF
## MOTION IN LIMINE NO. 10

# EXHIBIT B

*RE: RIVERA v. NIBCO, INC.*

# AN ASSESSMENT OF THE APPLICABILITY
# OF THE "Z-LEVEL TEST"
# IN THE NIBCO WORKPLACE

Prepared for

## The Legal Aid Society -- Employment Law Center, San Francisco

Report prepared by

Roseann Dueñas González, Ph.D.
Professor of English
Director, National Center for Interpretation
Testing, Research & Policy
The University of Arizona

March 14, 2003

EXHIBIT B

## 1.0   EXPERT STATEMENT

I am Dr. Roseann Dueñas González. I hold a Ph.D. in Linguistics and a master's degree in English as a Second Language from the University of Arizona (UA), where I am now a full Professor of English. Among the other positions that I hold, I am currently Director of the National Center for Interpretation Testing, Research and Policy (NCITRP) at the UA. NCITRP's mission is to help private and public agencies develop efficient and effective language policies and create appropriate language and interpreting services.

My areas of academic expertise are in sociolinguistics, language policy, language discrimination, English as a Second Language, second language acquisition, and language proficiency testing. I have been called upon many times to serve in the capacity of expert witness to answer questions of policy regarding interpretation and testing, as well as to evaluate and report to numerous courts on individuals whose linguistic competency was questioned. I also have extensive experience in applying psychometrics to test development, including item selection, the assessment of test validity and reliability, and job and linguistic analyses for employment related testing.

From 1979 to 2000, I was the primary consultant to the Administrative Office of the United States Courts (AOUSC), District Court Administration Division, on the subject of interpreter testing, policies, and practices. My doctoral dissertation, *The Design and Validation of an Evaluative Procedure to Diagnose the English Aural-Oral Competency of a Spanish-speaking Person in the Justice System*, became the basis of the 1979-2000 Federal Court Interpreter Certification Examination (FCICE). From 1985 to 2000, I served as the Director of the FCICE Project sponsored by the AOUSC under the auspices of NCITRP. This project is responsible for designing and implementing the statutory interpreter competency requirements for the Court Interpreters Act of 1978 (28 U.S.C. § 1827). As part of this mandate, FCICE developed the Federal Court Interpreters Certification Exam, a test that demonstrated outstanding reliability and validity in the face of legal challenges.

I have also served in various positions involving national language and educational test development, including as a consultant to the Educational Testing Service (ETS) with respect to the Graduate Record Exam (GRE), the Test of English as a Foreign Language (TOEFL), the Law School Admissions Test (LSAT), and the Scholastic Aptitude Exam (SAT). I have written numerous scholarly papers, reports, and books regarding the theory and practice of interpretation of foreign languages, the need for such services, and language discrimination. For a listing of my qualifications, the publications authored by me within the preceding ten years, and a list of cases in which I have served as an expert please see my curriculum vita, attached to this report.

Counsel for plaintiffs requested that I:

(1)  Assess the employees' language use on the job, in particular:

     a)  Describe the English used/required for carrying out lower-level manufacturing job duties in the NIBCO workplace;

    b) Examine NIBCO's business forms and workplace documents and determine the kind of reading and writing skills required for those employees to work with these documents;

(2) Examine NIBCO, Inc.'s practice of requiring limited English speaking, lower-level manufacturing employees to take written, paper/pencil examinations in English (the "Z-Level Tests") and record their answers only in English;

(3) Assess whether the Z-Level Tests were valid tests of English proficiency, and whether the tests bore a rational relationship to the English actually required of those employees on the job;

(4) Assess whether or not NIBCO's testing practice achieved the stated goals of ensuring business efficacy and workplace safety;

(5) Determine whether general English as a Second Language (ESL) training in community colleges or elsewhere in the community would help employees who failed the Z-Level tests learn the kind of English required by those tests;

(6) Examine the correlation between language and ethnicity/national origins (i.e., linguistic minorities);

(7) Describe the stigmatization and other harmful effects of language-based discrimination on individuals; and,

(8) Explore alternative methods that NIBCO could have used to satisfy its stated business purposes.

Before writing this report, I reviewed the following non-exhaustive list of materials:

- Plaintiffs' First Amended Complaint for Employment Discrimination
- Plaintiffs' Response to Defendant NIBCO, Inc.'s First Set of Interrogatories
- Answer of Defendant NIBCO, Inc.
- Defendant NIBCO, Inc.'s Initial Disclosures to Plaintiffs' Answer and Affirmative Defenses of Defendant
- Responses to Requests for Admissions, August 5, 2002
- U. S. Equal Employment Opportunity Commission Discrimination Charges for: Bee Lee, Chhom Chan, Peuang Bounnhong, Mai Meemoua L., Vath Rattanatay, Mao Her, Sy Vang, Bao Nhia Moua, Youa Xiong, See Yang, Eva Arriola, Paula Martinez, Maria Valdivia, Isidra Murillo, Maria Rodriguez, Maria Navarro, Maria Ruiz, Maria Medina, Margarita Mendoza, Alicia Alvarez, Ofelia Rivera, Sara Rivera, and Martha Rivera
- NIBCO Maintenance Apprenticeship Program (Training Documents)
- May 18, 1999 Letter *Statement of Position* from Thomas L. Eisele, Vice President, General Counsel & Secretary and Todd E. Grice, Assistant General

Counsel of NIBCO, Inc. to Deborah Randall, Equal Employment Opportunity Commission
- NIBCO – Fresno Plant Safety Program
- NIBCO Employee Handbook
- Z-Level Tests, Z – 1 through Z – 12 (Z-6 was missing), and Safety Quizzes
- Declarations of Anita Escamilla and Arthur Gonzalez
- Depositions of Alicia Alvarez, Eva Arriola, Eliseo Avitia, Peuang Bouunnhong, Steven Brunnengraeber, Randy Cates, Gregory Ceballos, Chhom Chan, Anita Escamilla, Michael Farrell, Margaret Franchi, Mao Her (Volumes I and II), Connie Hitt (Volumes I and II), Doug Kieper (Volumes I and II), Gary W. Ledbetter, Bee Lee, Paula Martinez, Henry Medina, Maria Medina, Mai Meemoua, Margarita Mendoza, Bao Nhia Moua, Isidra Murillo (Volumes I and II), Maria Navarro, Mark Rein, Sara Rivera, Martha Rivera (Volumes I and II), Ofelia Rivera (Volumes I and II), James Polian, Vath Rattanatay (Volumes I and II), Liduvina M. Robledo, Maria Rodriguez, Rachel Rodriguez, Maria Ruiz, Maria Valdivia, Sy Vang, Craig Vilhauer, Darcey Voyles, Gloria Jean Watson (Volumes I and II), See Yang, Xhue Yang, and Youa Xiong
- Completed or partial Z-Level Tests, Z-1 through Z-12 (except for Z-6) of Alicia Alvarez, Maria Anguiano, Eva Arriola, Peuang Bounnhong, Rosa Ceja, Chhom Chan, Maria Farias, Salvador Galaviz (Rehired), Mao Her, Bee Lee, Paula Martinez, Maria Medina (Rehired), Mai Meemoua, Margarita Mendoza, Bao Nhia Moua, Isidra Murillo, Maria Navarro, Martha Perez, Vath Rattanatay, Martha Rivera, Ofelia Rivera, Sara Rivera, Maria Rodriguez, Maria Ruiz, Maria Valdivia, Sy Vang, Mai Youa Xiong, Chao Yang, See Yang, Xhue Yang, and May Vongsing
- Compendium of NIBCO workplace documents
- Cyborg History Employee Profile for Chhom Chan, Eva Arriola, and Martha Rivera
- "P" Level Counseling Form for Maria Medina and Sara Rivera.
- Employee Performance Evaluations of Chhom Chan, Peuang Bounnhong, Mao Her, Bee Lee, Rosa Ceja, Paula Martinez, Maria Medina, Mai Mee Moua, Bao Moua, Margarita Mendoza, Isidra Murillo, Vath Rattanatay, Sara Rivera, Maria Rodriguez, Maria Ruiz, Sy Vang, Youa Xiong, Xhue Yang, See Yang.
- Safety Training Materials
- Wade Rain Employee Handbook, June 2001
- NIBCO Procedure Progression Maintenance Levels
- "A"-Level Entrance Test
- "A" and "P" Level Job Descriptions

Additionally, I participated in a site visit of NIBCO on May 3, 2001, and have reviewed the videotape taken of that visit. I also interviewed 23 of the Plaintiffs. Finally, I reviewed pertinent linguistic, language policy, social science, and other sociolinguistic and legal literature. A bibliography of the literature relied upon is contained in this report.

3

### 3.5.1    Use of Numbers and Color Codes to Obtain Necessary Workplace Information

Because of the nature of the work at the plant, numbers were relied upon to communicate about job related tasks, for example, part numbers, quantity of parts, and weight. Numbers are a universal language that any person, even a person with a limited education in a foreign language can understand. Workers in assembly, in particular, reported that they had little use for English or any other language in that their supervisors would give them a slip with the part to be done and the number of parts needed (Escamilla Deposition, pp. 91-92). Paula Martinez, who worked in assembly and molding, reported that she would separate items into various bags and would have to report numbers to a quality control inspector either orally or in writing. When she finished her molding shift, a test paper would be generated and hung on the machine for the next shift. She would take the test sheet with her during her shift, circle or record her numbers and then repost the sheet on the machine. Plaintiffs who operated machines described labeling machine panels with numbers in order to understand which button to push.

In addition to part numbers, colors were used to distinguish parts from one another. In many cases, the parts looked identical but functioned differently (e.g. different drip rates), and were thus color-coded. Workers had to understand what managers were saying when they said "blue" and then correctly identify a part as blue, but they did not have to write the word *blue*, except on the Z-test (Vilhauer Deposition, p. 191). Paula Martinez reported that she had to be very careful that a particular material was used in a particular machine. She would read the paper posted on a bin with a certain material and match the number with the correct material box. These boxes were color and number coded. She would not put in the material in the machine until she knew it was the right one.

### 3.5.2    Use of Demonstrations and Samples to Facilitate Understanding through Observational Learning

Observational learning is how many behaviors are learned among all human beings (Bandura, 1977). Consistent with this, NIBCO's limited English speaking employees also relied on observational learning to perform their jobs, observing supervisors, team leaders, or co-workers demonstrate a procedure or process using samples, diagrams, demonstrations and videos (Escamilla Deposition pp. 73, 112, 116; Vilhauer Deposition pp. 114-124).

Craig Vilhauer testified that very often, associates would know how to put the parts together because they could see how they went together without needing to read anything (Vilhauer Deposition, pp. 119-120). These employees would also look at samples of work that had been completed by other employees on a prior shift or earlier in the day. Through such processes, workers were able to complete their assigned tasks without proficiency in English. The assembly department also made diagrams or visuals because, according to Vilhauer, "visuals are always easier than reading", and "as far as putting a piece together it's easier to show someone then to write it down and have them read it." (Vilhauer Deposition, 113). Similarly, James Polian testified that he created "cheat sheets" to help employees learn how to access computer screens (Polian Deposition, p. 68).

Similarly, Sara Rivera related that a co-employee drew a machine's control panel for her and then showed her how to use it. Sara, in turn, trained other non-English, non-Spanish speakers. She would have the person follow her while she fixed something. Using hand signals she would tell him or her to do what she did. If the trainee did something wrong, she would step in and fix it having the novice watch her while she made the repair. Likewise, Sara reported that she effectively trained a monolingual English speaker through demonstration and by using a few English phrases such as *"Do this"*; *"Change"*; *"Stop"*; and *"Push the button."* Similarly, Margarita Mendoza communicated with an English-speaking co-worker using her hands (Mendoza Deposition, p. 45). Supervisors trained employees through gestures very well (Escamilla Deposition, p. 118).

### 3.5.3    Use of Interpreting

A common phenomenon among English speakers in a multilingual setting is to ask the speaker of a foreign language to interact with a second speaker of the same foreign language. In fact, employees stated that shifts were effectively set up by language, facilitating communication (Brunnengraeber Deposition, p. 84). Plaintiffs reported in their interviews with me that they were asked to translate or interpret for their co-workers in training new hires, training individuals in new tasks, and in safety meetings (Escamilla Deposition, p. 104). According to Maria Medina, Vina Robledo helped Maria's supervisor talk to the employees who spoke only Spanish and told them what they had to do on the job (Medina Deposition, Vol. 1 p. 31; Escamilla, p. 113). Maria Ruiz reported that the majority of the people she had to communicate with on a daily basis spoke Spanish.

### 3.6    Conclusion

The NIBCO workplace was essentially a manual labor environment that was non-language dependent. Job tasks were routine and limited in scope, and problems were predictable, thus making the need for language quite minimal, and the scope of language required quite limited. Communication was accomplished through a variety of means among culturally different employees. Employees relied on numbers, codes, colors, demonstration and visual observation of a sample to function effectively in their jobs and to learn new tasks.

### 4.0    PSYCHOMETRIC ANALYSIS OF THE Z-LEVEL TESTS DEMONSTRATES THEIR INVALIDITY FOR THEIR STATED PURPOSES

There is no evidence that NIBCO's Z-Level Tests were valid for the purpose for which they were intended. This is because, as explained in turn below:

1)    **Even though proper job skills and linguistic analyses for the jobs in question are essential preconditions to test validation, NIBCO conducted no such analyses. In fact, NIBCO relied on persons untrained in job testing to construct, implement, and score the Z-Tests.**

2)    As a result, the test items on the Z-Test bore no meaningful relationship to the job skills and no meaningful relationship to the reading and writing skills required in those jobs, and indeed were inherently skewed against limited English proficient workers irrespective of their actual job-related skills and knowledge;

3)    The choice of a 100% correct answer rate as the "cutoff" score for the Z-Test did not conform to standard psychometric practice.

4)    NIBCO chose to use its employees' scores on the Z-Test as a factor in selecting employees for layoff despite the fact that many of its most experienced employees were being terminated as a result.

5)    NIBCO failed to inform its employees about the consequences of failing the test.

6)    The Z-tests suffered from numerous other deviations from professionally accepted psychometric standards that only exacerbated their fundamental invalidity for their stated purposes.

The design, administration, and scoring of tests requires careful planning and competent preparation. Companies that use tests in the workplace to assess job performance must ensure that the tests are valid (the test measures what it was designed to measure for), reliable (the test consistently selects those who are proficient from those who are not), fair (it does not discriminate or exclude certain groups of test takers), and are presented in an accessible format (including consistent, valid, and accurate question styles, instructions, sample questions, guidance for preparation, and information on scoring). In addition, the tests should be designed and administered by experts or properly trained staff.

The general guidelines and standards of competent testing are established by several educational and other professional organizations, such as the American Educational Research Association (AERA), the American Psychological Association (APA), and the National Council on Measurement in Education (NCME) [hereinafter AERA *et al.*, 1999] and are observed in both educational and job performance related assessment. The observation of these standards is critical in high-stakes testing situations, because the inferences made from the test scores are used to make decisions that have long term effects on a person's life. Using tests in an occupational selection procedure— involving hiring, firing, promotion or demotion— qualifies as high-stakes testing situation.

The assessment of language proficiency in an employment setting is highly complex and should involve examination of the variety and complexity of productive (speaking, writing) and receptive (listening, reading) language skills used for the job. The level of proficiency required varies considerably, depending on the context in which the language is being used (Bachman, 1990). By all standards, however, it is clearly invalid to use a content examination (with content related to safety and other issues) to test for English proficiency, as is the case with the Z-Level Tests.

Though many testing instruments may superficially *appear* to be adequate for the desired purpose, "face validity" is the most superficial and least probative of the forms of test validity. According to one of the fundamental principles of testing and psychometric assessment:

> Adopting a test just because it appears reasonable is bad practice: many a "good looking" test has failed as a predictor [. . .] such evidence as this [. . .] is a strong warning against adopting a test solely because it is plausible. If one must choose between a test with "face validity" and no technically verified validity and one with technical validity and no appeal to the layman, he had better choose the latter (Cronbach, 1970, p.183).

Even if one can argue that the test instrument is proper because it appears to be "face valid," one must prove that the test is significantly related to the job in question in order to show its validity for its stated purposes. Such a demonstration of validity is not possible with the Z-Level Test.

## 4.1    Validity: General

Validity in a general sense refers to what the test measures and how well it does so. Validity is the most important consideration in the evaluation of a test, as it affects the appropriateness, meaningfulness, and usefulness of inferences made from test scores as stated in the Standards for Educational and Psychological Testing, jointly authorized by the American Educational Research Association, the American Psychological Association, and by the National Council on Measurement in Education (AERA *et al.*, 1999). In an occupational selection procedure, an invalid test is defined as one that is not related to the job under consideration and which may unfairly exclude employees who could have performed the job satisfactorily. There are two primary types of validity that will be discussed in this report: content and criterion-related validity.

### 4.1.1    Content Validity

The most important consideration in the evaluation of a selection procedure that purports to measure skills or abilities is its content validity, which is inextricably linked to criterion-related validity. Content validity refers to the extent to which a test actually discerns, or is specifically related to, the traits it was designed to measure. In the employment setting, evidence of this type of validity is established when the content domain of the test is significantly related to job specific knowledge, skills, abilities, traits, dispositions, and values. For example, in order to test the job-related skills of a court interpreter, one must isolate a skill, such as "the ability to interpret at the witness stand," and then create a section of an interpreting test that assesses the performance of that specific skill; in this case, asking the interpreter to perform a live witness stand interpretation.

Content-related evidence of validity involves the systematic examination of the test content to determine whether it covers a representative sample of the behavior domain to be measured. Furthermore, the behavior domain to be tested must be systematically analyzed to make certain that all major aspects are covered by the test items, and in the correct proportions.

13

Most importantly, "content validity is built into a test from the outset through the choice of appropriate items" (Anastasi, 1988, pp. 140-141).

### 4.1.2  Criterion-Related Validity

Criterion-related evidence of validity, like content validity, is another means of accumulating evidence about the overall validity of a test. Criterion-related validity is established when the test scores of a particular test like NIBCO's Z-level Tests are matched with an independent criterion or standard. This criterion or standard must have already been proven to have greater validity than the test being validated. The criterion can be another language test or a functional ability measure such as on-the-job performance (Ysseldyke, 1979; Finocchiaro & Sako, 1983). For example, to provide evidence of criterion validity for a court interpreting test involves assessing the interpreting accuracy of an interpreter who passed the test in a live performance in court. A high correlation between the test and the actual performance would provide evidence of criterion-related validity.

To establish the criterion-related validity of a test for employment purposes, a validation study must take place. The validation process involves four critical steps: (a) completion of a thorough job analysis to identify skills and characteristics needed to perform the job, (b) selection or development of a test instrument appropriate to the population and related to the characteristics defined in the job analysis, (c) establishment of a correlation between the test and the job's characteristics, and (d) determination of performance criteria that have predictive value as an indicator of job performance (Anastasi, 1988).

### 4.2  A Proper and Thorough Job Analysis and Linguistic Analysis are Essential to Test Validity

To establish either content or criterion-related validity for an employment selection procedure, a job analysis must be performed (AERA *et al.*, Standard 14.8, p. 160, 1999; APA, Standard 10.4, p. 60, 1985; Anastasi, 1988; 29 C.F.R. 1607.5 (C)(2) and 1607.14(C)). If a particular level of language proficiency has been proposed as a requirement for successful job performance, the job analysis must be supplemented with a systematic analysis of job-related language use.

When a test is used for employment purposes, the validation process followed must meet the most stringent standards. Standard 14.8 of the <u>Standards for Educational and Psychological Testing</u> establishes that

> Evidence of validity based on test content requires a thorough and explicit definition of the content domain of interest. For selection, classification, and promotion, the characterization of the domain should be based on job analysis (AERA *et al.*, Standard 14.8, p. 160, 1999).

To meet the above standard, a job analysis must be specific. A description of job duties is not sufficient. A proper job analysis should differentiate the job in question from other jobs, and effectively differentiate between better and poorer workers based on established criteria.

Additionally, a job analysis procedure calls for specialists working with a representative sample of job incumbents and supervisors to identify in a systematic process critical job features, including language skills, that are representative of the daily tasks, frequency estimates of certain job behaviors, and knowledge and responsibilities associated with the position. It should draw on a number of sources of information including, but not limited to, published sources, performance records, customer complaints, observations, and interviews with supervisors, job instructors, workers, and incumbents (Anastasi, 1988). Based on the job analysis, test specifications are determined which govern the format, modes, content, and complexity of the test. Consultation with a test construction expert is critical at this stage because the results of the job analysis will significantly influence the choice or construction of a test.

Without a proper, thorough, and expertly conducted job analysis, no test can achieve either content or criterion-related validity. Without a linguistic analysis, it is impossible to set a passing criterion on any test of requisite language proficiency, general or special use. Consequently, any selection procedure that is not based on job and linguistic analyses should be considered invalid at the outset.

### 4.2.1 NIBCO Did Not Conduct A Proper Job Analysis

Based on the materials I reviewed, it is clear that no appropriate job or linguistic analyses were conducted by NIBCO prior to its use of the Z-Level Tests.

The hasty drafting of the Z-Level Tests by NIBCO's personnel managers, plant supervisors, and plant manager did not meet the established standard of a thorough job analysis. A review of the resumes and deposition testimony of the NIBCO managers who were involved in their creation reveals that they had no professional training or experience as test developers or administrators (See Appendix M, Résumés of Kieper, Polian, Farrell, and Rosato; Vilhauer Deposition, p. 14;. Admission No. 9, in *Responses to Requests for Admissions*).

The Z-Level Tests did not accurately reflect the continuum of job-related tasks that plaintiffs and others in their positions performed daily. NIBCO did not offer any observational or field data that would provide evidence about the type or frequency with which certain job-related activities would be performed by someone in the job positions that Plaintiffs held. Without these critical data, it is difficult to develop a job profile that is representative of the positions in question.

In addition, NIBCO failed to perform an objective analysis of language samples taken from job-related materials or to observe on-the-job language interactions in order to determine the level and type of language proficiency actually required by the job. Because language use and proficiency can vary along many dimensions, observations across various language settings and contexts should have been performed (e.g., interactions with supervisors, team leaders, co-workers, and NIBCO managers). Then, the data accumulated from these multiple sources of information should have been analyzed, using either descriptive or inferential statistics.

None of the above-described steps of a job analysis were performed, nor was any expert consultation secured to inform the procedure conducted in-house by NIBCO. Not surprisingly,

as a result, these tests do not test content domains that are representative of the skills required for "A" and "P" level jobs. Both "A" and "P" level jobs at NIBCO require predominantly manual skills, like the use of certain equipment, accomplishment of specific task-related procedures (e.g., packaging, coiling, or molding), and some general areas (e.g., keeping the work station clean and organized, task related communication with associates, acting in accordance with rules of appearance, conduct, and safety). (See Sections 3.1, 3.2 and Appendix C). Based on my interviews with employees, depositions of supervisors, and my review of other discovery materials, I conclude that the Z-Level Tests do not test a representative content domain of the "A" and "P" level associates' jobs. The mismatch between the content of the job tasks and the test questions is examined in more detail in Section 4.3.

### 4.2.2   NIBCO Did Not Conduct A Proper Linguistic Analysis

Likewise, it is evident from an examination of the Z-Tests that NIBCO did not perform a linguistic analysis of plaintiffs' jobs that could have rendered those tests valid in that respect.

For a selection procedure to validly measure and be consistent with the language skills required for NIBCO associates' jobs, test content must reflect the linguistic tasks and complexity relevant to the actual practice of a person in such a position. Clearly, in NIBCO's case, a close link between test content and language required for the job was not established. Most importantly, NIBCO's tests are not valid English proficiency tests because they do not reflect how language is used in the workplace.

The Z-Level Tests were written at a level far beyond the level of minimal English proficiency required for carrying out the day-to-day language tasks and functions of NIBCO "A" or "P" level associates. (For a detailed linguistic analysis of the English proficiency levels of job requirements and the test questions, see Appendix Q).

More importantly, the tests did not test oral communicative skills, despite the fact that this was a primary basis of the NIBCO's asserted complaints about the Plaintiffs' lack of English proficiency. Peuang Bounnhong's comments at her interview sum up the inadequacy of this type of testing conducted by NIBCO: "I have trouble with reading." Peuang Bounnhong's comments also reveal that the Plaintiffs' listening comprehension was sufficient for performing a variety of jobs: "When they sent me to different jobs, they tell me. First time, I understand. So many new jobs."

The testing of reading and writing skills in the Z-tests did not reflect – either from a content or criterion validity point of view – the linguistic and communicative nature of the work NIBCO employees were required to use on a daily basis. A more detailed analysis of the lack of correspondence between the type and level of English proficiency required by the Z-Level Test, on the one hand, and that actually required by plaintiffs' on-the-job duties at NIBCO, on the other, appears in Section 4.3.

### 4.2.3   NIBCO Used Untrained Personnel to Develop, Implement, and Score Tests

All of the Z-Level Tests were clearly created by persons who lacked knowledge about or experience with test development and administration. A review of the résumés and deposition testimony of the NIBCO managers who were involved in their creation reveals that they had no professional training or experience as test developers or administrators (See Appendix J, Résumés of Kieper, Polian, Farrell, and Rosato) (Vilhauer Deposition, p. 14).

The fact that native speakers of English failed these tests initially should have alerted NIBCO that the level of language was too complex (See Kieper Deposition, p. 468). The additional fact that long-term employees with good performance records, regardless of the fact that they were limited English speakers, were failing these tests should have prompted NIBCO to abandon this type of testing altogether. Yet, these warning signals were ignored by the NIBCO personnel who were responsible for the Z-Test. These practices are empirically invalid and unacceptable under any circumstances and violate rudimentary linguistic, sociolinguistic, and professional testing precepts (AERA, Standard 2.10, pp. 33-34, 1999; Bachman & Palmer, 1996; Bachman, 1990).

### 4.2.4. Conclusion re Absence of Job and Linguistic Analyses

NIBCO's failure to conduct proper job and linguistic analyses to match the knowledge, language, and other skills and abilities of the categories of "A" and "P" level positions is abundantly reflected in the lack of correspondence between the content domain of the Z-Test with the actual work behaviors required for successful job performance (see Section 4.3). As a result, the scores from the Z-Level Tests are meaningless and invalid. In bypassing the essential job and linguistic analyses, NIBCO failed to establish a relationship between the job skills and either the test content or a relevant criterion measure. The obtained score only represented the candidates' ability to take these tests -- not their ability to carry out the substantive job and linguistic skills associated with their positions. Therefore, the tests were inherently skewed against limited English proficient workers irrespective of their actual job-related skills and knowledge.

### 4.3    Analysis of Z-Tests: Non-Correspondence vs. Actual Linguistic Requirements of Job Performance

A comparison of NIBCO workplace forms and documents used in the plant by "A" and "P" Level Associates and the Z-Level Tests reveals a complete lack of correspondence in terms of content, linguistic complexity, and character of language tasks (See Section 3 and Appendix Q for detail). Most importantly, the reading and writing required to complete these tests and quizzes differed significantly in terms of context, purpose, function, and task relatedness, from the reading and writing Plaintiffs routinely performed as part of their job tasks. Sections 4.3.1 and 4.3.2, below, describe the differences between the reading and writing tasks of the workplace in contrast to the Z-level tests.

### 4.3.1 Reading Tasks on Test vs. in the NIBCO Workplace

### A. Comprehending NIBCO Workplace Documents

17

For all intents and purposes, NIBCO's "A" and "P" level associates are not required to "read" in English, except in a very limited, very contextually-dependent sense—reading (or recognizing) single words, numbers, or short phrases usually arranged in tables or columns. Appendix Q provides a detailed description of the readability analysis I conducted of NIBCO's workplace documents. Based on this analysis, I concluded that NIBCO's job-related documents were task-oriented, non-abstract, and were always used in the context of specific tasks (See Appendix Q for more detail).

Successful reading and comprehension of these kinds of texts is contextually and situationally dependent. That is, a large part of comprehension depends on the reader's understanding of the use and function of the document in the context of the workplace. Also, assuming the context of the workplace helps the reader to select the information that requires attention, or sometimes action (e.g., the number of items that were scrapped) from the information that is marginal (e.g., the date the order was placed). The successful reading and comprehension of such non-linear texts involve judging how carefully to read and how much time is required. For example, a Product Quality Plan (PQP) document can be read at a glance just for checking for the color, size, or other parameters of the product a worker is working on. As this example illustrates, NIBCO's associates depended on context, purpose, function, and task relatedness when "reading" documents, and not simply on linguistic competence of abstract language.

## B. Comprehending NIBCO's Z-level tests required more abstract, non-situational reading skills that were far beyond the level necessary for competence in the workplace.

The nature and complexity of reading tasks and language features contained in NIBCO's Z-level Tests differ significantly from those of workplace documents. NIBCO's Z-level tests contain linear texts that required the reading of every word in order to comprehend the meaning of the whole. For limited English speakers who may have recognized the few words of memorized work jargon required to comprehend a NIBCO work document, reading an entire sentence or set of sentences goes far beyond their English comprehension. In a linear text, every sentence plays some role in the meaning of the whole.

Additionally, the Z-level tests contained questions that were not grounded in the understanding of a work task or the familiarity of a form that they had memorized. The language is more abstract, less contextually dependent, and therefore more difficult. In addition, unlike the documents that NIBCO associates routinely read on the job, the Z-level tests lack explicit purpose, function, and their meaning cannot be derived from the nonverbal tasks and procedures that are inseparable from the text. Note the following example taken from Z-level Test Z-7: *"Associate Handbook: At what number of points is an associate terminated for attendance?"* This sentence contains the following terms: number of points, associate, terminated, for attendance, which are abstract, complex, and difficult technical terms and structures that are usually used in administrative registers, not usually heard in everyday colloquial speech.

In addition, they are abstract because they are detached from any meaningful function or context. In contrast, in the Plaintiffs' job environment a similar meaning would be communicated by pointing at a machine part, product, or material, and pronouncing the name or code term. This

18

way, limited English speakers could create a direct and concrete relationship between a name or label and a functional object. They understood that the name or label "stands for" the machine part or product by using it in meaningful contexts and for meaningful purposes: For example, they knew that a certain number of the labeled part needed to be cut, or they knew that the dysfunction of a machine part needed to be reported; they knew that know how to fill out a production tag when they completed production,, etc. In comparison, asking an abstract question regarding "the purpose of a production tag" or "how much notice" needs to be given before a shift starts was not something that the associates encountered on a daily basis, and it was not even clearly demonstrated that knowing the name of this organizational unit would have improved plant safety.

### 4.3.2. Writing Tasks on Test vs. Writing Tasks Required of "A" and "P" Level Associates in the NIBCO Workplace

#### A. Writing Tasks Required for NIBCO Jobs

The writing tasks on these jobs comprised recording numbers and codes. Even supervisory duties did not entail much writing beyond filling out forms with names and limited work-related, memorized jargon. It essentially involved only providing relevant and often non-verbal pieces of information (numbers, codes, time, brief problem descriptions) (See Section 3 and Appendix Q for a full discussion of workplace documents).

#### B. Writing Tasks Required in NIBCO *Z-level tests*

In contrast, many test items on NIBCO's Z-level tests were open-ended questions that required understanding an open-ended question and then composing a coherent answer in complete sentences. For example, the question *What should you do if you are injured at work?* (Z-level Test 1, Safety, Exhibit B) requires an answer that organizes information in a certain logical sequence and expresses it in coherent sentences. "Composing" full answers to open-ended questions on Z-level tests far exceeded the level of language proficiency and the kind of writing tasks required on the job. Thus, it is a far more complex task than what workers routinely performed.

### 4.3.3. Consequently, there is no match between the reading and writing tasks of the *Z-level tests* and the minimal and radically different kind of reading and writing required on the job.

By comparison, NIBCO's entry-level tests for "A" level associates primarily tested manipulation, reading, and writing of numbers, which is in accord with the findings of my linguistic analysis of the NIBCO workplace and documents (See Appendix F). The "A" level associate tests are not without their problems, but they at least more accurately reflect the functions that these employees engaged in on a day-to-day basis. In this way, they are superior to the Z-level tests, which bear no rational relationship to the job tasks required of an "A" or "P" level associate.

### 4.3.4    The Z-level Tests are Invalid Because They Address Issues of Safety and Production as if They Required <u>Declarative</u> Instead of Procedural Knowledge

For a test to be job-related and therefore valid, it must measure the cognitive skills relevant to successful job performance. The Z-level tests failed to distinguish between two distinct cognitive tasks: those requiring declarative vs. procedural knowledge. Declarative knowledge is a term in cognitive psychology used for knowledge that can be verbalized. This knowledge allows us to be able to explain how we do things. Procedural knowledge, on the other hand, is mostly automated or subconscious. It includes our ability to proficiently carry out complex operations or respond to recurrent situations. The Z-level tests only tested declarative knowledge, despite the fact that the job tasks only required procedural knowledge.

Safety issues and competent performance of the jobs typical in the NIBCO plant required procedural knowledge. This means that the associate needed to know what to do at all times and especially under circumstances that may have jeopardized their safety or product quality, but they did not need to be able to explain or discuss in elaborate detail what they were doing. For example, they needed to wear safety glasses at all times and places where their eyesight might be at risk, but knowing how to write an essay about the rules and conditions of wearing safety glasses is another kind of knowledge that has little connection with job safety. A person can write an articulate description of the reasons why safety glasses are important, but if that same person is not wearing safety glasses at the right time and in the required place, his or her eyesight is still in danger.

While declarative knowledge is transferred through verbal learning (reading, listening, writing, and speaking), procedural knowledge can be passed on in alternative ways that do not require extensive verbalization. Most rules, regulations, and procedures can be taught by modeling or shown on videotape. A good example of such instruction is what we experience as passengers on airplanes. Emergency procedures are communicated through pictures, through the air attendants' demonstration, on video, or all three. Operators of airlines have developed these methods for reasons that similarly apply to NIBCO's conditions: They are aware that, especially on international airlines, it is hard to use a language in which everyone is equally proficient. Moreover, they also know that in an emergency situation it is more efficient to rely on visual memory (remember to put on your oxygen mask before you apply it to a child) than on verbal information (being able to reproduce in words what needs to be done).

See Figures 1 and 2, at the end of this report, for tables illustrating the mismatch between these two forms of knowledge as represented in NIBCO associates' work experience and in the tests and quizzes meant to assess that knowledge.

### 4.4    Arbitrary Scoring by NIBCO:  *"Passing"* Scores Should Bear a Rational Relationship to the Level of Skill to Be Determined by the Test and Should Be Ascertained By a Qualified Professional

Setting a passing criterion for a given level of job skills and language proficiency needed for a job must be based on a job analysis that includes linguistic analysis of the nature, topics, and complexity of the language tasks used on the job. A pilot study involving actual on-the-job

related linguistic tasks with an appropriate sample of candidates and incumbents should also be conducted. The results of the linguistic analysis and pilot study, in combination with expert opinion, would form the basis for a legitimate minimal proficiency score (APA, 1985, Standard 6.9, p. 43). According to Standard 14.7, "[I]f tests are to be used to make job classification decisions…evidence that scores are linked to different levels or likelihoods of success among jobs or job groups is needed" (AERA *et al.*, Standard 14.7, p. 160, 1999).

The scoring used by NIBCO was arbitrary and the process for determining scoring was not based on any empirical evidence. Associates were required to pass the Z-Level Tests with 100% of the items correct (See Appendix C). Not only is this "perfect scoring" standard inappropriate and unsound, but it does not even account for test bias/error related to poor item design and construction (See Appendix M). Typically, in the employment setting, passing scores for high-risk occupations is set at a reasonable cut-off, often at 80%. (Bachman & Palmer, 1996; Barrett, 1996; Anastasi, 1988; Ebel & Frisbie, 1986; The National Center for Fair and Open Testing).

NIBCO neither developed nor sought assistance from linguistics or testing experts to elucidate the test scoring procedures. Most importantly, NIBCO concedes that it does not know the precise level of English proficiency their associates need to have in order to perform their jobs. See Appendix I, and Responses to Interrogatory Questions #8, #89, & #176.

Without competent test administrators, and without appropriate pilot or benchmark studies to concretize the scoring, NIBCO's test scoring was uninformed and non-uniform. The scoring became a completely subjective matter in which there were no controls to guard against rater bias. NIBCO could not produce answer keys for any of its Z-Level Tests nor could the NIBCO managers relate the scoring philosophy underlying the tests. One deponent said that he thought that 100% of the items had to be correct in order to pass; a second deponent said he thought an individual could miss one or two questions and still pass; other deponents had no idea whatsoever. Any layperson approaching this task would naturally be inclined to select an optimal linguistic level rather than a minimal level. The idea of having the employer "choose" its own proficiency score like a flavor in an ice cream shop is not only methodologically unsound, but patently unfair to potential job candidates who are unfairly screened on the basis of an invalid test and arbitrary passing score.

## 4.5    Test Failed to Differentiate between Qualified and Non-Qualified Workers

The most relevant sources of validity data are test scores themselves. Evidence of the test's validity for testing job-related knowledge would have been that all workers, including limited English speakers, with meritorious job performances would have passed the test. That a large number of outstanding but limited English speaking associates failed the test should have alerted NIBCO that their testing instrument was flawed. There were no demonstrable production problems because of limited English proficiency (Brunnengraeber Deposition, p. 325). As was previously discussed in Section 4.2.3, these warning signals were ignored by the NIBCO personnel who were responsible for the Z-Test. These practices are empirically invalid and unacceptable under any circumstances and violate rudimentary linguistic, sociolinguistic, and professional testing precepts (AERA, Rule 2.10, pp. 33-34, 1999; Bachman & Palmer, 1996; Bachman, 1990).

**4.6    NIBCO Did Not Inform its Employees about the Consequences of Failing the Tests**

An additional major problem with the Z-Level Tests is that NIBCO failed to provide fair information to its associates about the consequences of passing or failing.

NIBCO misled its associates about the consequences of its testing when, during the initial tests, it advised workers that they could simply sign the test. NIBCO advised workers that "they did not need to worry about the test," that "there wouldn't be any problems even if we didn't pass this test" (Medina Deposition, p. 109), and that they would keep their job whether they passed or failed (Mendoza Deposition, p. 125). Consequently, out of the 27 test takers, 19 took the option of signing the test. This percentage suggests that workers had good faith in NIBCO's promise that this would not be held against them. This is of particular concern with respect to any "high-stakes" testing situation, such as was the case here, where plaintiffs were subject to layoff based on their test performance (Bachman & Palmer, 1996; Bachman, 1990). NIBCO's failure to fully inform its workers violates two relevant professional test development standards:

Standard 8.1: Any information about test content and purpose that is available to any test taker prior to testing should be available to *all* test takers.

Standard 8.2: Where appropriate, test takers should be provided, in advance, as much information about the test, the testing process, the intended test use, test-scoring criteria, testing policy, and confidentiality protection as is consistent with obtaining valid responses. (AERA *et al.*, p. 86, 1999)

**4.7    Additional Psychometric, Linguistic, and Administration Problems with NIBCO's Z-Level Tests**

NIBCO's Z-Level Tests are also infirm because, in addition to lacking validity, preliminary job analysis, and competent scoring, they are poorly constructed in several other areas as well. Examples of these problems include, but are not limited to: (a) mixed format; (b) lack of instructions; (c) ambiguous, vague, misleading or grammatically incorrect questions; and (d) inconsistent and arbitrary administration. A more detailed analysis and description of these problems is presented in Appendix M.

**(a) Mixed Format:** Standard practice in testing requires that tests be written in a consistent and understandable format. For example, mixing: a) true or false questions[1]; b) open-

---

[1]    E.g., *"T or F: Safety glasses need to be worn in all area's* [sic] *of the manufacturing plant at all times?"* [sic] [Z-level test 1, Question 3]

ended questions[2]; and c) multiple choice items[3] in the same testing instrument is not advisable and contributes to test error/bias.[4]

**(b) Lack of Instructions:** None of the Z-tests included clear and concise instructions on how the questions need to be answered (e.g., in complete sentences, or by circling the letters T or F in true or false questions, etc.), how much time is allowed to complete the answers, or how the answers will be scored. Mr. Vilhauer did not recall the criteria for passing at either the "A" or "P" levels (Vilhauer Deposition, p. 1999).

**(c) Ambiguous, Vague, Misleading or Grammatically Incorrect Questions:** Many questions are worded in vague language, or in a way that is more likely to confuse the test taker than to elicit useful knowledge: (e.g., *Why is [sic] important to make sure that the information is accurate?* (Z-level test Log and Reporting Daily Production Z-5). This question is ambiguous because it is grammatically incorrect: Why is what important? Especially for limited English speakers who have trouble compensating for grammatical and structural errors, the question would have little meaning.

Many of the items written in the True/False format seem to be a play on words rather than a choice between an all true or all false statement. This tends to trick the test taker about definitions rather than encourage the learning of information vital for the employee's safety. In addition, many questions contain grammatical errors or faulty punctuation (See Appendix M for examples).

**(d) Inconsistent and Arbitrary Administration:** My interviews with the Plaintiffs revealed that the tests were often administered in an inconsistent and arbitrary manner. For example, the test asked for information about the location of machines that had been moved without Mai Meemoua's knowledge. In other cases, NIBCO used the test results in an arbitrary manner. For example, Plaintiff Maria Medina was terminated after she failed NIBCO's tests three times. However, after two months, NIBCO requested that Ms. Medina return to attempt the tests again. When she came back, Administrative Manager Connie Rosato explained to her the

---

[2]    E.g., "*What* [sic] *associates are allowed to drive a forklift?*" [Z-level test 1, Question 2]

[3]    E.g., "*If you are asked to do a job that you feel is unsafe* [sic] *you should: a. Keep working until a supervisor walks by. b. Go home. c. Stop what you are doing and notify a supervisor immediately.*" [Z-level test 1, Question 4]

[4]    The inclusion of open-ended questions is particularly problematic because they require extended written response. While a True or False statement only requires understanding of the statement and marking it as True or False, an open-ended question, like *What should you do if you are injured at work?* requires organizing the response in more logical or sequential order, and presenting it in grammatically well-formed sentences. Extensive use of English literacy skills as the above is not only not required for Plaintiffs' successful job performance, but is most likely to be beyond their level of education. While these employees may not be able to write in well-formed English prose about the importance of wearing safety glasses in certain areas of their workplace, they certainly can demonstrate their understanding by their actions. (See discussion of procedural and declarative knowledge in Section 4.34). With regard to having the associates write all their answers in English, Peuang Bounnhong reported that everyday the extent of her writing was to sign and date preprinted work order reports. Materials produced were simply check-marked on the preprinted forms. When asked if any particular written materials were used to design the tests, Mr. Vilhauer reported that he didn't recall being given any direction in terms of developing questions (Vilhauer Deposition, pp. 197-198). Therefore, requiring associates to respond to test questions in writing was not a demonstration of an essential job-related task. If writing were to be a focus of English proficiency testing, the type of writing performed on the test should have borne a rational relationship to the actual work performed.

# DECLARATION OF WILLIAM C. HAHESY
## IN SUPPORT OF
## MOTION IN LIMINE NO. 10

## EXHIBIT C

**Supplemental Report**
**in the matter of**
*RIVERA V. NIBCO*

**Dr. Roseann Dueñas González**
**July 7, 2003**

Introduction

In their reports, Dr. Barrett and Mr. Burnias fail to provide an accurate picture of either the validity of the Z-level tests, or of the use and costs of interpretation and translation. This supplemental report will outline the serious flaws in their presentations and will offer clarification and supplemental evidence to the court.

Throughout his report Dr. Barrett demonstrates his lack of linguistic and sociolinguistic expertise in his analysis of the testing evidence and language issues related to this case. Because his methods are flawed, his analysis fails to make the key point: that the Z-level test could not possibly be a valid test of job skills as it was created by persons unqualified to do so, and required a level of English far beyond what the job, in reality, requires. In his report, Dr. Barrett ignores best practices in content validity analysis. He mistakes the language proficiency issues in NIBCO for literacy problems. He oversimplifies data, and as a result, draws conclusions that are insupportable. He ignores relevant data and does not use the proper documents in his readability analysis. Dr. Barrett evidently also relies on his own notions about this population rather than credible evidence, data and professionally required studies. Moreover, he ignores the *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, and National Council on Measurement in Education, 1999 [AERA *et al.*, 1999) and other professional and legal testing standards regarding high-stakes employment testing of limited and non-English speakers. In sum, Dr. Barrett fails to inform the court of all of the critical issues in this case.

Mr. Burnias' analysis also fails to properly address the actual issues at stake in this case. Aside from not being fully qualified to provide expert testimony on the issue of interpretation and translation costs, Mr. Burnias ignores the historical record regarding the use of in-house personnel for translation and interpretation, and he also uses faulty methodology to arrive at vastly inflated price estimates.

Sections I to VII addresses the weaknesses in Dr. Barrett's arguments particularly his failure to supply the court with any evidence of the test's content validity and his fatally flawed linguistic analysis. Section VIII addresses the weaknesses in Mr. Burnias' report focusing primarily on his misleading conclusions about translation and interpretation costs and interpreter and translator usage by businesses. Much of the discussion about false conclusions in Mr. Burnias' report regarding the use of employees as interpreters and translators by businesses also applies to Dr. Barrett's report as well

**EXHIBIT C**

1

behaviors."[3] Dr. Barrett's *post hoc* linkage chart cannot and does not prove that NIBCO personnel considered the actual task of each job their employees performed prior to tests items being developed. Dr. Barrett's production of the chart actually proves that this evidence never existed before, during, or after Z-level testing was conducted by NIBCO and, therefore, was never taken into consideration in the test development process.

In conclusion, an indirect measure of the construct of interest is never as powerful as a direct measure. There is no need for a proxy, in this case a test of English proficiency (the Z-level tests), when there are abundant direct measures available to make determinations about the job knowledge that an employee possesses. There was no need to develop a culturally biased instrument, when non-culturally biased measures were available.

B.  *Content validity: The definition excludes Dr. Barrett's analysis*

There are many common sense approaches to determining the correct form of validation to select when trying to determine which validation strategy is best in any particular situation. Burns (1996) describes two such common sense approaches to deciding whether or not to use content validation strategies.

The first consideration in deciding to use content validity evidence to support a job relatedness claim is to apply the 'same as' criterion: the test content must be the same as the job domain....[4] Otherwise, empirical evidence must be added.... [I]n deciding whether using a test can be supported by content validity you might apply my rule-of-thumb — if you could use the test as part of an incumbent's performance evaluation, then it is probably content valid. For example, if the job description for a typist sets an expected typing speed, then administering a typing test as a performance measure might be justified but administering a mental ability test would not be appropriate. (p. 45).

---

[3] Dr. Barrett himself refers to this section of the *Uniform Guidelines* on page 64 of his Report, 2003.

[4] If the exam is a knowledge test, then the knowledge domain must match the job knowledge domain to ensure job-relatedness or provide evidence of content validity. Of course, the language of the test takers must also be taken into consideration. NIBCO and Dr. Barrett failed to take into account the language of the Z-level tests as well as the level of language that should have been tested. As Anastasi (1988, p. 167) notes: "For the proper interpretation of a validity coefficient, attention should also be given to the form of the relationship between test and criterion....[S]pecial circumstances may alter this relationship, and the test user should be alert to such possibilities. For example, a particular job may require a minimum level of reading comprehension, to enable employees to read instruction manuals, labels, and the like. Once the minimum is exceeded, however, further increments in reading ability may be unrelated to degree of job success." Thus, knowledge tests do not test job domains, rather they sample knowledge. To accurately measure the knowledge of limited and non-English speakers, other means are necessary such as translating the test into the native language or use of non-verbal performance measures. The aforementioned examples are valid methods that can be used to reach conclusions about the "knowledge of the job" these special test takers possess. Use of a knowledge test is still determined by a job analysis (Burns, 1996, p. 44).

6

since he made similar erroneous statements. Finally, Section IX offers additional evidence for the court that NIBCO had less discriminatory alternatives available to assess job skills.

I.    The Z-level tests were not designed by qualified experts and the test development process did not follow accepted guidelines

A.  *NIBCO personnel who developed the tests are not subject matter experts*

Dr. Barrett's argument that the Z-level tests were content-valid relies on his disingenuous characterization of personnel in leadership/supervisory positions as "subject matter experts (SMEs)" (Barrett Report, 2002, p. 11). Dr. Barrett's blanket statement is not supported by the record. Only in the narrowest and incomplete sense could the item writers be called "subject matter experts," because those individuals fulfilled only one function in the test development process. Their primary responsibility was to inform the test development team about what job incumbents actually do on the job. However, because they were human resource managers, plant supervisors, and the plant manager, their collective experience was not representative of the work plaintiffs performed. Of the alleged SMEs, only one of them, James Plain (Deposition, pp. 193-194), may have had some direct experience in the job(s) that plaintiffs performed, and he worked on only one of the Z-level tests. More importantly, these personnel had no real qualifications to describe the language requirements of the job (See González Report, 2003, Section 4.2.3). Furthermore, nowhere in Dr. Barrett's report is there evidence of the allegedly "careful" test development process that the "subject matter experts" undertook to construct the Z-level tests.

B.  *NIBCO personnel who developed the tests did not follow accepted test development guidelines*

Not only were the test item writers not true "subject matter experts," they also failed to follow the prescribed test development guidelines (AERA *et al.*, 1999) to document evidence of a test's content validity. "Content knowledge" alone does not ensure the creation of a valid and reliable test (*Uniform Guidelines on Employee Selection Procedures*, 1978; Anastasi, 1988).[1] Absent from the group was someone who possessed expertise in test design, psychometrics, and test development and administration (Seberhagen, 1996). Neither is there any indication that NIBCO sought such advice or expertise while drafting the Z-level tests. A properly constituted expert

---

[1]The Equal Employment Opportunity Commission (2003), the Civil Service Commission, the Department of Labor, and the Department of Justice jointly have adopted a uniform set of principles on the question of the use of tests and other selection procedures. These guidelines assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin.

panel should have included test development experts, a linguist, and individuals familiar with the content of the job. Had all of these individuals been on a testing team, then the term "subject matter experts" could be appropriately used.

Standard 9.8 of the *Standards for Educational and Psychological Testing* (AERA *et al.*, 1999) and its comment provides guidance in this case:

> **Standard**: In employment and credentialing testing, the proficiency level required in the language of the test should not exceed that appropriate to the relevant occupation or profession.

> **Comment**: ...However, the level of language proficiency required on the test should be no greater than the level needed to meet work requirements. Similarly, the modality in which language proficiency is assessed should be comparable to that on the job. For example, if the job requires only that employees understand verbal instructions in the language used on the job, it would be inappropriate for a selection test to require proficiency in reading and writing that particular language.

This is the guiding test development principle in this case: an employment test cannot test for language proficiency in any modality when it is not a part of the job, and if it is part of the job then it can only be tested at the level necessary to perform the job. As is documented in detail in my report, these alleged "subject matter experts" did not follow any of the procedures for establishing a test's content validity including the above principle (González Report, 2003, Section 4). Conspicuously absent from Dr. Barrett's report is any discussion of how the alleged "subject matter experts" produced the mandatory job analysis required to be done prior to writing test items, documented the process undertaken to assure the content validity of the test, documented any evidence of concurrent validity, linked the theoretical cognitive abilities to be measured, with actual job behaviors and test items, developed a job description to be used in determining appropriate test content, examined and revised the test and test items for obvious test bias features such as its linguistic readability level, measured the actual language spoken, written, and comprehended by the test takers, and any other necessary and important aspect of test development that is indicated by professional standards.

Finally, Dr. Barrett does not discuss the fact that it is an established testing validation practice to evaluate and modify a test that has been developed for one purpose before it is applied to a new testing situation (AERA *et al.*, 1999). The tests were originally created to screen out potential job applicants (and would have had the same discriminatory impact on limited and non-English speaking applicants as it had on existing employees). NIBCO then imposed a pre-employment selection device on existing employees to allegedly measure job knowledge for purposes of promotion, demotion or termination. Furthermore, NIBCO applied this "pre-employment screening device" to a wide-range of NIBCO employees including supervisors and upper

3

management personnel for which the tests were not normed nor intended. Knowing these facts should have led Dr. Barrett to question some of NIBCO's testing decisions, but he chose to ignore all of this pertinent data.

II.    Dr. Barrett fails to provide evidence that NIBCO even attempted to assure the content validity of their tests at the time they were designed

Dr. Barrett's *post-hoc* attempt to validate the Z-level tests reveals several serious flaws in NIBCO's test development approach and, ultimately, in the Z-level tests. In an effort to demonstrate content validity, Dr. Barrett produces a chart (Barrett Report, 2002, p. 66) allegedly making the connection between the Z-level tests and a set of job descriptions more comprehensive than those that were in existence at the time the Z-level tests were developed.[2] Thus, it is clear that NIBCO did not use the same job descriptions in developing the Z-level tests that Dr. Barrett relied upon in his analysis. There is no doubt that a chart similar to the one generated by Dr. Barrett should have been constructed prior to the writing of the Z-level test items. The fact that Dr. Barrett attempted to generate one after the start of litigation calls attention to errors that NIBCO committed in developing its tests by failing to begin the process with a sound job analysis.

A. *Dr. Barrett fails to make the required connections between the test items and job tasks*

Because the job analysis was not conducted prior to the development of the test and Dr. Barrett had to rely on a *post-hoc* analysis, Dr. Barrett's (Barrett Report, 2002, p. 66) connections between the job description behaviors are vague and only linked to abstract theoretical constructs or ill defined tasks (e.g., "comprehend and execute work instructions accurately") that bear little resemblance to the actual job tasks. In an empirically sound job analysis, what would have been most important is to connect the actual job behaviors or representative samples to the actual test items. That is, the testing team would begin with the job samples or representative job behaviors then correlate them to the theoretical construct of interest, then link the theoretical construct to specific testing items and then select a testing format. For example, if the work behavior of interest is "comprehend the supervisor, lead, or co-worker," then instead of just listing

---

[2] Best practices in content validation of employment testing devices calls for marshalling evidence on job-relatedness through a job analysis study prior to the development of the test. Failing that, as NIBCO clearly did, a *post-hoc* validation study would include documentation of evidence showing either criterion-related validity, content validity, or construct validity; or documentation from other studies showing the validity of the selection procedure in the user's facility; or documentation of evidence showing why a validity study cannot or need not be performed and why continued use of the procedure is consistent with Federal law (EEOC *Uniform Guidelines*, 29 C.F.R 1607.15(3); also see AERA *et al.* (1999), Standard 14.1). Dr. Barrett did not comply with these standards. As a result, his validation analysis itself is fatally flawed.

4

job functions, test developers would want to separate out different tasks to be measured within the job duties. Had the final connection to the actual job behaviors of interest been made prior to item writing, it would have been clear that the use of a paper-pencil exam was not necessarily the best method to assess job performance.

Other entries on Dr. Barrett's (Barrett Report, 2002, p. 66-70) chart are also suspect. Examples of other amorphous concepts include but are not limited to: "complete production reports" (p. 66); "adhere to all NIBCO Health, Safety, and Environmental policies" (p. 66); and, "[r]esponsible for grinding runners and scrap" (Barrett Report, 2002, p. 67). For example, the entry "complete production reports" in Dr. Barrett's chart raises the following, as well as other, questions:

- Is oral reporting to a supervisor acceptable for fulfilling this job requirement?
- Is there writing required? If so, what type of writing will satisfy the requirement?
- Is reading involved? If so, at what level is reading required?

Thus, "complete production reports" could involve no less than three types of language skills — none of which would have called for content or knowledge-based testing. All of these skills are best tested through simulations of an actual job task and not the essays that the Z-level tests contained. Similarly, for the entry "responsible for grinding runners and scrap", the following questions, among others, are raised:

- What steps does a worker take to determine that a product should be scrapped?
- What cognitive abilities are called upon in order to make this determination?
- Is running machinery involved in grinding scrap? If so, what performance skills are called upon as a result of machinery being involved in the process?

As can be seen, rather than answering any questions, Barrett's ambiguous chart only raises more questions for informed test developers. All of the ambiguous phrases in Dr. Barrett's charts should have been broken down into the various tasks and categorized into appropriate testing constructs. Then the appropriate method to test those constructs could have been decided upon.

This crucial test development step — of establishing the link between a construct and actual job behaviors and the final test items — is missing in Dr. Barrett's analysis because it is a *post hoc* attempt to produce evidence of the content validity of the Z-level tests. That is why he makes the invalid assumption that these abstract "major work behaviors" are best tested through content testing (Barrett Report, 2002, p. 99) because he is stuck with the Z-level tests as is. However, if the work behaviors had been defined in advance, then the need for a performance test, or the development of alternative measures appropriate for limited and non-English speakers, would have been obvious.

In addition, NIBCO does not adhere to Section 14C of the Uniform Guidelines (1978) which requires a "representative sample of the knowledge skill or ability...that is used in and is a necessary prerequisite to performance of critical or important work

More importantly, if NIBCO was truly interested in testing cognitive ability, they could have measured it in a variety of ways that are not dependent upon verbal ability. For example, they could have used certain non-verbal and job skill-related subsections of general cognitive ability tests such as the Work Skills Series for Production (1990) tests, the PSI Basic Skills Tests: Visual Speed and Accuracy (1981), General Ability Tests: Non-Verbal (NFER-Nelson, 1988) and portions of the Hay Aptitude Test Battery (1991). NIBCO could also have used manual dexterity tests such as the Roeder Manipulative Aptitude Test (1991) or the Stromberg Dexterity Test (1951)[11] which would have more validity for measuring the jobs performed by plaintiffs than does any verbal measure. These cognitive ability subsections and non-verbal manual dexterity tests would be less English-language dependent and thus less culturally biased/discriminatory against limited and non-English speakers. These subsections would also be more related to the actual jobs that plaintiffs performed because they test job relevant skills such as the ability to match numbers or alphabetic codes, the ability to differentiate shapes, the ability to coordinate eye and hand movements in order to operate machinery, and the ability to rotate parts and to assemble them. It would have been more appropriate to test any of these cognitive abilities than it was to have tested verbal ability.

### B. Dr. Barrett's assumption that cognitive abilities are language specific is erroneous

Fundamental to Dr. Barrett's proposed "cognitive abilities" argument is the assumption that cognitive abilities are language specific. They are not. For example, when given the instruction to take the following four letters and rearrange them into a common word: "acto", most English speakers spell the word "coat." However, when Hispanics are asked to perform the same task, they often form the word "taco." Although one word is Spanish and the other English, both individuals have demonstrated the same cognitive ability to rearrange Roman alphabetical characters into common everyday words — they both can spell. Listening and reading are also cognitive abilities that are not language specific. As Greenberg, Macías, Rhodes, and Chan (2001, at footnote 16; see also Vygotsky, 1978) noted in their study of the NALS data: "Quantitative literacy was measured using assessment questions written in English. Many non-native English speakers would have higher levels of quantitative literacy if assessed in their native language." Low test scores on English-based ability tests reflect their lack of English proficiency not necessarily their lack of cognitive abilities. In making this specious connection between verbal ability and cognitive ability, Dr. Barrett ignores and fails to report or address the fact that the Z-level tests were written entirely in English, required to be responded to in English, were supported only with English study materials and were administered to a limited and non-English speaking population in violation of widely accepted testing standards.[12]

---

[11] Descriptions of all of the above referenced tests can be found at the Professional Examination Service website, http://www.proexam.org; in Kline, 2000; or, at the Buros Institute website, http://www.unl.edu/buros/.

[12] Although Dr. Barrett cites to and lists in the reference section of his report to AERA *et al.* (1999) (Barrett Report, 2002, p. 139), the EEOC, 1978 and 1980 (Barrett Report, 2002, p. 141), the *Uniform Guidelines on Employee Selection Procedure* [sic], Federal Register 44 (Barrett Report, 2002, p. 141), among others (also

# DECLARATION OF WILLIAM C. HAHESY
## IN SUPPORT OF
## MOTION IN LIMINE NO. 10

# EXHIBIT D

9E087BF
Roseann D. Gonzalez - 10/14/2004

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                         - - -
 4    MARTHA RIVERA, MAO HER, ALICIA       )
      ALVAREZ, EVA ARRIOLA, PEUANG         )
 5    BOUNNHONG, CHHOM CHAN, BEE LEE,      )
      PAULA MARTINEZ, MARIA MEDINA, MAI    )
 6    MEEMOUA, MARGARITA MENDOZA, BAO      )
      NHIA MOUA, ISIDRA MURILLO, MARIA     )
 7    NAVARRO, VATH RATTANATAY, OFELIA     )
      RIVERA, SARA RIVERA, MARIA           )
 8    RODRIGUEZ, MARIA RUIZ, MARIA         )
      VALDIVIA, SY VANG, YOUA XIONG, and   )
 9    SEE YANG,                            )
                                           )
10                    Plaintiffs           )
            vs.                            ) No. CIV F-99-6443
11                                         )    AWI SMS
      NIBCO, INC., an Indiana              )
12    corporation,                         )
                                           )
13                    Defendant.           )
      _____)
14
15                    DEPOSITION OF
16              ROSEANN DUENAS GONZALEZ
17              SAN FRANCISCO, CALIFORNIA
18             THURSDAY, OCTOBER 14, 2004
19              VOLUME I - Pages 1 - 255
20
21    ATKINSON-BAKER, INC.
      COURT REPORTERS
22    180 Montgomery Street, Suite 800
      San Francisco, California 94104
23    (415) 288-9000
24    REPORTED BY:  PATRICIA SEGOVIA-VALDES, CSR NO. 8416
25    FILE NO.:   9E087BF
```

**EXHIBIT D**

Page 1

00036

1    Q.  But in terms of the -- Was it the development

2  of standards for testing of teachers?

3    A.  It was reviewing standards and revising and

4  modifying standards.  And, honestly, that was done over

5  a 15-year period, and I am not quite sure where that

6  began.  It might have begun in the early '70s, but I

7  really don't remember right now.

8    Q.  What I am trying to find out is what you

9  actually did.  So there was -- You sat on a panel that

10  reviewed standards for the testing of teachers; right?

11    A.  Yes.

12    Q.  Were those standards ultimately ever

13  published?

14    A.  I believe so.  They were published by the

15  organization.

16    Q.  Do you know when?

17    A.  I am not sure.

18    Q.  Relative -- And you think this was a 15-year

19  process to develop these standards?

20    A.  No.  I think that there were different

21  committees throughout my tenure with the National

22  Council of Teachers of English, where we reviewed a

23  number of different testing standards.

24    Q.  Did you sit on more than one committee

25  reviewing standards for testing of teachers?

00037

1    A.  I believe that I sat on at least two

2  committees or three committees having to do with testing

3  teachers and testing students; but that's a little bit

4  later, I think.

5    Q.  The testing of the students is later?

6    A.  Yes.

7    Q.  So let's focus on the testing of teachers.

8        Did you sit on how many subcommittees relative

9  to reviewing standards for the testing of teachers?

10    A.  It's really hard for me put a -- place a

11  number.  Because I was awarded the Distinguished Service

12  Award, which is reserved for people who have served the

13  council in extraordinary ways.  So, honestly, I have

14  been on so many committees, that I can't remember.  Some

15  of them have to do with the professional standards for

16  teaching, standards for the testing of teachers, and

17  some of them for students.

18    Q.  Let's focus on the teachers, the committees

19  that you sat on.  What was your role relative to working

20  on those particular committees?

21    A.  I was considered to be an expert, as the other

22  committee members were.  They were expert in the

23  consideration of the factors that influence teacher

24  success, teacher job performance.

25    Q.  So you were considered an expert in the

00038

1 consideration of the factors that influenced teacher

2 success?

3    A.  Yes.

4    Q.  When you sat on these committees, did you

5 consider yourself to be an expert in test development?

6    A.  Yes.

7    Q.  Test design?

8    A.  Yes.

9    MR. HO:  Do you want to focus on a particular

10 time period?

11    MR. HAHESY:  Q.  I'm focusing on these one or

12 two committees that you sat on, that dealt with the

13 testing, the reviewing the testing standards for

14 teachers.  Did this relate to the development of

15 standardized tests that would be administered to

16 teachers?

17    A.  Yes.

18    Q.  Like the CBEST test?

19    A.  No, not the CBEST test; but other measures

20 that were worked on.  It was kind of general, you know.

21 The NCTE wanted to be in the leadership position to

22 inform all kinds of testing agencies of what we

23 considered to be the most important variables that had

24 to be present to test good teacher job performance.

25    Q.  This committee you worked on, was it dedicated

00053

1  at the -- you know, relating the items to the actual job

2  tasks. I was part of that. That's considered content

3  validation.

4     Q. How many situations were you involved in that

5  type of content validation?

6     A. I can't really remember.

7     Q. Can you give me a range?

8     A. Maybe four, during that time. I don't know.

9        MR. HAHESY: Why don't we take a break.

10       MR. HO: Five minutes.

11       (Recess: 10:41 to 10:51 a.m.)

12       **MR. HAHESY: Q. Dr. Gonzalez, these**

13  **approximate four tests that you were involved with,**

14  **relative to the in-town and border facilities, what was**

15  **the purpose for the development of these tests?**

16     **A. It was to improve the communicative skills in**

17  **English, required for the job.**

18     **Q. Were they English proficiency tests?**

19     A. It was an English -- It was a workplace ESP,

20  English for Specific Purposes curriculum and tests.

21     Q. And these were facilities that were located in

22  Arizona?

23     A. Yes.

24     Q. And were these tests as part of some training

25  program or educational program, or something else?

00056

1    Q.  And those facilities that you were involved in

2  had workers that were both English and Spanish speaking?

3    A.  Yes.

4    Q.  How do you know there were workers that were

5  both English and Spanish speaking?  You understood you

6  had some workers who spoke English, and some who spoke

7  Spanish, and some who spoke both?

8    A.  Yes, I understood.

9    Q.  So only those two languages?

10    A.  I can't remember.

11    Q.  Do you remember developing a program for any

12  other language?

13    A.  No.  It would have been an English curriculum.

14    Q.  And the courses were taught in English?

15    A.  Yes.

16    **Q.  With respect to these three or four instances,**

17  **leaving aside the Saudi oil rig situation, how do you**

18  **know what use the tests were put to?**

19    **A.  Because the programs were to create**

20  **proficiency, and they would use the curricula, over**

21  **time, to help improve the proficiency of employees.  And**

22  **we had the same employees over a period of a long time.**

23    **Q.  How do you know what the tests were used for**

24  **in the workplace?**

25    **A.  Well, there was no relationship between**

00057

1  **employee selection or termination with these English for**

2  **Special Purposes programs.**

3     Q.  Do you know if there was any effect on

4  compensation?

5     A.  No, I don't know that.

6     Q.  Do you know if there was any people whose

7  skills progressed?  Do you know if they had the ability

8  to advance faster than people whose skills did not

9  progress?

10    A.  No, I don't know that.

11    Q.  So in terms of the progress of the individual

12  employees who participated in the ESP programs, in terms

13  of where they were situated in the company, you don't

14  have any information?

15    A.  Well, I don't.  But the director for our

16  Center for English as a Second Language was the one who

17  was working with the companies, he would have had the

18  information.

19       But from what I understood, from everything I

20  was working on, these were training programs to improve

21  proficiency of good employees.  And these were employees

22  that were selected by the company to improve, because

23  they had just such good job performance and they wanted

24  to improve their English communication ability.

25    Q.  What type of work were these employees

00058
1 performing, in general?

2    A.  I think some of them were in manufacturing.

3 The oil rig people -- and I can't exclude the oil rig

4 people, because I think that was one of the four tests.

5    Q.  We will get into it.  Manufacturing is kind of

6 general.  Can you be more specific?

7    A.  Assembly workers.  I think some of them might

8 have been doing basically manual labor.

9    Q.  Do you remember what kinds of products were

10 being manufactured?

11    A.  I don't.  I really don't.

12    Q.  So do you know anything about the

13 manufacturing processes that were in place at any of the

14 facilities?

15    A.  The Ford Motor plant, I do.  The oil rig

16 processes, I certainly do, because I was deeply involved

17 in that.

18    Q.  We are going to come back to that.  Stay with

19 the three.

20    A.  No, I don't remember them.

21    Q.  Let's talk about the Ford Company for a moment

22 now.

23    A.  Okay.

24    Q.  First of all, this was a manufacturing

25 facility that was located in Mexico?

00059

1    A.  Yes.  In Hermosillo, H-E-R-M-O-S-I-L-L-O.

2    Q.  And were you actually hired by Ford Motor

3  Company?

4    A.  No.  I worked -- Well, I am not sure.  I think

5  there was a contract between Ford Motor Company and our

6  Center for English as a Second Language.

7    Q.  And did you -- How long did you work on this

8  project involving Ford Motor Company?

9    A.  I guess it was around, I don't know, maybe a

10  ten-month period, something like that.

11    Q.  And what did you understand this contract

12  involved the center doing for Ford Motor Company?

13    A.  We did a job analysis to understand what the

14  job tasks were, what the communicative functions were,

15  so that we could create curriculum that would absolutely

16  simulate the kinds of communicative tasks and job tasks

17  that they were being asked to do on the job, so that we

18  could improve their understanding of the job tasks and

19  the English that went along with it, the communicative

20  tasks.

21    **Q.  So was the objective to increase the English**

22  **skills of the workers who were working in the Mexico**

23  **factory?**

24    **A.  Yes.**

25    Q.  And so these were people who were living and

**Gonzales, Roseann 10/14/04 (Vol 1)**          **Page 59**

00063

1  items.

2     A.  There was a curriculum, not study materials.

3     Q.  And the other people were involved in writing

4  the curriculum and the test items?

5     A.  Yes.

6     Q.  Who were those other people?

7     A.  I don't remember.  We had a staff of about 30

8  people at the Center for English as a Second Language.

9     **Q.  So what was your -- Other than going on-site**

10  **for these approximate two days, what was your -- and**

11  **gathering information relative to a job analysis, did**

12  **you do anything else concerning this Ford Motor**

13  **Company project?**

14     **A.  We had focus groups.  I met with every level**

15  **of manufacturing concerned, from the general plant**

16  **manager -- I spent a lot of time with him -- on down the**

17  **hierarchy of management.  And then we actually talked to**

18  **many of the actual workers, who were involved at**

19  **different levels.  And I think there were three**

20  **different communicative levels that we were looking at,**

21  **three different jobs that required different**

22  **communicative levels.  In other words, some were very**

23  **limited language, some were more language, others were**

24  **even more language.**

25     **Q.  We've got to get back to my question.**

00064

1    A.  Yes.

2    Q.  You spent two days on-site, doing work?

3    A.  Well, I can't say that.

4    Q.  Approximately two days?

5    A.  I think I spent two days actually shadowing

6 people, and I think I spent another two days with focus

7 groups.

8    Q.  Focus groups, meaning what?

9    A.  Actually getting input from what the job is,

10 from the actual people who do the job.  Instead of

11 relying on some very far-removed executive or even

12 manager, we talked to the actual people doing the job,

13 the incumbents.

14    Q.  Did you talk to the supervisors, the first

15 line supervisors?

16    A.  Yes.  We talked to everybody.

17    Q.  They are a good source of information?

18    A.  In some cases, if they are experienced.

19 Sometimes I find that incumbents are more experienced

20 than the actual on-the-job supervisors.  So it depends

21 on the experience of the supervisors.

22    Q.  So you spent about two days talking to the

23 people in the highest level of management in the plant,

24 down to the on-the-job incumbents; is that a fair

25 statement?

00081

1 know that.

2    MR. HAHESY: Q. Well, you interviewed some of

3 the managers at the Ford Motor Company plant?

4    A.  Yes. And none of them talked about problems.

5 They talked about how great these workers were, and they

6 talked about how much they wanted to help them develop.

7 It was completely -- It was a very encouraging

8 atmosphere. There was no restriction about Spanish.

9 They just wanted them to learn their jobs better and to

10 learn the little bit of English that they needed at the

11 lower level. And as they went on, there was more

12 English to be learned; but the whole idea was to develop

13 these very good workers. And they had identified these

14 workers as very high-performing, and they wanted to help

15 them.

16    **Q.  So they would select a group of production**

17 **workers to go through these programs?**

18    **A.  Yes.**

19    **Q.  These were hand-picked people that were going**

20 **through the program?**

21    **A.  I believe so.**

22    Q.  So is it your testimony that there was no

23 discussion, during your work at this Ford Motor Company

24 plant, that there was any communication problem between

25 the work force and any of the management?

**Gonzales, Roseann 10/14/04 (Vol 1)**        **Page 81**

00131

1 Doctorate work; and beyond that, I have continued in my

2 own reading and studies.

3    **Q.  How about psychometrics?**

4    **A.  That was a part of quantitative and**

5 **qualitative research designs, part of testing courses**

6 **that I took, and I don't remember the exact names of the**

7 **testing courses.  Because the testing comes in**

8 **sociolinguistics, it comes in second language teaching,**

9 **and education psychology.**

10    **Q.  Have you taken specific courses related to**

11 **psychometrics?**

12    **A.  No.  They are a part of other courses.**

13    **Q.  Have you ever taught a course in**

14 **psychometrics?**

15    **A.  We teach our graduate students to read --**

16    **Q.  What's the name of the course that taught**

17 **psychometric techniques?**

18    **A.  There are several courses.**

19    **Q.  That you teach?**

20    **A.  I don't teach any courses right now.**

21    **Q.  Have you ever taught a course that --**

22    **A.  I had to include it anytime I covered testing**

23 **in high courses, which would be a graduate seminar in**

24 **English.  They are all graduate seminars.**

25    Q.  Well, are there any courses that you taught

1

1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA

3              *  *  *  *  *

4

5

6       MARTHA RIVERA, MAO HER, ALICIA ALVAREZ,
        EVA ARRIOLA, PEUANG BOUNNHONG CHHOM CHAN,
7       BEE LEE, PAULA MARTINEZ, MARIA MEDINA,
        MAI MEEMOUA, MARGARITA MENDOZA, BAO NHIA MOUA,
8       ISIDRA MURILLO, MARIA NAVARRO, VATH RATTANATAY,
        OFELIA RIVERA, SARA RIVERA, MARIA RODRIGUEZ,
9       MARIA RUIZ, MARIA VALDIVIA, SY VANG, YOUA XIONG,
        and SEE YANG, Plaintiffs

10
        NIBCO, INC., an Indiana Corporation,
11                 Defendant

12

13    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

14        DEPOSITION OF ROSEANN DUENAS GONZALEZ

15              February 23, 2006

16               Tucson, Arizona

17    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

18

19

20            Colville & Associates

21             1309 E. Broadway

22          Tucson, AZ   85719-5824

23             (520) 884-9041

24           FAX (520) 623-1681

25            DARLENE K. GALL
        CERTIFIED COURT REPORTER #50239

00278

1  employment possibilities, that were barred to them

2  because of a selection test that was unfairly excluding

3  them -- or a firing, a test that was used for firing,

4  that unfairly excluded them.  So that's what high stakes

5  means, because the consequences are far-reaching.

6      Q.  Have you ever done any -- Have you ever

7  written anything concerning high-stakes testing

8  situations in the employment area?

9      A.  The federal court interpreter is high-stakes

10 testing.  The San Francisco Fire Department is

11 high-stakes testing.

12     Q.  My question is --

13     A.  Yes, I've written several reports about that.

14     Q.  Several reports in connection with work

15 assignment?

16     A.  Several reports about high-stakes testing in

17 the educational area, in the employment area also.

18     **Q.  Give me the articles or books that you've**

19 **written on high-stakes testing in the employment area.**

20     **A.  In Fundamentals of Court Interpretation, I**

21 **talk about the high-stakes testing situation.  I've**

22 **talked about it in many of the reports that I've**

23 **written.**

24     **Q.  Are these reports that are subject to peer**

25 **review?**

00279

1     **A.   These are reports that are considered**

2  **publications of low circulation, because they are**

3  **confidential and they are written for certain agencies.**

4     **Q.   These are ones you marked CD, Confidential**

5  **Documents, in your CV?**

6     **A.   Yes.**

7     **Q.   They are only circulated to the audiences, the**

8  **agency or the government organization, that retained you**

9  **to do some work?**

10     **A.   Yes, and who also engage in peer review.**

11     Q.   Let's exclude those situations.  Other than

12  the Fundamentals of Court Interpretation, have you

13  authored any professional literature concerning

14  high-stakes testing in the employment area?

15     A.   Besides my 25 to 30 reports on the

16  examinations that I have authored, and the work that I

17  have done in that area in the last 20 years --

18     Q.   These are reports that you would do, that

19  would summarize different administrations of the federal

20  interpreter certification exam?

21     A.   They would be validity exams; and they would

22  be larger papers, position papers, issue papers -- for

23  example, a whole report on the high-stakes testing area

24  for the Department of Justice with the immigration

25  courts.  So all of those.

00340

1  AFTERNOON SESSION          TIME: 1:00 P.M.

2          ---oOo---

3  EXAMINATION (RESUMED) BY MR. WILLIAM C. HAHESY

4      **MR. HAHESY:  Q.  All right.  Dr. Gonzalez,**

5  **yesterday you mentioned that for a period of time after**

6  **you started at the University of Arizona in a teaching**

7  **capacity -- which, I believe, was the fall of 1971 --**

8  **there was a period of time between then and today that**

9  **you did not teach at the University.  What is that**

10  **period of time, or periods of time?**

11      **A.  Let's see.  From about 1989 to 1999.  But I**

12  was still working with students on graduate

13  dissertations on master's theses and sitting on

14  committees, and that's considered teaching at the

15  university.

16      Q.  So in terms of actually teaching classes, you

17  took a ten-year hiatus from approximately 1989 to 1999?

18      A.  I think that's about right, yes, because I was

19  doing full-time test administration, development,

20  construction, validation.

21      Q.  And this was through the center?

22      A.  The National Center for Interpretation, the

23  University of Arizona.  It was part of my load.

24      Q.  Now, if you will look at Exhibit 767, which

25  was your March 14, 2003, report.

00364

1  skills that are required.  And then you specify for each

2  one of those exactly what the behavior is in the actual

3  job, how it's related to that actual performance in the

4  job.  Burns outlines a method to do this.

5      Q.  Burns?

6      A.  And I think Dr. Barrett might have it on his

7  Web site, too -- the actual steps, where you need an

8  expert, where you need to use subject matter experts and

9  incumbents, where you have to have a process where you

10  document and you can actually specify and look at all of

11  these very important criticality, proportionality, and

12  relevance issues.

13      Q.  So have you ever authored anything concerning

14  empirically sound job analyses?

15      A.  I have worked on job analyses and have had to

16  document work on job analyses -- for example, when we

17  did the first job analysis for the Federal Court

18  Interpreter Certification program, when we created the

19  first performance exam in the United States, on court

20  interpreting at the federal level.  And all of that

21  information is in reports that are confidential

22  documents, that I was not allowed to publish.  But I've

23  reported it generally -- very generally, because I was

24  limited -- in Fundamentals of Court Interpretation and

25  in other papers that I've given.

00368

1  is what I am talking about, a second language

2  acquisition.

3      MR. HO:  We have gone on for an hour now, so

4  if we could take that break within the next five or ten

5  minutes.

6      MR. HAHESY:  Yes.  Why don't we take that

7  break right now.

8      (Recess:  2:00 p.m.)

9      MR. HAHESY:  Ready to go back on the record.

10      Q.  Dr. Gonzalez, while we were off the record, I

11  asked you to read to yourself the first full paragraph

12  on page 18 of Exhibit 768, which begins with the words

13  "more importantly."  Have you had a chance to review

14  that paragraph?

15      A.  Not completely.

16      Q.  All right.  Why don't you tell me when you're

17  done.

18      (Time noted:  2:09 p.m.)

19      THE WITNESS:  Okay.

20      MR. HAHESY:  Q.  In that first paragraph on

21  page 18, there is a reference to a series of tests

22  starting with Work Skills Series for Production 1990

23  test.  Do you see that?  PSI Basic Skills Test.  General

24  Ability Test:  Nonverbal (NFER-Nelson 1998), and

25  portions of the Hay Aptitude Test Battery.  And then

00369

1  **there is a -- Do you see those references?**

2  **A.  Yes.**

3  **Q.  Have you ever given any of those tests?**

4  **A.  No.**

5  **Q.  Have you ever read any of the test manuals for**

6  **any of those tests?**

7  **A.  I think, at the time, I did read them, in the**

8  **ones that were available.  I read about them in the**

9  **critical review, where tests have to pass a certain**

10  **number specs and then can be reviewed in the**

11  **compilation.**

12  **Q.  You mean when you were putting your report**

13  **together?**

14  **A.  Yes.**

15  **Q.  Have you ever seen the content of those tests?**

16  **A.  No.  Just what's described in the validity**

17  reliability information and the information about the

18  domain of the test, and just the descriptions.  The

19  descriptions in Mental Measurement are usually pretty

20  comprehensive.

21  Q.  Tell me, in any of the literature that you

22  reference in your report, where, if at all, are these

23  tests referenced.

24  MR. HO:  Aside from what she just testified?

25  MR. HAHESY:  She hasn't given me the name of