# EXHIBIT A

Indianapolis Minority Contractors Assoc. Inc. v Wiley

## APPENDIX OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR. GERLAD BARRETT

Not Reported in F.Supp., 1998 WL 1988826 (S.D.Ind.)

Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana,
Indianapolis Division.

INDIANAPOLIS MINORITY CONTRACTORS ASSOCIATION, INC., an Indiana not-for-profit corporation, et al., Plaintiffs,

v.

Curtis A. WILEY, in his official capacity as Commissioner of the Indiana Department of Transportation, The Indiana Department of Transportation, Betty Cockrum, in her official capacity as Commissioner of the Indiana Department of Administration, Indiana Department of Administration and State of Indiana, Defendants.

No. IP 94-1175-C-T/G.
May 13, 1998.

ENTRY REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

JOHN DANIEL TINDER, Judge.

Introduction

***1* This case illustrates the difference between rhetoric and proof in a court of law. The Plaintiffs brought this suit almost four years ago to challenge the manner in which the State of Indiana administers the affirmative action program for minority and disadvantaged businesses that is a part of the federally funded highway construction program. This program is provided by federal legislation and is regulated by the United States Department of Transportation ("USDOT"). The original complaint, and virtually every pleading thereafter submitted by the Plaintiffs, contains vivid and often vituperative rhetorical allegations of wrongdoing. In these allegations, the Plaintiffs contend that wrongful actions by state officials and others have resulted in the disbursement of federal highway funds to undeserving businesses that do not qualify for the affirmative action program because they are not controlled by either minority individuals or financially disadvantaged individuals. Moreover, the Plaintiffs claim that, because of this wrongdoing, they have not received their fair share of the federal highway funds.

Of course, affirmative action programs are sensitive topics in these times, both in courts of law and in the arena of public debate. Accusations of wrongdoing in connection with such programs gives great cause for attention. The sound and fury of the Plaintiffs' accusations have no doubt generated more than a few heated discussions as this case has been pending, and may still for years to come.

However, when put to the tests of documentation and admissibility as the law requires, rhetoric often fails to carry the day. As seen through the exacting lens of the summary judgment process, the Plaintiffs' bold but unsupported claims fail. While perhaps persuasive as rhetoric, the strong conclusions of the Plaintiffs and their witnesses do not survive the careful scrutiny required in litigation. Word and theories which play well in political discussions and media accounts do not necessarily meet the legal standards appropriately applied to all lawsuits.

Because much has been written and filed in this lawsuit, much is being written here to explain its demise, both procedurally and substantively. It is hoped that the following index will be helpful in guiding the readers through to the conclusion.

Discussion and Analysis

This matter is now before the court on cross motions for summary judgment. In addition, there are outstanding motions to compel discovery, a motion for leave to take additional depositions, a motion for

sanctions, a motion to strike the Defendants' reply brief in support of their motion for summary judgment, as well as a motion by the Defendants to strike inadmissible evidence submitted by the Plaintiffs.

In order to determine the appropriate result under the cross motions for summary judgment, the court will first determine if the Defendants' reply brief in support of their motion should be stricken. Then the court must determine what evidence can be considered before addressing the merits of the arguments submitted by the parties. Once that evidence has been determined, the court will address the motions for summary judgment. As the remaining motions turn on the outcome of these motions, they will also be addressed at the appropriate juncture.

I. Plaintiffs' Motion to Strike Defendants' Reply Brief in Support of Motion for Summary Judgment

*2 As an initial matter, the court must determine whether the Defendants' reply brief in support of its motion for summary judgment may be considered in adjudicating this case. The Plaintiffs have moved to strike the reply brief on the grounds that it is not authorized and was not timely filed. Alternatively, the Plaintiffs request that parts of the brief be stricken for making alleged insufficient, irrelevant arguments and including impertinent, immaterial and scandalous claims.

Upon review of the Plaintiffs' supporting memoranda and the Defendants' response brief, the court finds that Plaintiffs' motion should be DENIED. The Local Rules for the Southern District of Indiana provide for three briefs upon the filing of a motion for summary judgment: an initial brief in support, a response brief by the non-filing party, and a reply brief by the filing party. *See* S.D. IND. L.R. 7.1(a). Local Rule 7.1 also states the time periods, computed as provided in FED.R.CIV.P. 6, by which those briefs must be filed. *Id.* Specifically, the moving party, here the Defendants, had seven days from the filing of the response brief by the non-moving party to file its reply brief.

Rule 6 provides that, in computing time periods for filing, three days are to be added to the prescribed period if service is by mail. FED.R.CIV.P. 6(e). Further, if the prescribed period is less than eleven days, intermediate Saturdays, Sundays, or holidays are excluded from the computation. FED.R.CIV.P. 6(a). Thus, as Plaintiffs' response was filed on September 16, 1997 and the Defendants received notice of the response by mail, the Defendants had until September 30, 1997 to file their reply brief. The reply was actually filed on September 29, 1997. The reply brief was both authorized by the Local Rules and timely filed.

Further, Rule 12(f) provides authorization for the court to strike "from any *pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED.R.CIV.P. 12(f) (emphasis added). The question then is whether a brief in support of a motion for summary judgment is a pleading to which this rule applies. An overwhelming weight of authority holds that such a brief is not a pleading. *See* *Equal Employment Opportunity Comm. v. Admiral Maintenance Serv., L.P.,* 174 F.R.D. 643, 645-47 (N.D.Ill.1997) (discussing authority and citing cases). Thus, the motion to strike under Rule 12(f) is inappropriate, and the Defendants' reply brief in support of the motion for summary judgment will be considered by the court in its entirety. However, before actually turning to the cross motions for summary judgment, the court must first consider the motion by the Defendants to strike several items of evidence submitted by the Plaintiffs in support of its motion for summary judgment. Because the outcome of this motion will affect what evidence and arguments may be considered in the motions for summary judgment, it must be determined before considering the merits of the summary judgment motions.

II. Motion to Strike Defendants' Reply Brief in Support of the Motion to Strike Inadmissible Evidence

*3 The Defendants have filed a motion to strike many items of evidence that the Plaintiffs have submitted in support of their motion for summary judgment. Before ruling on that motion, the court must again decide if a reply brief filed by the Defendants may be considered. The Plaintiffs have filed a motion to strike the reply brief to the Motion to Strike Inadmissible Evidence on the grounds that it impermissibly raises new arguments not contained in the Defendants' original Memorandum of Law in Support of the Motion to Strike.

In their reply brief to the motion to strike the evidence, the Defendants admit that many of the

documents they want stricken were produced by them during discovery. However, the Defendants also argue that the documents have not been authenticated, or at least not timely authenticated, by the Plaintiffs and raise other objections to their admittance as evidence. The Plaintiffs allege that these arguments are new matters that could have, and should have, been raised in their original memorandum of law and thus should be stricken from the reply brief. In the alternative, the Plaintiffs ask for leave to file a surreply to respond to these matters. The Defendants argue that their reply does not raise any new arguments, but only addresses the Plaintiffs' brief in response and the additional evidence Plaintiffs submitted with their response brief without first obtaining leave of the court.

Based upon a review of the Defendants' reply brief in support of the Motion to Strike Evidence, the court agrees with the Defendants that the reply does not raise impermissible arguments. Rather, the reply brief responds to arguments specifically raised by the Plaintiffs in response to the original memorandum. Further, it is clear that the Defendants did raise the issue of authentication in the original memorandum, as well as hearsay arguments that the Plaintiffs counter with arguments that the documents in question meet the requirements for hearsay exceptions. The arguments concerning the actual documents the Defendants wish to strike will be taken up below. However, as the court finds that the reply brief in support of the Motion to Strike does not raise impermissible arguments, the Plaintiffs' Motion to Strike that brief is DENIED as is the alternative request to file a surreply brief.[FN1] In making the determination as to what evidence will be stricken, if any, the court will consider the original memorandum in support, the Plaintiffs' response brief, as well as the reply brief.

FN1. The gravamen of the Plaintiffs' argument as to the reply brief is that the Defendants impermissibly argue the issue of authentication. As will soon be evident, despite the consideration of the reply brief, the Defendants' argument that the documents lack authentication has merit with only a few of the disputed documents.

III. The Motion to Strike Inadmissible Evidence and Portions of Plaintiffs' Statement of Material Facts

The Defendants' Motion to Strike attacks several items of evidence submitted by the Plaintiffs and used by them to support their Statement of Material Facts, which is to accompany the motion of summary judgment as required by Local Rule 56.1. The Defendants base their arguments on several grounds, *inter alia:* 1) that the affidavits and depositions include inadmissible hearsay, speculation and conclusory opinions; 2) that the deposition of witness Harry Alford cannot be admitted as expert opinion; 3) that two of the reports proffered are subject to the deliberative process privilege and are otherwise irrelevant; and 4) that many of the documents are unauthenticated. Each of these arguments will be addressed in turn. In addition, an analysis of the Plaintiffs' Statement of Material Facts will be conducted to determine if all the alleged facts are properly supported.

A. Summary Judgment Standard and Related Burdens of the Parties

***4** As this case is now before the court on cross motions for summary judgment, it is appropriate to reiterate here the standards for summary judgment and the burdens of the parties when filing or opposing such a motion. Further, a discussion of compliance with both the Federal Rules of Civil Procedure and the Local Rules for the Southern District of Indiana is necessary as Plaintiffs' efforts at compliance in this case can be described as weak at best.

Rule 56(c) provides that summary judgment is proper only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). As the Seventh Circuit has stated in describing the nature of summary judgment:

It is not, as parties opposing summary judgment are fond of pointing out, a vehicle for resolving factual disputes.... And because summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.... The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment. Thus, as Fed. R. Civ. Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings.... This requirement is more than a technicality; as the now familiar trilogy of 1986 cases from

the Supreme Court established, if the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); *Anderson [v. Liberty Lobby, Inc.],* 477 U.S. at 249-52, 106 S.Ct. at 2511-12. The burden on the non-movant is not onerous.... She need not tender evidence in a form that would be admissible at trial; [FN2] she may rely on affidavits or any other materials of the kind identified in Rule 56(c).... Moreover, the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact.

FN2. However, the evidence set forth must be of a kind admissible at trial. *See Waldridge,* 24 F.3d at 921 n. 2. (citing *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 849 (7th Cir.1992); Fed.R.Civ.P. 56(e)).

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920-21 (7th Cir.1994) (other citations omitted).

To facilitate the summary judgment process, Local Rule 56.1 was promulgated. This rule requires both the movant to file a "Statement of Material Facts" and the non-movant to file a "Statement of Genuine Issues." Each of these statements is to be filed with any affidavits or other documentary material and each statement must include "appropriate citations to discovery responses, affidavits, depositions, or other *admissible* evidence" to support the position of the filing party. *See* S.D. IND. L.R. 56.1 (emphasis added). Compliance with this rule is strictly enforced. *Waldridge,* 24 F.3d at 922.

**5* Facts alleged in a summary judgment motion must be "presented by affidavit or otherwise in evidentiary form." *Early v. Bankers Life and Cas. Co.,* 959 F.2d 75, 78 (7th Cir.1992). In addition, in opposing summary judgment, a party "must present *affirmative* evidence in order to defeat a properly supported motion for summary judgment." *Smith v. City of Joliet,* 965 F.2d 235, 236 (7th Cir.1992) (citations omitted) (emphasis added). If the affirmative evidence is in the form of affidavits, the affidavits must not be "flights of fancy, speculations, hunches, intuitions, or rumors." *Visser v. Packer Eng'g Assoc., Inc.,* 924 F.2d 655, 659 (7th Cir .1991). Statements within affidavits must have a factual foundation and inferences and opinions must be substantiated by specific facts. *See Drake v. Minnesota Min. & Mfg. Co,* 134 F.3d 878, 887 (7th Cir.1998).

Documentary evidence submitted to support an alleged fact or issue of fact must be authenticated. Neglecting to authenticate exhibits for consideration in a summary judgment motion is a violation of FED.R.CIV.P. 56(e). *See Macklin v. Butler,* 553 F.2d 525, 528 & n. 1. (7th Cir.1977). Further, Local Rule 5.1 requires that any paper presented to the Clerk for filing that has four or more exhibits shall include a separate index identifying and briefly describing each exhibit. Compliance with these rules is only to a party's benefit, as a district court is "not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge,* 24 F.3d at 922. "District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits-not only because the rules of procedure place the burden on the litigants, but also because their time is scarce." *Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662-63 (7th Cir.1994).

Plaintiffs' counsel appears to have trouble comprehending these rules. Counsel submitted approximately 40 documents and exhibits by numbering them and placing them in a box left with the Clerk's Office. Counsel did not attach an affidavit authenticating the exhibits or an index to them. This was an obvious violation of Local Rule 5.1. Further, the documents are not numbered consecutively and are often miscited in the Plaintiffs' briefs, making difficult the court's determination of whether Plaintiffs' allegations of fact or issues of fact are properly supported.

As a result of the lack of authentication and, among other evidentiary objections, the misciting of the documents in support, Defendants request that the court strike most of the Plaintiffs' Statement of Material Facts in support of their motion for summary judgment. Although tardy, Plaintiffs' counsel did submit an affidavit attempting to authenticate the documents with the Brief in Response to Defendants' Motion to Strike Inadmissible Evidence. Thus, the court has decided not to strike the documents for non-compliance with Local Rule 5.1. However, counsel should be warned that strict compliance with

both the Federal Rules of Civil Procedure and the Local Rules of this district is required and expected of attorneys appearing in this court. Further, the Statement of Material Facts will not be stricken in its entirety. However, the evidence submitted by the Plaintiffs will be evaluated in light of the standards described above, and the Statement of Material Facts will then be examined to determined whether the facts alleged are properly supported by admissible evidence.

B. Unauthenticated Documents

*6 The Defendants object to the admission of several documents submitted by the Plaintiffs, alleging that the documents are not authenticated. The Defendants argue specifically that the following exhibits must be stricken on this basis: Plaintiffs' Exhibits 2 through 15 (Minutes and Reports from the Governor's Commission on Minority Business Development); 16 (Preliminary Draft Report by Gary Gibson) and 18 (Minority Business Enterprise Program Construction Overview: State of the Program Statistics, Analysis, and Recommendations by Gary Gibson)(collectively, the "Gibson Reports"); 22 and 23 (computer data extractions); 30 (George Roney's Supportive Service Reports); 35 (Indianapolis Disparity Study, which has been misidentified as Exhibit 36); 37 (Quarterly U.S. Department of Transportation Reports); 40 (Request for Proposal, which is actually Exhibit 40a); the Minority Business Enterprise Directories from 1990-1997; and Exhibit A to Exhibit 24, the Affidavit of Harry C. Alford. Plaintiffs counter that these documents were actually produced by the Defendants during discovery, and thus, their authenticity cannot be disputed. However, the Defendants further contend that the tardy submission of an affidavit of Plaintiffs' counsel stating that many of these disputed documents were produced as the result of discovery requests should not be tolerated.

The Plaintiffs have the better argument, at least to most of the documents in dispute.[FN3] The act of production is an implicit authentication of documents produced. *See* United States v. Lawrence, 934 F.2d 868, 870-872 (7th Cir.1991); *United States v. Brown,* 688 F.2d 1112, 1114-15 (7th Cir.1982). Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). Defendants admit that they did produce Exhibits 1 through 15, 27, 28, 30, 32, 37, and 40a. ( *See* Defs.' Reply in Supp. of Their Mot. to Strike at 4.) Thus, as explained in *Brown,* the Defendants cannot have it both ways. They cannot voluntarily produce documents and implicitly represent their authenticity and then contend they cannot be used by the Plaintiffs because the authenticity is lacking. *Brown,* 688 F.2d at 1116.

FN3. Exhibits 16 and 18 are discussed under subheading B, "Deliberative Process Privilege." Exhibits 22 and 23 are furthered addressed in this section.

Thus, Exhibits 2 through 15, 30, 37 and 40 will not be stricken on the basis they are not authenticated. However, Exhibits 22, 23 and Exhibit A to Exhibit 24, the Affidavit of Harry Alford, pose a greater problem. First, the court finds no exhibit marked as Exhibit A to Exhibit 24 that supports Mr. Alford's conclusion in his affidavit, let alone an authenticated document. Thus, statements and conclusions of the Affiant based on Exhibit A are inadmissible and will not be considered.

Second, although Plaintiffs state the computer data extractions designated as Exhibits 22 and 23 were produced during discovery in response to a Request for Production, ( *see* Aff. of D. Robert Webster, Ex. A, Pls.' Mem. In Opp'n to Defs.' Mot. to Strike), Plaintiffs do not cite to any particular request for this data nor do they provide any legend for deciphering or interpreting the reports submitted. Most likely, from the court's review of the discovery documents submitted, these reports were extracted from computer data to which the Defendants provided access in response to interrogatories from the Plaintiffs. Interrogatory 3 was a request for the "percentage of highway construction contracts funded all or in part with federal funds awarded to African-American firms" from 1983 forward. Interrogatory 4 was a request for "the total dollar volume of federally funded (all or in part) highway construction contracts awarded to African-American firms" from 1983 forward. Interrogatory 5 was a request for the names, dollar amounts, and subject matter of contracts and subcontracts awarded to African-American owned construction firms, white women owned construction firms, and those owned by other ethnic classifications.

*7 The court is unable to determine from Exhibits 22 and 23 what the figures reported represent.

The reports are listings of what appears to be contracting firms and payments, but what the figures actually represent cannot be ascertained. Apparently, even the Plaintiffs are unsure of what these reports represent. At one point, Plaintiffs claim that Exhibit 22 lists *all payments* by the State on federally financed construction projects to African-American businesses from 1990 through 1996. (Pls.' Am. Br. In Supp. of Mot. for Partial Summ. J. at 9.) However, Plaintiffs' request was for the total dollar volume of federally funded highway construction contracts awarded to various DBEs, which is the contract price and does not include any payments prime contractors may have made to DBE subcontractors. Then, Plaintiffs state at another point that Exhibits 22 and 23 are the basis for the reports the State makes to the federal government for determining DBE participation. (Pls.' Mem. in Opp'n to Defs.' Mot. to Strike at 22.) However, this is not an accurate statement because the amount of DBE participation counted towards the participation goal is not merely the raw dollar volume of federal highway construction contracts. *See* Participant's Manual, Ex. 1, Decl. of Charlotte Leavell, pp. 153-156 (submitted in support of Defs.' Mot. for Summ. J.).

As the computer data was extracted and prepared especially for this litigation, the reports are not admissible as business records under FED.R.EVID. 803(6). *United States v. Blackburn,* 992 F.2d 666, 670 (7th Cir.1993). Further, as a condition precedent to admissibility of computer records, the proponent must establish that the process or system used produces an accurate result, FED.R.EVID. 901(b)(9), and that foundation has not been established. In light of the above, the veracity and reliability of these reports are questionable, and thus, Exhibits 22 and 23 are not admissible and will be stricken.

Finally, as to Exhibit 35, the City of Indianapolis Disparity Study, Defendants also object to its authenticity.[FN4] In response, Plaintiffs direct the court again to the Affidavit of their counsel, D. Robert Webster, submitted with their brief in opposition to the motion to strike. The Affidavit states that this exhibit was introduced at the deposition of Addison Simpson where the Defendants did not object to the authenticity and the deponent identified the study.

FN4. Plaintiffs did not comply with the Local Rules with regard to Exhibit 35. Exhibit 35 is simply a collection of papers, not bound or stapled, purporting to be a disparity study performed by the City of Indianapolis. Local Rule 5.1 requires that all filings "shall be fastened together at the top left corner and at no other place." Again, the court admonishes Plaintiffs' counsel and reminds them that compliance with the Local Rules is not to be taken lightly. Further, this Exhibit appears to have pages missing and/or completely out of order.

The court assumes that the Plaintiffs are arguing that the disparity study has thus been authenticated through the testimony of a witness with knowledge that a matter is what it is claimed to be. *See* FED.R.EVID. 901(b)(1). Generally, this would be enough to authenticate this document; however, the authenticity and reliability of this document is questionable. Although from a examination of the report it appears to be a disparity study from the City of Indianapolis, the court finds there is reason to question whether this is, in fact, the same report presented to Mr. Simpson at his deposition.

***8** The report at the deposition was identified as a disparity study and marked Exhibit 5; however, no Exhibit 5 is attached to the deposition. Thus, no determination can be made that the report produced at the deposition is the same report submitted as Exhibit 35. Further, this document is not bound and pages seem to be out of order and/or missing, which causes some concern as to whether the document is complete. Without establishment of authenticity, the reliability of this document is questionable. *See* *Northwestern Nat'l Ins. Co.,* 15 F.3d at 662 (stating that unsworn and uncertified documents together with affidavit of attorney who lacked personal knowledge of underlying facts were not sufficient to raise genuine issue of fact). Therefore, as Plaintiffs have failed to show the authenticity and reliability of this document, Exhibit 35 will be stricken and will not be considered in evaluating the motions for summary judgment.

C. The Gibson Reports and the Deliberative Process Privilege

The Defendants have requested that the Gibson Reports, Exhibits 16 and 18, be stricken on the basis that they are unauthenticated, deliberative, and irrelevant. These reports were prepared by Gary Gibson during the period of time he was employed as a "Construction Specialist" for the Office of Minority

Business Development in the Indiana Department of Administration.[FN5] Plaintiffs counter that the Gibson Reports had been previously presented at depositions without objection, that any deliberative process privilege has not been timely or specifically invoked, and that the reports are relevant as they show "the State's pattern and practice of historic discrimination against African-American contractors." (Pls.' Mem. in Opp'n to Defs.' Mot. to Strike at 12.)

FN5. Mr. Gibson later served as the Deputy Commissioner for Minority Business Development in the Indiana Department of Administration.

As to the Defendants' argument that the Gibson Reports are unauthenticated, the court finds as to these reports, the argument has little merit. These reports were specifically identified and described in the Declaration of Gary Gibson submitted by the Defendants in support of their motion for summary judgment. ( *See* Decl. of Gary Gibson, ¶¶ 6 and 17-22.) Further, Exhibit 18 was attached as Exhibit 1 to the Deposition of Gary Gibson, submitted by the Defendants as Appendix F to their Brief in Support of Motion for Summary Judgment. As the Defendants themselves have submitted evidence which establishes the authenticity of these documents, they cannot legitimately claim that the documents should be stricken on that basis.

The Defendants also argue that the Gibson Reports are protected by the deliberative process privilege. This privilege protects communications, such as advisory opinions, recommendations and deliberations, that are part of the decision-making process of a governmental agency. *National Labor Relations Bd v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975); *United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir.1993). Communications made prior to an agency decision are protected from disclosure; communications subsequent to the decision are not. *Farley,* 11 F .3d at 1389 (citations omitted). In other words, because the purpose of the privilege is to protect governmental decision-making, a document must be both generated before the adoption of an agency policy and be deliberative, that is, "reflect[ ] the give and take of the consultative process." *K.L., L.F., and R.B. v. Edgar,* 964 F.Supp. 1206, 1208 (N.D.Ill.1997) (citations omitted). The privilege does not extend to factual or objective material or to documents adopted as the agency's position on an issue. *Id.* In addition, the privilege is a qualified one. It "may be overcome where there is a sufficient showing of a *particularized* need to outweigh the reasons for confidentiality." *Farley, supra* (emphasis added).

***9** To determine whether a claim of deliberative process privilege may be upheld, courts must engage in a two-part analysis. First, the court must determine "whether the government has shown that the privilege applies to the documents the government seeks to protect." *Edgar,* 964 F.Supp. at 1209. To satisfy this step, the government must show:

(1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents.

*Id.* (citing, among others, *Mobil Oil Corp. v. Department of Energy,* 102 F.R.D. 1, 7-8 (N.D.N.Y.1983)) (government agency may meet its burden by providing enough information about each document to demonstrate why document falls within privilege and to enable court to engage in required balancing between confidentiality and needs of litigant).

If the government meets the burden of showing that the privilege applies, the second step of the analysis requires the other party to show that he or she has a particularized need for the documents. *Edgar,* 964 F.Supp. at 1209 (citing *Farley,* 11 F.3d at 1389). The court then balances the particularized need of the litigant against the government's need for confidentiality, using the following factors: (1) the relevance of the documents; (2) the availability of other evidence serving the same purpose as the privileged documents; (3) the government's role in the litigation; (4) the seriousness of the issues involved; and (5) the degree to which disclosure "would hinder frank and independent discussion about governmental policies and decisions" in the future. *Id.* (citations omitted). It is essential that the court balance the particularized need against the nature of the documents and the effect of their disclosure. The documents cannot be ordered admissible without such balancing. *Farley,* 11 F.3d at 1390.

Plaintiffs argue that Defendants have failed to sustain their burden because they have failed to comply with the requirements for invoking the privilege. Technically, this is so because there is no showing that the department head with control over the matter has made a formal claim of privilege, after personal consideration of the problem. However, Mr. Gibson has sworn in his Declaration that the reports were prepared to assist state officials in their formulation of decisions and policies regarding the state's Minority Business Enterprise program and contained recommendations to strengthen the program, based on case studies of various situations. (Decl. of Gary Gibson, ¶¶ 20-22.) In addition, the reports were confidential, precautions were taken to insure that confidentiality, and the reports were not released to the public. [FN6] ( *Id.* ¶ 22.) Thus, the Defendants have provided sufficient information for the balancing required to determine whether or not the documents should be protected by the privilege. *See* Edgar, 964 F.Supp. at 1210.

FN6. The Defendants did not provide Plaintiffs copies of these reports as a result of a discovery request. The Defendants hypothesize that the reports were obtained from another of the Plaintiffs' witnesses, Harry Alford, a former deputy commissioner of the Minority Business Development Commission, who received a copy of the reports during his tenure.

***10** The Plaintiffs claim that their particularized need for the documents outweighs any protection to be provided the Gibson Reports. They argue these reports contain significant factual and statistical data not protected by the scope of the privilege that underscores the State of Indiana's "pattern and practice of historic discrimination against African-American contractors." (Pls .' Mem. in Opp'n to Mot. to Strike at 12.) Further, the Plaintiffs argue that the relevance of the Gibson Reports to this case is straightforward and the availability of evidence related to whether the State engaged in a pattern of discrimination must come from the State. Finally, Plaintiffs argue that disclosure would not chill the deliberative process as "the reports do not and have not affected the DBE policies of the State." ( *Id.* at 13.)

An argument of relevance alone is not enough to overcome a claim of deliberative process privilege. *Farley,* 11 F.3d at 1390. Further, the court fails to see how the relevance of the documents to this case shows a particularized need. This case concerns whether the State of Indiana has complied with federal law related to the receipt of federal highway funds or whether it has engaged in a practice of discrimination with respect to those funds. Mr. Gibson stated in his Declaration and in his deposition that his reports concerned only the state Minority Business Enterprise program and did not involve projects utilizing federal funds. Further, the Department of Administration ("DOA"), where the Office of Minority Business Development was housed and Mr. Gibson was employed, had no responsibility concerning MBE or DBE compliance as to the federal highway funds. That compliance was monitored by the Indiana Department of Transportation ("INDOT").[FN7]

FN7. After Mr. Gibson's tenure with the Minority Business Development Office, certification of minority businesses apparently was centralized with the DOA.

Thus, the Gibson Reports are not probative of any discriminatory use of federal funds. The incident reported in Exhibit 16, which was an incident of a *contractor* misrepresenting minority participation levels while utilizing *state* funds, is not evidence of the State itself engaging in a pattern of discrimination with regard to federal funds. The evidence shows that the State took steps to correct this problem, punished the contractor, and that the recommendations contained in the Gibson Reports were all implemented, except one, with regard to developing and strengthening minority participation in state construction and procurement contracts. To the extent that the Gibson Reports contain advisory opinions, recommendations, proposals or deliberations, they will be protected by the deliberative process privilege and will not be considered with regard to the motions for summary judgment. However, with respect to Exhibit 18, to the extent it contains statistics and other factual and objective information regarding minority participation levels, the document will not be protected and the factual information may be admitted.

D. Deposition of Harry Alford

***11** Defendants object to admitting the deposition of Plaintiffs' witness, Harry Alford ("Alford"), on several grounds. Defendants contend the deposition is conclusory, based on inadmissible hearsay and

contains legal conclusions masquerading as expert opinions. Defendants contend that Alford is not an expert under the Supreme Court's standard set forth in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993); therefore, his opinions and conclusions cannot be transformed into admissible evidence under FED.R.EVID. 702. Plaintiffs claim that a *Daubert* inquiry applies only to scientific or technical methodologies and is not necessary when dealing with a non-scientific expert testifying as to matters within his own training and experience.

Plaintiffs rest their argument on *Compton v. Subaru of America,* 82 F.3d 1513 (10th Cir.1996). Unfortunately for Plaintiffs, the Seventh Circuit explicitly rejected the holding of *Compton* in *Tyus v. Urban Search Management,* 102 F.3d 256 (7th Cir.1996), holding that "the *Daubert* framework is appropriate for all kinds of expert testimony." *Id.* at 263. Therefore, a *Daubert* based inquiry is necessary to determine whether and to what extent Alford's testimony as an expert may be considered.

"[E]xpert testimony proffered under FED.R.EVID. 104(a) for admission under Rule 702 ... must be tested to be sure the person possesses genuine expertise in a field." *Id.* Under the *Daubert* methodology, the court must first consider whether the proffer of testimony demonstrates that the work the expert performed meets standards of intellectual rigor. In other words, the court "must rule out 'subjective belief or unsupported speculation.' " *Deimer v. Cincinnati Sub-Zero Products, Inc.,* 58 F.3d 341, 344 (7th Cir.1995) (citing *Porter v. Whitehall Lab.,* 9 F.3d 607, 614 (7th Cir.1993) (quoting *Daubert,* 509 U.S. at 590)). Second, the court must determine whether the testimony is actually based upon the expert's special skills. Finally, under Rule 702, the court must decide whether the testimony actually assists the trier of fact in understanding or determining a fact in issue. *Id.* This is the ultimate test of expert testimony. *United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996) (hereinafter " *Hall I* ").

Applying this three part analysis to "soft" sciences, such as social sciences, has been somewhat perplexing for the federal courts, as the four nonexhaustive factors identified by the Supreme Court that bear on the inquiry relate more to classic "Newtonian experimental science." *See United States v. Hall,* 974 F.Supp. 1198, 1199-1203 (C.D. Ill 1997), *upon remand from Hall I* (discussing application of *Daubert* to soft sciences) (hereinafter " *Hall II* "). Those factors include: whether the theory or methodology can be and has been tested; whether the theory or methodology has been subjected to peer review and publication; whether there is a known or potential error rate and whether there are standards controlling the operation of the methodology; and whether the theory or methodology is generally accepted. *Daubert,* 509 U.S. at 593-94. However, the Supreme Court also described the preliminary inquiry upon a proffer of expert testimony as a flexible one used to determine the "validity-and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission." *Id.* at 595. Thus, underlying the analysis is the requirement that for *all* forms of expert testimony "there must be some degree of reliability of the expert and the methods by which he has arrived at his conclusions. This criterion for admissibility derives from Rule 702 itself as well as the implications of the *Daubert* opinion." *Hall II,* 974 F.Supp. at 1202 (citing *United States v. Jones,* 107 F.3d 1147, 1156 (6th Cir.), *cert. denied,* 117 S.Ct. 2527 (1997)).

***12** *Hall I* and *Hall II* are instructive here as the Plaintiffs offer Alford as an expert in affirmative action, which cannot be considered a "hard" science. As explained in *Hall II,* "the four factors laid out in *Daubert* must be applied when an expert bases his testimony on scientific hypotheses which are capable of being refuted by controlled experimentation. However, these factors may be applied in differing degrees when it comes to non-Newtonian science or 'other specialized knowledge.' " *Id.* Thus, in determining whether a proffer of non-scientific testimony meets the standards of intellectual rigor required of expert testimony, a determination of whether a sufficiently reliable body of specialized knowledge exists is first necessary. *Hall I,* 93 F.3d at 1342. Courts have used other factors when applying the *Daubert* tests for qualification, reliability, and fitness to the testimony of experts that testify to matters outside what one might consider to be a "hard" science. As a starting point, considerations include:

the longevity of that particular field, the amount of literature written about the subject, the methods of peer review among its scholarly journals, the quantity of observational or other studies conducted in that field, the comparative similarity of observations obtained, the reasons why those studies are deemed valid and reliable, and the general consensus or debate as to what the raw data means. In addition, the particular expert who wishes to testify must establish that he is sufficiently familiar with

the topics mentioned above to render an informed opinion about them. It would also be helpful, but not necessary, to show that the proposed expert personally contributed to the field about which he is testifying, either through personal observation or by publication of an article, book or treatise on the subject.

*Hall II,* 974 F.Supp. at 1203.

Here, the Plaintiffs have not demonstrated a sufficiently reliable body of specialized knowledge exists with regard to the study of affirmative action. They have laid no foundation to show that such a sufficiently reliable body of specialized knowledge exists. They have presented no other literature or observational studies conducted in the field of affirmative action, or any other studies to which comparisons of statistics and conclusions drawn in this case can be made.

Further, the Plaintiffs have not shown, even if a body of specialized knowledge concerning affirmative action exists and is reliable, that Alford is qualified to testify concerning that body of knowledge. Alford's *curriculum vita* does tend to show he might have specialized knowledge from his experiences. Alford has earned a Bachelor of Arts degree in sociology from the University of Wisconsin as well as Associate in Arts degrees in social sciences from Ventura Community College in California and in business administration from the Detroit College of Business. He worked for approximately two years as a Deputy Commissioner for Minority Business Development in the Department of Administration for the State of Indiana. Alford is also the president and chief executive officer, and a founder, of the National Black Chamber of Commerce. In his capacity at the National Black Chamber of Commerce, Alford consults with state and local governments, as well as private organizations, to develop and assure minority development and participation in, and compliance with, various minority business programs. Alford is a paid speaker and lecturer on the subject of minority business affairs. Despite this experience, however, his testimony does not show that conclusions he draws concerning the matters at issue in this case are reliable.

***13** With regard to the claim that the Defendants are discriminating against African-Americans, Alford merely concludes that the State is discriminating based upon his review of the percentages of payments to what he considers to be "legitimate black companies" as compared to the payments made to what he considers to be "front" companies. These front companies are owned by minorities or women, but Alford claims that these companies are not disadvantaged as described in the applicable regulations. But conclusory opinions based only upon Alford's knowledge of "legitimate black companies" are problematic. Alford admits he has not been involved in activities within the State of Indiana since 1994. He has not shown any basis for his knowledge as to which companies that were paid funds by INDOT are "legitimate black companies" and which are not. Nor does Alford discuss any "legitimate women-owned companies." Yet he concludes Indiana is not in compliance with the federal regulations because the goal under the federal DBE program is 10%, but he calculates that only 3.8% of the total contracts from 1991-1996 went to "legitimate black-owned businesses." (Alford Dep. p. 93.) The regulations do not provide for a 10% participation by African-Americans, but a 10% participation by African-Americans, Hispanics, Portuguese, Asian Americans, American Indians, and women. *See* 49 C.F.R. §§ 23.1, 23.5, 23.61. Further, Alford did not testify as to whether he performed any study of the federal reports to test INDOT's compliance with the 10% goal based on *all* DBEs as defined by federal law.

In addition, his conclusion that INDOT is not complying with the federal regulations is based in part on speculation. Alford testified that he did not believe INDOT has adequate record keeping with regard to reports made to the USDOT because, apparently, he has approached INDOT to ask for the records, did not receive them, and stated that INDOT showed no concern. (Alford Dep. p. 105.) Alford also testified that, while employed by the State of Indiana, he had *no* responsibility for reporting to the USDOT regarding INDOT's compliance with the federal regulations. (Alford Dep. pp. 108-09.) But Alford claims the federal reports are probably not accurate because he received INDOT's reports regarding state-funded programs while employed as a Deputy Commissioner and "there was a lot of gross errors." ( *Id.* at 107.) Further, Alford claims, "the federal government wasn't checking" the reports. Alford contends this conclusion regarding INDOT's noncompliance is his "professional opinion" based upon information he received from civil rights officers from USDOT, who told him the reports are not really scrutinized.

The problem is this "professional opinion" is based on hearsay and an untenable position that because the state reports had what he considered to be "gross errors" the federal reports must also. Alford's "professional opinion" is not enough to show that INDOT was not complying with the reporting requirements of the regulations. The Plaintiffs have not provided any other evidence to support a position that the reports made to the federal government are incorrect. Although *Daubert* set forth a more open approach to expert opinions, such opinions cannot be based on "subjective belief or unsupported speculation." *Diemer, supra; In re Paoli R .R. Yard PCB Litigation,* 35 F.3d 717, 742 (3rd Cir.1994). Nor can they demonstrate a genuine issue of fact for summary judgment purposes. *Tyler v. Runyon,* 70 F.3d 458, 469 (7th Cir.1996); *Cusson-Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992) ( "Such a conclusory allegation without any factual support is insufficient to create a genuine issue of fact.")

***14** Alford's statistical analysis regarding a disparate impact on African-Americans causes further concerns. Plaintiffs have not demonstrated that Alford has any training in the performance of the type of statistical disparate impact studies that justify his interpretations of the Defendants' data. *See Engineering Contractors Assoc. of South Fla., Inc. v. Metropolitan Dade County,* 122 F.3d 895, 911-26 (11th Cir.1997); *United States v. City of Miami,* 115 F.3d 870, 873-74 (11th Cir.1997); *Council 31, American Federation of State, County and Municipal Employees, AFL-CIO v. Ward,* 978 F.2d 373, 379 n. 3 (7th Cir.1992). Alford's results have not been tested, reviewed or verified. No evidence has been shown concerning any possible error rate, standard deviation or confidence levels related to the proffered results. Nor is there any evidence related to whether the proper statistical pool was used to calculate the percentages proffered as evidence of a disparate impact. Alford testified that in comparing INDOT's compliance with mandatory federal DBE programs with other states, Indiana ranked as one of the worst. (Alford Dep. at 94.) Alford testified that he based this on the fact that Indiana's demographics were eight to nine percent black. But the statewide demographic may be a statistical universe larger than the number of firms actually qualified, willing and able to work on the construction contracts. "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501 (1989) (quoting *Hazelwood School Dist. v. United States,* 433 U.S. 299, 308 n. 13 (1977)).

Finally, Plaintiffs have failed to show how Alford's testimony will be helpful to the trier of fact, which is the "touchstone of admissibility under Rule 702." *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991). First, Alford's statistical conclusions, based on no more than simple mathematics, do not assist the trier of fact in that the jury is fully capable of drawing the same conclusions without his help. Alford is no more expert than the jury in determining percentages paid and making comparisons of the amounts paid to certain groups. He is no more qualified than the jury to draw the inferences to which he testified. Therefore, the testimony provides no assistance in evaluating the evidence. *See Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 293-94 (7th Cir.1996); *Mercado v. Ahmed,* 974 F.2d 863, 871 (7th Cir.1992); *Benson,* 941 F.2d at 604.

Second, Alford reaches legal conclusions concerning INDOT's compliance with the regulations at 49 C.F.R. Part 23 and whether certain companies should have been certified as DBEs. Alford cannot be allowed to reach such conclusions; otherwise, his testimony as an expert usurps the role of the fact-finder. *West by and through Norris v. Waymire,* 114 F.3d 646, 642 (7th Cir.1997); *Berry v. City of Detroit,* 25 F.3d 1342, 1353-54 (6th Cir.1994). Although experts are entitled to opine as to an ultimate issue in a case; *see* FED. R. EVID 704(a), the expert must also be able to substantiate his opinion. Unsupported, conclusory testimony is dangerous, because "[u]nless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403." *Hall II,* 93 F.3d at 1343; *see also Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1996).

***15** Because Alford's testimony fails to meet the *Daubert* standards for fitness and reliability, it will not be considered as expert testimony for purposes of summary judgment.

E. Remaining Objections to Plaintiffs' Statement of Material Facts

The remainder of the Defendants' objections to the Plaintiffs' evidence are that the alleged facts within the Plaintiffs' Statement of Material Facts are based upon hearsay, evidence that is irrelevant, or

statements in affidavits that are conclusory or speculative. The Defendants have submitted as part of their Motion to Strike a listing of their objections to each page of the Plaintiffs' Statement of Material Facts, to which the Plaintiffs have responded. An analysis of these objections, other than those discussed above, follows.

1. Exhibits 2-15

On pages three through seven of the Plaintiffs' Statement of Material Facts, they cite several statements regarding minority participation in state programs taken from minutes of meetings of the Governor's Commission on Minority Business Development. These minutes are labeled Exhibits 2-15. Defendants object to these exhibits on the basis that they are unauthenticated and irrelevant.

Because these documents were produced by the Defendants during discovery, the authentication argument deserves no further attention. However, the court does agree that these documents are irrelevant to the case at hand. A review of these exhibits shows that the minutes of these meetings relate to the Indiana's minority business development program established to accomplish the voluntary goal that at least five percent of *state* contracts be let to minority businesses. *See* IND.CODE ANN. § 4-13-16.5-2 (Michie 1996). As has been established, this commission had no responsibility for ensuring compliance with the *federal* DBE program related to highway funds, which is administered by INDOT. Thus, as explained regarding the Gibson Reports, *supra* Part III.C., these exhibits are not probative of any discriminatory use of federal funds. Further, these reports could be misleading and confusing to a trier of fact. The motion to strike these exhibits will be sustained.

2. Affidavit of Alonzo Harris

Plaintiffs cite the Affidavit of Alonzo Harris to support claims that several members of the Indianapolis Minority Contractors Association have submitted bids but not received any work and many others have declined to apply for minority certification or bid jobs because it is futile to do so.[FN8] Other than a statement that members and non-members of the association have expressed frustration regarding exclusion from "construction opportunities by the State of Indiana, INDOT, and DOA," the affidavit provides no other support for the Plaintiffs' assertion. Further, this assertion is based on hearsay evidence of what others have allegedly stated to Mr. Harris. Thus, the affidavit cannot be used as evidence to support this assertion.

FN8. Though Plaintiffs fail to give a cite for this affidavit, it was submitted as Exhibit 20.

3. George Roney Reports

***16** Plaintiffs cite to Exhibit 30,[FN9] a series of monthly reports prepared by George Roney, the supportive services manager in the Division of Civil Rights within INDOT, to support an allegation that the State did not provide "technical service reports" required under 49 C.F.R. Part 23 until September 1, 1994 (a month after the first complaint in this litigation was filed). Further, these reports are cited to support an allegation that the State quit filing "technical service reports" after May, 1995. Defendants object to Exhibit 30 on the basis that the documents are not authenticated and that they are not reports presented to USDOT.

FN9. The reports are actually Exhibit 30, but were cited as Exhibit 31 on page nine of Plaintiffs' Amended Brief in Support of Summary Judgment.

Defendants agree that they produced non-deliberative portions of these reports in response to a production request from the Defendants following Mr. Roney's deposition, leading the court to conclude that the authenticity of the documents is not seriously in question. However, Mr. Roney testified in his deposition that he prepared these reports at the request of his supervisor and stopped preparing them when the consensus within his department was that the reports were no longer necessary. (Dep. of George Roney, at 10-11.) The Plaintiffs have submitted no other evidence laying a foundation to show that, in fact, these reports are "technical services reports" or any other report submitted to USDOT as a requirement of receiving federal funds.

The court agrees that the Plaintiffs appear to misconstrue these reports. An examination of the reports shows that they appear to be informal monthly activity reports for the Division of Civil Rights. Comparing Exhibit 30 with Exhibit 37, the formal quarterly reports submitted to USDOT, Mr. Roney's reports do not appear to be the type of form or formal report USDOT would require. This leads the court to question the reliability and probative value of this Exhibit to support an allegation that the State is not complying with "technical" reporting requirements under 49 C.F.R. Part 23. As such, Exhibit 30 will not be admitted.

4. Statements of State Employees Made to Harry Alford

The Defendants, in addition to challenging Mr. Alford's status as an expert, have moved to strike, as hearsay, allegations in his deposition that he claims were statements made to him by other state employees. The Plaintiffs use these statements, made to either Charlotte Leavell or Bill Brown of INDOT, as support for their allegation that certification decisions were made on political considerations and not the certification requirements as mandated by the federal government. Mr. Alford alleges in his deposition that Ms. Leavell and Mr. Brown stated to him that someone told them that someone from the Governor's office called the Commissioner of INDOT and told the Commissioner to certify certain companies not otherwise eligible for DBE status. In turn, Ms. Leavell or Mr. Brown would then certify the company. (Dep. of Harry Alford, Ex. 26, at 38-39, 86, 90, 130-47.)

Ostensibly, these statements are hearsay within hearsay. In response to the Defendants' argument, Plaintiffs counter that these statements fall within two exceptions to the hearsay rule under the Federal Rules of Evidence: Rule 801(d)(2)(D), admissions of a party opponent, and Rule 801(d)(2)(E), statements by a co-conspirator of a party during the course of and in furtherance of a conspiracy. However, these counter arguments have little merit.

*__17__* As to Plaintiffs' argument that the statements are admissions of party opponents, the Defendants note an Eighth Circuit case, *Cedeck v. Hamiltonian Federal Savings & Loan Assoc.,* 551 F.2d 1136 (8th Cir.1977). In *Cedeck,* the plaintiff argued that a statement by a fellow employee of what another employee had told him was admissible as an admission of a party opponent. However, the Eighth Circuit disagreed and held that a statement containing a reiteration of what someone told another employee is not admissible as an admission when the author of the statement is unknown. *Id.* at 1138. Such is the case here. Mr. Alford testified that Ms. Leavell and/or Mr. Brown told him someone from INDOT told them to certify companies after "someone" from the Governor's office ordered the Commissioner to do so. However, the "someone" from INDOT who made the statements to Ms. Leavell and/or Mr. Brown is unknown as is the "someone" from the Governor's office. Clearly, these statements are not admissible. Nor is this result changed by the Plaintiffs' argument that the Eighth Circuit later distinguished their holding in *Pillsbury Co. v. Cleaver-Brooks Div. Of Aqua-Chem, Inc.,* 646 F.2d 1216, 1217-18 (8th Cir.1981). The statements of the employees in the *Pillsbury* case were contained in a report authored by another employee and adopted by the signature of a Pillsbury supervisor. The indicia of reliability present in the *Pillsbury* case are not present here. Thus, Mr. Alford's statements are hearsay within hearsay and will not be admitted under the admissions exception.

Further, these statements do not fall within the hearsay exception for statements of co-conspirators. In order for a statement allegedly made by a member of a conspiracy to be admissible, the Plaintiffs "must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the [Defendants] and the declarant were members of the conspiracy; and (3) the statement was made during the course of and in furtherance of the conspiracy." *United States v. Powers,* 75 F.3d 335, 339 (7th Cir.1996) (citing *United States v. Stephenson,* 53 F.3d 836, 842 (7th Cir.1995)). Here, Plaintiffs' argument fails for two reasons. First, in light of the foregoing discussion of the evidence in this case, Plaintiffs have failed to show by a preponderance of the evidence that a conspiracy existed. Second, the court agrees with the Defendants that the statements by Ms. Leavell and/or Mr. Brown cannot be characterized as being in furtherance of a conspiracy. The statements protesting the certification of certain DBEs would be in derogation of, and not in furtherance of, any conspiracy. Thus, Plaintiffs have not shown the statements fall into this exception. As such, these statements, as well as any other statements by Mr. Alford that constitute hearsay, will not be admitted.

F. Motion for Sanctions

The court notes that the Plaintiffs have filed a motion to impose sanctions against the Defendants for filing the Motion to Strike, alleging it was filed frivolously and without merit for the purposes of harassment and delay.

***18** In light of the foregoing discussion, the Defendants' motion to strike was not without merit. Further, the Plaintiffs failed to comply with Rule 11(c) when filing the motion for sanctions. Rule 11(c) requires service on the party against whom sanctions are sought at least 21 days before filing the motion with the court. This "safe harbor" provision gives the party time to correct any challenges or contentions made by the party filing the motion. FED.R.CIV.P. 11(c)(1)(A). The Plaintiffs did not comply with the 21 day notice, and thus, the motion was not proper. The Motion for Sanctions is DENIED.

IV. Plaintiffs' Claims Pursuant to § 1983 under STAA, STURAA, ISTEA and 49 C.F.R. Part 23 after *Blessing v. Freestone*

In this court's Entry dated April 1, 1996, the court outlined the remaining claims in this action. One of these claims was a claim under 42 U.S.C. § 1983 for violations of the Surface Transportation Assistance Act of 1982 ("STAA"), the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), and the regulations implementing these acts at 49 C.F.R. Part 23. Subsequently, the United States Supreme Court issued its opinion in *Blessing v. Freestone,* 117 S.Ct. 1353 (1997). In *Blessing,* the Supreme Court refined and reinforced the analysis required of the lower courts when determining whether plaintiffs may rely on § 1983 to challenge violations of federal statutes. Consequently, the court ordered the parties to supplement their briefing in this case to determine whether, in light of *Blessing,* the Plaintiffs could continue to maintain their § 1983 claims for alleged violations of these statutes and regulations.

As the Supreme Court has explained, § 1983 allows only the redressing of violations of federal "rights, privileges, or immunities," requiring a plaintiff to show that the particular statute at issue creates specific rights. *Marie O. v. Edgar,* 131 F.3d 610, 618 (7th Cir.1997) (citing *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106 (1989)). Once the rights are identified, lower courts are directed to use a three-part inquiry to determine whether the rights are enforceable under § 1983. Under that inquiry, the lower court is to decide:

(1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the Plaintiffs' asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce; and (3) whether the statute imposes a binding obligation on the state.

*Id.* (citing *Blessing,* 117 S.Ct. at 1359; *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509 (1990)).

In *Blessing,* the Supreme Court reiterated this three-part test but also reinforced and refined it. In doing so, the Court unanimously reversed a Ninth Circuit Court of Appeals decision in favor of the plaintiffs, who claimed to have an enforceable right under § 1983 to have the State of Arizona achieve "substantial compliance" with the requirements of Title IV-D related to child support services. *Blessing,* 117 S.Ct. at 1356. The Court rejected the general or blanket approach used by the Ninth Circuit in making their decision. As explained by the Court:

***19** Without distinguishing among the numerous rights that might have been created by this federally funded welfare program, the Court of Appeals agreed in sweeping terms that "Title IV-D creates enforceable rights in families in need of Title IV-D services."

...

[T]he lower court's holding that Title IV-D "creates enforceable rights" paints with too broad a brush. It was incumbent upon [plaintiffs] to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined "rights."

*Id.* at 1360. The Court remanded the case for a determination of "exactly what rights, considered in their most concrete, specific form" the plaintiffs were asserting and whether any of the specific claims

actually asserted an individual federal right. *Id* . at 1362.

Following *Blessing,* the Seventh Circuit issued its decision in *Marie O. v. Edgar, supra.* Interpreting *Blessing,* the Seventh Circuit stated that the Supreme Court had "reemphasized" the three-part inquiry, noting that lower courts "must 'examine exactly what is required of States,' " *Marie O.,* 131 F.3d at 619 (quoting *Suter v. Artist M.,* 503 U.S. 347, 358 (1992)), and "also take 'pains to analyze the statutory provisions in detail.' " *Id.* (quoting *Suter,* 503 U.S. at 357). *See Blessing,* 117 S.Ct. 1360 ("Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.") To assist in this analysis, the parties were directed to identify the particular statutory rights being asserted and the particular statutory provisions of the highway funding statutes providing those rights; apply the three-part analysis to those rights in light of the further definition provided by *Blessing;* address whether Congress intended to allow individualized enforcement under § 1983 if any rights asserted arise under federal regulations; and discuss whether enforcement was precluded by the comprehensiveness of the enforcement scheme provided to the Secretary of the USDOT. Before actually turning to an analysis of whether the funding statutes and regulations provide rights enforceable through private causes of action, a review of the statutory scheme is appropriate.

A. Federal Highway Funding Scheme

Judge Harris of the United States District Court for the District of Columbia has summarized the highway funding acts and the related DBE requirements. His thorough and comprehensive summary is included here:

Congress enacted a five-year transportation authorization act in 1983 entitled the Surface Transportation Assistance Act of 1982 ("STAA"), Pub.L. No. 97-424, 96 Stat.2097 (1983). After STAA funding expired, Congress passed the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), Pub.L. No. 100-17, 101 Stat. 132 (1987). Congress enacted these statutes to achieve minority business participation goals, primarily through the use of set-asides for qualified subcontractors. *Harrison & Burrowes Bridge Constructors v. Cuomo,* 981 F.2d 50, 53 (2d Cir.1992) (citing S.Rep. No. 4, 100th Cong., 1st Sess. 11-12 (1987), reprinted in 1987 U.S.C.C.A.N. 66, 76). Pursuant to STAA and STURAA, each federal aid recipient must make reasonable efforts to award at least 10% of these funds to businesses owned and controlled by socially and economically disadvantaged persons. The Department of Transportation promulgated regulations, codified at 49 C.F.R. Part 23 (1990), to implement these statutes.

***20** Congress conditioned the granting of federal transportation funds on the [recipient's] compliance with federal rules regarding contracting generally and STURAA in particular. A disadvantaged business must be certified as a DBE by the [recipient] pursuant to eligibility standards set forth in 49 C.F.R. § 23.62. *See generally, Car-Mar Constr. Corp. v. Skinner,* 777 F.Supp. 50 (D.D .C.1991) (providing a detailed discussion of the DBE certification process). Only a small business owned and controlled by socially and economically disadvantaged persons will be certifiable. *Id.* STURAA incorporated the definitions of social and economic disadvantage that were set forth in § 2(8) of the Small Business Act, 15 U.S.C. § 637(d) (1988).

Under the statutory scheme, the overall goal for federal fund recipients is for DBE participation to be "practical and related to the availability of [DBEs] in desired areas of expertise." 49 C.F.R. § 23.45(g). Recipients of federal funds must "develop and use affirmative action techniques to facilitate MBE participation in contracting activities." 49 C.F.R. § 23.45(c). The statute sets forth a target: not less than 10% of the amounts authorized will go to certified DBEs. STURAA § 106(c), 101 Stat. at 145. An overall goal of less than 10% may be accepted but must be supported by specific factual findings justifying a lesser percentage. *See* 49 C.F.R. § 23.65 (outlining specific factors that may justify a lesser percentage). A state must petition the Secretary of Transportation to obtain a waiver of the 10% minimum overall goal. 49 C.F.R. §§ 23.64(e), 23.65, and 49 C.F.R. Part 23, Subpart D, Appendix D. ( *See Ellis v. Skinner,* 961 F.2d 912, 915 (10th Cir.), *cert. denied sub nom. Ellis v. Card,* 506 U.S. 939, 113 S.Ct. 374, 121 L.Ed.2d. 286, 121 L.Ed.2d 286 (1992)).

Upon receiving a grant, the federal aid recipient must execute an agreement promising to submit, for Department of Transportation ("DOT") review, a disadvantaged business enterprise affirmative action

program. 49 C.F.R. § 23.43(b)....

The federal DBE statutory scheme sets both overall and contract specific goals for DBE participation. However, the plain language of the implementing regulations (49 C.F.R. § 23, *et seq.*) makes it clear that both of these goals are applicable only to federally-assisted contracts made by the federal aid recipient.

Subpart C of the implementing regulations notes that the statutes were created so that minority businesses would have "the maximum opportunity to participate in the performance of contracts *financed in whole or in part with Federal funds* under this agreement." 49 C.F.R. § 23.43(a)(1) and (2) (emphasis added). Subpart D of the regulations applies to all "DOT financial assistance ... that recipients expend in DOT-assisted contracts." *Id.* § 23.63. DOT financial assistance is defined as financial aid "provided directly in the form of actual money ... or indirectly in the form of guarantees authorized by statute ... or any other arrangement through which the recipient benefits financially." *Id.* § 23.5. DOT-assisted contract means "any contract ... which is paid for in whole or in part with DOT financial assistance." *Id.*

***21** Taken together, these provisions outline a statutory scheme in which recipients of federal funds must comply with DBE requirements for any contract financed in whole or in part with federal money. The requirement to make every reasonable and necessary effort to ensure minority participation applies to every contract between the [recipient] and any contractor that involves the expenditure of federal funds. *Cone Corp. v. Florida Dept. of Transp.*, 921 F.2d 1190, 1193 (11th Cir.1991) (construing 49 C.F.R. § 23.43(a)).

*Transworld Products Co., Inc. v. Canteen Corp.*, 908 F.Supp. 1, 3-5 (D.D.C.1995).

When Congress enacted ISTEA in 1991, it re-enacted the ten-percent DBE goal of STURAA and included women in the definition of DBEs. Pub.L. No. 102-240, 105 Stat.1914, 1919 (1991). The pertinent portion of ISTEA follows:

(1) General rule.-Except to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts authorized to be appropriated under titles I (other than part B), III, V, and VI of this Act [Pub.L. 102-240, Dec. 18, 1991, 105 Stat.1914] shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals.

(2) Definitions.-For purposes of this subsection, the following definitions apply:

(A) Small business concern.-The term 'small business concern' has the meaning such term has under section 3 of the Small Business Act (15 U.S.C. § 632); except that such term shall not include any concern or group of concerns controlled by the same socially and economically disadvantaged individual or individuals which has average annual gross receipts over the preceding 3 fiscal years in excess of $15,370,000, as adjusted by the Secretary for inflation.

(B) Socially and economically disadvantaged individuals.-The term 'socially and economically disadvantaged individuals' has the meaning such term has under section 8(d) of the Small Business Act (15 U.S.C. § 637(d)) and relevant subcontracting regulations promulgated pursuant thereto; except that women shall be presumed to be socially and economically disadvantaged individuals for purposes of this subsection.

(3) Annual listing of disadvantaged business enterprises.-Each State shall annually survey and compile a list of the small business concerns referred to in paragraph (1) and the location of such concerns in the State and notify the Secretary, in writing, of the percentage of such concerns which are controlled by women, by socially and economically disadvantaged individuals (other than women), and by individuals who are women and are also otherwise socially and economically disadvantaged individuals.

(4) Uniform certification.-The Secretary shall establish minimum uniform criteria for State governments to use in certifying whether a concern qualifies for purposes of this subsection. Such minimum uniform criteria shall include but not be limited to on-site visits, personal interviews, licenses,

analysis of stock ownership, listing of equipment, analysis of bonding capacity, listing of work completed, resume of principal owners, financial capacity, and type of work preferred.

**22* Pub.L. 102-240, Title I, § 1003(b), Dec. 18, 1991, 105 Stat.1919.

Under STURAA and ISTEA, businesses owned and controlled by African-Americans, Hispanic Americans, Native Americans, Asian Pacific Americans and women are rebuttably presumed to be both socially and economically disadvantaged. *Cone,* 921 F.2d at 1192; *Adarand Constructors, Inc. v. Pena,* 965 F.Supp. 1556, 1565 (D.Colo.1997) (on remand from the Supreme Court). *See also* 49 C.F.R. § 23.62; 49 C.F.R. pt. 23, subpt. D, App. C. The regulations "explicitly permit the state or other entity receiving the grant to apply the presumption without investigating the situation of particular applicants." *Milwaukee Co. Pavers Assoc. v. Fiedler,* 922 F.2d 419, 424 (7th Cir.1991) (citing 49 C.F.R. pt. 23, subpt. D, App. A., § 23.69, Challenge Procedure).[FN10]

FN10. This analysis of 49 C.F.R. § 23.69 states: "[T]he basic meaning of a presumption is that the recipient *assumes* that a member of the designated groups is socially and economically disadvantaged. In making certification decisions, the recipient relies on this presumption, and does not investigate the social and economic status of the individuals who fall into one of the presumptive categories." (Emphasis in original.)

As the presumption is rebuttable, "third parties may come forward with evidence to rebut the presumption of disadvantage for any particular business." *Adarand,* 965 F.Supp. at 1566 (citing 49 C.F.R. § 23.69). *See also Milwaukee Co. Pavers,* 922 F.2d at 425; *Gauvin v. Trombatore,* 682 F.Supp. 1067, 1072 (N.D.Cal.1988). Also, "the DBE program does not provide for specific quotas or goals for participation by each identifiable group of socially or economically disadvantaged individuals.... Rather, the statute establishes an overall goal of DBE participation of ten percent for *all* groups." *Gauvin,* 682 F.Supp. at 1072 (citing 49 C.F.R. §§ 23.61, 62) (emphasis added).

With this explanation of the funding scheme as reference, the court now turns to the specific questions the parties were asked to brief. As the Plaintiffs have asserted that some of the rights enforceable through § 1983 arise from regulations proscribed by the USDOT, the court will first address the question of whether Congress intended that the regulations were to provide individualized rights.

B. Does 49 C.F.R. Part 23 Provide Enforceable Rights?

The court requested the parties brief this question as there exists a split in the circuits regarding this issue. *See* Harris v.. James, 127 F.3d 993, 1005-1009 (11th Cir.1997) (discussing circuit case law). Indirectly, this issue was also raised by Justice Scalia in his concurring opinion in *Blessing,* where he questioned "whether § 1983 *ever* authorizes the beneficiaries of a federal-state funding and spending agreement ... to bring suit ." *Blessing,* 117 S.Ct. at 1364 (Scalia, J., concurring). Relying on *Harris,* the Defendants claim that, in light of the *Blessing* opinion, the regulations cannot provide such rights.

In *Harris,* the Eleventh Circuit took great pains to analyze the Supreme Court's jurisprudence under § 1983 in relation to an action by Medicaid recipients claiming an enforceable right under federal regulations to necessary transportation to and from Medicaid providers. In summarizing, the court stated that "the driving force behind the Supreme Court's case law in this area is a requirement that courts find a Congressional intent to create a particular federal right." *Id.* at 1008. In light of that focus, the Eleventh Circuit rejected the Sixth Circuit's approach of finding a federal right in any regulation that meets the three part test. *See Loschiavo v. City of Dearborn,* 33 F.3d 548, 551 (6th Cir.1994), *cert. denied,* 513 U.S. 1150 (1995). The Eleventh Circuit also rejected an approach finding enforceable rights in a valid administrative interpretation of a statute that creates an enforceable right. *Harris,* 127 F.3d at 1008 (stating that this approach was found "troubling" by the dissent in *Wright,* 479 U .S. at 437-38). As the court explained:

**23* *Wright* would seem to indicate that so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute-"in conjunction with the regulation"-may create a federal right as further defined by the regulation.

...

On the other hand, if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a "federal right" enforceable under § 1983. To hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a Congressional intent to create federal rights and with the Supreme Court's directive that courts must find that Congress has unambiguously conferred federal rights on the plaintiff. *See* Suter, 503 U.S. at 357, 112 S.Ct. at 1367; *see also* *Pennhurst [State School & Hosp. v. Halderman]*, 451 U.S. at 18, 24-25, 101 S.Ct. at 1540, 1543-44.

...

Again, we do not believe that in the absence of a federal right created by Congress, an implementing regulation can create a right enforceable under § 1983.

*Id.* at 1008-1011.

The Defendants argue that the regulations cited by Plaintiffs extend beyond the statutory requirements of ISTEA, Pub.L. 102-240 cited above. The Defendants argue that ISTEA simply provides for the Secretary of the USDOT to set goals for DBE participation, defines the term DBE, provides for an annual list of DBEs and sets uniform criteria for states to use in certifications. Thus, Defendants argue that the Plaintiffs' claims related to the regulatory requirements regarding, *inter alia,* an adequate support staff, a bonding program, a technical program, DBE directories, etc., ( *see* 49 C.F.R. § 23.45), plainly go beyond the underlying statutory provision. As the Defendants phrase it: "In the absence of unambiguous language in ISTEA, however, there is no basis to conclude that the Congress ever intended to grant such services the status of 'federal rights.' Consequently, there is no basis to conclude that the regulations cited by Plaintiffs are enforceable under Section 1983." (Defs.' Br. in Accordance with Ct .'s Order of Briefing at 20.)

In response, Plaintiffs note the dissenting opinion in *Harris.* In the dissent, Senior Judge Kravitch criticized the majority's approach of requiring a demonstration of "Congressional intent to create a particular federal right" as a departure from the three part test. *Harris,* 127 F.3d at 1014 (Kravitch, J., dissenting). Under Judge Kravitch's interpretation, § 1983 plaintiffs may assert an enforceable statutory right by simply proving the provision satisfies the three part test. *Id.* (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509 (1990)). According to Judge Kravitch, § 1983 plaintiffs, rather than bearing the burden of showing that Congress affirmatively intended to create a specific federal right enforceable under § 1983, must show only a Congressional intent to benefit them. *Id.* In support of his position, Judge Kravitch states that "[t]he proper methodology, employed by the Supreme Court and by the courts of appeals in at least eight circuits, is to consider both the statute and its implementing regulations in determining whether an enforceable right exists under the [three part] test and in defining the precise contours of such a right." One of the eight circuits noted by Judge Kravitch is the Seventh Circuit, citing to *City of Chicago v. Lindley,* 66 F.3d 819, 827 (7th Cir.1995). In further support of Judge Kravitch's interpretation, which the Plaintiffs urge this court to adopt, the Plaintiffs cite several other cases where they allege the courts viewed the statute and regulations as a whole, rather than stopping the analysis after a determination that the statute in question did not create enforceable rights. *See* *Buckley v. City of Redding, Calif.,* 66 F.3d 188, 191 (9th Cir.1995); *Laschiavo, supra;* *Miller by Miller v. Whitburn,* 10 F.3d 1315, 1319 (7th Cir.1993); *Clifton v. Schafer,* 969 F.2d 278, 284 (7th Cir.1992); *DeHarder Inv. Corp. v. Indiana Housing Finance Auth.,* 909 F.Supp. 606, 615 (S.D.Ind.1995).

***24** This question is important because, while the regulations are more narrow and specific in delineating requirements, the statutes establishing the DBE programs are considerably more vague. Whether the regulations are to be considered is "highly significant," because "the second and third parts of the [three part *Wright/Wilder* ] test to discern a federal right ... focus on the specificity and tone of the mandate to state actors." *Roman v. Morace,* No. 97 CIV. 341(DLC), 1997 WL 777844, at *4 n. 4 (S.D.N .Y. Dec. 16, 1997). If only the statute is to be considered, the Plaintiffs face a substantial hurdle

in showing they hold a federal right.

Based upon the opinion of the Seventh Circuit in *Marie O.,* issued subsequent to the court ordered briefing in this case, the court finds that it may look to the implementing regulations to determine if enforceable rights exist. In *Marie O.,* the Seventh Circuit examined regulations implementing Part H of the Individuals with Disabilities Education Act to determine whether there were rights enforceable through § 1983. In so doing, Judge Ripple stated in a footnote: "We note that the Supreme Court has looked to regulations that further define and delineate the meaning of a statute to aid in its analysis regarding whether the statutory and regulatory scheme creates rights enforceable under § 1983." *Marie O.,* 131 F.3d at 620 n. 17 (citing *Wright,* 479 U.S. at 431-32; *Wilder,* 496 U.S. at 511 & 513 n. 11). However, even when considering the regulations, the "focus must be on the statutory scheme ... taken in its totality." *Lindley,* 66 F.3d at 826. *See also* *Doe v. District of Columbia,* 93 F.3d 861, 866 (D.C.Cir .1996) (stating that Supreme Court, in *Suter,* emphasized the necessity of analyzing statutory provisions in light of entire legislative enactment). Further, as *Suter* remains good law, the relevant question is still whether Congress "unambiguously confer[red]" the right to individual enforcement. *Suter,* 503 U.S. at 357.

C. Analysis As Required under *Blessing*

In their brief, the Plaintiffs essentially allege that the State of Indiana has never met the ten percent goal required under STURAA and ISTEA. Further, the Plaintiffs allege that the State does not comply with almost every regulation under 49 C.F.R. Part 23. ( *See* Pls.' Br. in Supp. of Pls.' Implied Right of Action Pursuant to § 1983 at 8-12.) Instead of applying the *Blessing* analysis to each of these alleged rights as directed, the Plaintiffs devote the majority of the rest of their brief to the question of whether Congress either specifically or impliedly precluded individualized enforcement, ( *id.* at 15-27), presuming this to be "the only remaining possible impediment." ( *Id.* at 15.) However, the court need not reach the question of whether Congress precluded individualized enforcement. That question arises only if a plaintiff demonstrates, through the three part *Wright/Wilder* analysis, that a federal statute creates the rebuttable presumption that a right is enforceable under § 1983. *Blessing,* 117 S.Ct. at 1360. That rebuttable presumption has not been shown in this case.

***25** In analyzing the highway funding scheme, the first step of the three part test requires a determination of whether the Plaintiffs are intended beneficiaries of the statute. Further definition to the general requirement that Congress must have intended the provision at issue to benefit the Plaintiffs was provided by the Supreme Court in *Blessing:*

For instance, statutory provisions "designed only to guide the State in structuring its systemwide efforts", while they "may ultimately benefit individuals who are eligible for [statutory] services", do not give rise to enforceable rights. *Blessing,* 520 U.S. at ----, 117 S.Ct. at 1361. Any benefit conferred by such provisions upon specific individuals is "indirect [ ]" at best and thus does not "fit [the Supreme Court's] traditional three criteria for identifying statutory rights." *Id.* The example given in *Blessing* was Title IV-D's extensive and detailed requirements regarding the composition of each State's child support data processing systems. "Obviously, these complex standards do not give rise to individualized rights to computer services. They are simply intended to improve the overall efficiency of the States' child support enforcement scheme." *Id.*

*Jeanine B. v. Thompson,* 967 F.Supp. 1104, 1110 (E.D.Wis.1997). After *Blessing,* there appears to be a "guiding distinction" for the courts when making the determination of whether the first prong has been met. *Brinkley v. Hill,* 981 F.Supp. 423, 438 (S.D .W.Va.1997). That distinction is made between statutes "which prescribe a specific course of conduct to be followed by the State (no individual right), as was the case in *Suter* ..., and those statutes which specifically enumerate that an individual plaintiff is to receive a personally precise benefit (individual right found), as determined by the Court in *Wilder* and *Livadas v. Bradshaw,* 512 U.S. 107 (1994)." *Id.*

Using this criteria, it does not appear that Congress "unambiguously conferred" an individual right to enforce the state plan requirements as specified in 49 C.F.R. Part 23. Similar to the statutory provisions discussed in *Blessing,* the regulations that the Plaintiffs allege that the State does not comply with are more of the type "to guide the State in structuring its systemwide efforts." *Blessing,* 117 S.Ct. at 1361. For instance, this would include many of the program requirements in 23 C.F.R. § 23.45, such as a

bonding program, a financial assistance program, a program to remove barriers to assist DBEs, and adequate staffing. While the Plaintiffs "may ultimately benefit" from these services, they would do so only indirectly. Thus, these regulations do not give rise to enforceable rights. *See id.* ("Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied.")

***26** This conclusion is in accord with Seventh Circuit case law both pre-and post- *Blessing.* In an opinion prior to the *Blessing* decision, the Seventh Circuit was confronted with a § 1983 action by a Medicaid recipient against the Wisconsin Department of Health and Social Services to obtain funding for a liver-bowel transplant. In examining the Medicaid funding statutes and related regulations, the court stated: "In *Clifton* [ *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992) ], we read *Suter* to hold that a § 1983 action is unavailable if the federal statute at issue merely conditioned a state's receipt of federal funds on the adoption of a plan satisfying certain criteria." *Miller,* 10 F.3d at 1319. The statutory highway funding is similar in the respect that a state receives highway funding on the condition that it put a DBE program in place. The goal of that program is at least 10% participation by DBEs, as defined in the statute. Further, the 10% goal is not mandatory. Although it is clear that Congress desired a minimum goal of 10%, a state can still receive highway funds if the goal is less than ten percent and the state justifies the lower goal to the satisfaction of the Secretary of the USDOT. ISTEA, Pub.L. No. 102-240, 105 Stat.1914, 1919 ("Except to the extent the Secretary determines otherwise, ..."); *see also* 49 C.F.R. §§ 23.41(f), 23.66(b) (discussing justification, exemptions and deviations from the 10% goal). Thus, states can receive federal transportation funds even if the 10% goal is not met. To hold that each criteria of the plan adopted as a condition to receipt of the federal highway funds provides an individualized right to enforcement would be contrary to controlling precedent established in *Miller* and *Clifton,* as well as *Suter.*

Two other opinions issued by the Seventh Circuit subsequent to the *Blessing* decision support the conclusion that a § 1983 action is no longer available to the Plaintiffs. In *Mallett v. Wisconsin Division Of Vocational Rehabilitation,* the Seventh Circuit examined whether Title I of the Rehabilitation Act, which seeks to provide vocational rehabilitation services to handicapped individuals, creates enforceable rights through § 1983. In discussing the Seventh Circuit's holding in *Clifton* attempting to harmonize the Supreme Court's holdings in *Suter,* where no individual rights were found under the Adoption Assistance and Child Welfare Act, with *Wilder,* where Medicaid providers were found to have a right under § 1983 to challenge a states' method of setting reimbursement rates under the Boren Amendment to the Medicaid Act, Judge Kanne included a discussion of the application of § 1983 to Spending Clause statutes:

This Court addressed the problem in *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992). Clifton, a benefits recipient of the Aid to Families with Dependent Children ("AFDC") program, sued the Director of the Wisconsin Department of Health and Social Services under § 1983 for a temporary deprivation of his welfare benefits. See *id.* at 284. 45 C.F.R. § 205.10(a)(6)(I), however, requires all state AFDC plans to include provisions that protect a recipient from having his assistance suspended or reduced if that person is facing a reduction or termination of benefits. Like the statutory provision at issue in *Suter,* § 205.10(a)(6)(i) created only an enforceable right to insist that Wisconsin adopt a plan that satisfies the regulation's requirement. *See Clifton,* 969 F.2d at 284. In his case, Clifton did not "dispute that Wisconsin's plan meets the regulation's requirement." *Id.* He, therefore, had no right enforceable under § 1983.

***27** This holding is consistent with the Supreme Court's holding in *Wilder* because Clifton asserted a different challenge than the *Wilder* plaintiffs. " *Wilder* was a suit over the legality of the state plan: the plaintiffs in *Wilder* alleged that the state plan itself violated the Boren Amendment because the rates were not reasonable and adequate." *Id.; see Wilder,* 496 U.S. at 503-04, 110 S.Ct. at 2514-15. In allowing the plaintiffs to use § 1983, the Supreme Court in *Wilder* "held simply that health care providers could sue to enforce their right to a state plan that did not violate the Boren Amendment; it did not hold that providers had a right to challenge any deviation the state might make from a plan that did comply with federal law." *Clifton,* 969 F.2d at 285. Because Clifton alleged an "isolated violation of a concededly legal plan" and because § 205.10(a)(6) affords him only the "right to a plan that complies with the regulation's requirements," Clifton did not have a statutory right to enforce under § 1983. *Id .;*

*see also* Procopio v. Johnson, 994 F.2d 325, 332 n. 12 (7th Cir.1993) (refusing to allow use of § 1983 because of " *Clifton's* understanding of this Supreme Court precedent").

This limited application of § 1983 also traces the interactive federal-state scheme of Spending Clause statutes. These statutes do not mandate the creation of social service plans. They simply guarantee federal funds if a state elects to provide services that satisfy the federal requirements. Because § 1983 enforces only "rights, privileges, or immunities secured by the Constitution and [federal] laws," a plaintiff may utilize § 1983 only to the extent that a state plan which receives federal funding does not conform to one of the federal requirements. Section 1983, therefore, is not an appropriate means of remedying an isolated violation of an otherwise legal plan. *See* *Albiston v. Maine Comm'r of Human Servs.,* 7 F.3d 258, 263 (1st Cir.1993) (differentiating "federal-state funding statutes enacted pursuant to the Spending Clause" that place "the onus of compliance with the statute's substantive provisions on the federal government" and those that "impose a *direct obligation on the States* ") (emphasis in original).

*Mallett v. Wisconsin Div. Of Vocational Rehabilitation,* 130 F.3d 1245, 1252-53 (7th Cir.1997). Thus, *Mallet* would direct that the Plaintiffs here have a right to utilize § 1983 to enforce their right to a state plan that satisfies the requirements to receive federal highway funding, but not the right to utilize § 1983 to redress any alleged deviations from an otherwise compliant plan.

Finally, in *Marie O.,* the Seventh Circuit found that the regulations implementing Part H of the Individuals with Disabilities Education Act created enforceable rights by individuals through § 1983. In so holding, the court found that the statute at issue was specific with respect to the beneficiaries in that it required the states to provide services to *all* children with disabilities. Further, the court noted that the United States Department of Education, the agency in charge of the federal program, interpreted the legislation to mean that *all* eligible children receive early intervention services, noting specifically that Part H was described as an "entitlement program." *Marie O.,* 131 F.3d at 620 & n. 18. The DBE program at issue here is not an entitlement program. The states are not required to provide specific services to *all* DBEs. Rather, to receive funding, the State must only implement a DBE plan and establish goals to the satisfaction of the Secretary of the USDOT.

***28** As an example, the court turns to the regulations concerning the certification of DBEs, which relate to the core of the Plaintiffs' complaint that "front" companies are being used to satisfy the 10% DBE goal. 49 C.F.R. § 23.45 provides:

(f) Procedures to ascertain the eligibility of MBEs and joint ventures involving MBEs.

(1) To ensure that its MBE program benefits only firms owned and controlled by minorities or women, the recipient shall certify the eligibility of MBEs and joint ventures involving MBEs that are named by the competitors in accordance with this subpart. Recipients may, at their own discretion, accept certifications made by other DOT recipients.

(2) Recipients shall require their prime contractors to make good faith efforts to replace an MBE subcontractor that is unable to perform successfully with another MBE. The recipient shall approve all substitutions of subcontractors before bid opening and during contract performance, in order to ensure that the substitute firms are eligible MBEs.

(3) Recipients covered by the disadvantaged business program requirements of Subpart D of this Part shall, in determining whether a firm is an eligible disadvantaged business enterprise, take at least the following steps:

(i) Perform an on-site visit to the offices of the firm and to any job sites on which the firm is working at the time of the eligibility investigation;

(ii) Obtain the resumes or work histories of the principal owners of the firm and personally interview these individuals;

(iii) Analyze the ownership of stock in the firm, if it is a corporation;

(iv) Analyze the bonding and financial capacity of the firm;

(v) Determine the work history of the firm, including contracts it has received and work it has completed;

(vi) Obtain or compile a list of equipment owned or available to the firm and the licenses of the firm and its key personnel to perform the work it seeks to do as part of the DBE program; and

(vii) Obtain a statement from the firm of the type of work it prefers to perform as part of the DBE program.

49 C.F.R. § 23.45(f). *See also* 49 C.F.R. §§ 23.51, 23.53 (further discussing DBE eligibility and certification procedures).

The Plaintiffs allege that the State of Indiana does not comply with any of these requirements. However, as the Defendants have pointed out, these regulations do not provide a basis to conclude that they were intended to provide rights enforceable under § 1983. They do provide a means to assure that the DBE program benefits legitimate DBEs, and provide the Secretary of USDOT, charged with enforcement of the program, a means to ensure its integrity. These regulations provide a method for the Secretary to oversee the services provided by the states, rather than a means to ensure that individual DBEs receive funds or services. These regulations are similar to the type that caused the Supreme Court in *Blessing* to conclude that "[f]ar from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the system wide performance of a ... program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied." *Blessing,* 117 S.Ct. At 1361; *see also* Gauvin, 682 F.Supp. at 1072 (stating "there is no indication in the statute that Congress intended to provide a private right to institute a civil action challenging certification of DBEs.") FN11

FN11. This does not mean that the Plaintiffs are without recourse. 49 C.F.R. § 23.69 was implemented to provide third parties a procedure to challenge any DBE certification. *See* *Milwaukee Pavers,* 922 F.2d at 425; *Adarand,* 965 F.Supp. at 1566.

**29* Therefore, the court concludes that, although the Plaintiffs may benefit from the State's plan implemented in order to receive federal transportation funds, they are only indirect beneficiaries. Further, as the DBE program is not an entitlement program, the regulations implementing the program do not provide enforceable rights under § 1983. Under Seventh Circuit precedent established in *Clifton* and *Miller,* and reaffirmed in *Mallet* and *Marie O.* in light of the Supreme Court's decision in *Blessing,* the Plaintiffs have not established the first prong of the three part *Wright/Wilder* test.

Of further note, another aspect of the *Blessing* decision supports the conclusion reached by the court. In *Blessing,* the Supreme Court concluded that the Plaintiffs, mothers of the children eligible for state support services under Title IV-D, failed in their complaint "to request little if anything more than a declaration that their rights had been violated and an injunction requiring [the state] to substantially comply with the requirements of Title IV-D." Plaintiffs here have also asked for broad relief in the form of fashioning a set-aside program that complies with the regulatory requirements but benefitting only African-American contractors. The Plaintiffs' request essentially asks this court to micro-manage a state agency. Such a position is not the proper role of a federal court. *See* Brinkley, 981 F.Supp. at 436 n. 6 (noting that during oral argument in *Blessing,* Justice O'Connor declared that "the notion that the Federal court could be asked to come in and just take over the whole idea of whether there is substantial compliance in all its details, supervise it, struck me as going beyond any case that this [Court] has ever handed down." Further, Justice Souter questioned "why should a court in effect take over an obligation which has pretty clearly been delineated to be that of the Secretary[?].") As in *Blessing,* the Secretary of the USDOT has been given the primary responsibility of overseeing the DBE programs within the states. As such, the requested micro-management of Indiana's DBE program is not a proper role of this court.

In conclusion, the Plaintiffs may utilize § 1983 to enforce their right to a state wide plan that complies with federal requirements for the receipt of federal transportation and highway funds. The

Plaintiffs do not have rights under § 1983 to remedy isolated violations of requirements under the plan. This includes claims that certain companies should not have been certified under the DBE program.

D. Plaintiffs' Motion to Compel Discovery, Motion to Take Additional Depositions, and Motion to File Addendum to Brief in Support of Partial Summary Judgment

The Plaintiffs have filed three additional motions that the court may now address with regard to the claims under § 1983. The Plaintiffs have filed a Motion to Compel Discovery of tax returns of two companies they believe are "front" companies. They have also filed a motion to file an addendum to their Brief in Support of Partial Summary Judgment in order to submit the deposition of William Harmon, an officer in these two companies. They have also filed a motion for leave to take additional depositions of officers/owners of other companies the Plaintiffs believe are operating as "front" companies.

***30** In light of the foregoing analysis and the conclusion that the Plaintiffs do not have the right to challenge the certifications of companies under § 1983, each of these motions is DENIED. From a review of these motions, it is apparent that this additional discovery is related only to the claim that improper certifications are being made. As previously explained, the Plaintiffs' proper course of action is to challenge certifications as provided under 49 C.F.R. § 23.69.

V. Remaining Claims

In addition to the allowable § 1983 claim seeking prospective relief to enforce Plaintiffs' right to a state wide plan that complies with federal highway funding requirements, the following claims remain as previously stated in the Entry of April 1, 1996:

1. A claim under § 1983 for violations of the Fourteenth Amendment, for prospective relief only.

2. A claim directly under Title VI that Indiana state officials administer the federally funded highway program in a discriminatory fashion.

3. If sufficiently pleaded, a claim under 42 U.S.C. § 1985(3) for conspiracy to violate the Plaintiffs' civil rights.

The court notes that the Plaintiffs have alleged claims in their Third Amended Complaint that have already been determined in favor of the Defendants. All claims under 42 U.S.C. § 1983 against the State of Indiana, INDOT, and the DOA were dismissed with prejudice. ( *See* Entry of April 1, 1996 at 4.) Additionally, the claims under § 1983 are for prospective relief only, but the Plaintiffs continue to demand monetary damages without differentiating their claims. ( *See* Third Am. Compl. Count II ¶ 29 (mixing Title VI and Equal Protection Claims); Count III (restating Equal Protection claims under § 1983 and claiming monetary damages); pp. 28-30 (global request for relief as to all claims).) The Plaintiffs also appear to assert a Title VI claim under § 1983 or attempt to combine it with Equal Protection claims cognizable under § 1983. ( *See* Count II, ¶¶ 21, 26, 29; Count IV, ¶ 34.) However, all claims under § 1983 for violations of Title VI were previously dismissed. (Entry of April 1, 1996, at 21.) As such, to the extent the Third Amended Complaint asserts claims against inappropriate parties or continues to assert claims previously dismissed in the Entry of April 1, 1996, judgment will be entered in favor of Defendants. The remaining claims as described above will be analyzed below.

Also, the Plaintiffs have again requested this action be certified as a class action. However, the court has already denied class certification and the Plaintiffs have made no showing that would cause the court to reconsider this determination. Thus, for reasons previously explained, the class action certification is DENIED. ( *See* Entry Den. Mot. for Class Certification, July 23, 1997.)

VI. Plaintiffs' Motion for Partial Summary Judgment

On cross motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, *Proviso Association of Retarded Citizens v. Village of Westchester,* 914 F.Supp. 1555, 1560 (N.D.Ill.1996), and the traditional standards for summary judgment will apply even though both parties have moved for summary judgment. *Blum v. Fisher and Fisher, Attorneys at Law,* 961 F.Supp. 1218, 1222 (N.D.Ill.1997). The court considers the merits of each cross motion separately and draws all

reasonable inferences and resolves all factual uncertainties in favor of the non-moving party.

***31** Although labeled "partial summary judgment," Plaintiffs have essentially moved for summary judgment in their favor as to liability on all remaining claims. As the moving party, the Plaintiffs bear the burden of production, requiring them to identify "those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they believe] demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 423 (quoting FED.R.CIV.P. 56(c)). Plaintiffs also have the burden of proof at trial as to the remaining claims. As such, Plaintiffs, as the moving party, bear the burden of establishing "beyond peradventure all of the essential elements of the claim or defense" in order to obtain summary judgment in their favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). As the Supreme Court has explained:

The Court has said that summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944). And we have noted that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 2171, n. 11, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

... [W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a runof-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the Plaintiffs' position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." [ *Improvement Co. v.*] *Munson,* 14 Wall. [442,] 448 (1872).

***32** *Liberty Lobby,* 477 U.S. at 251-252. As a result, an unsupported motion for summary judgment does not require the nonmovant to present specific facts to show each element of its claim that there is a genuine issue for trial. "Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (7th Cir.1996) (citing *Celotex Corp.,* 477 U.S. at 323).

With these standards and the court's determination of the admissible evidence following the Defendants' Motion to Strike (Part III, *supra* ) in mind, the court turns to the Plaintiffs' Motion for Partial Summary Judgment. A review of the remaining evidence submitted by the Plaintiffs shows that it is not so one-sided that Plaintiffs must prevail on any claim as a matter of law. Nor does the remaining evidence show that reasonable jurors would find by a preponderance of the evidence that the Plaintiffs would be entitled to a verdict in their favor. Consequently, summary judgment in favor of the Plaintiffs is simply not appropriate regardless of whether the Defendants show there is a genuine issue of material fact.[FN12] As such, the Plaintiffs' Motion for Partial Summary Judgment must be DENIED.

FN12. It is clear, however, from a review of the Defendants' well-supported Statement of Material Facts that they have fulfilled their burden as the non-movant to show that the Plaintiffs are not entitled to prevail as a matter of law. Morevoer, as discussed below, the opposite is true and the Defendants win as a matter of law.

VII. Defendants' Motion for Summary Judgment

The Defendants have also filed a motion for summary judgment as to all remaining claims. Thus, in opposing this motion, the Plaintiffs' burden is to set forth, "with appropriate citations to discovery responses, affidavits, depositions, or other *admissible* evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." S.D. IND. L.R. 56.1 (emphasis added). Under the Local Rules, this burden is fulfilled by filing a "Statement of Genuine Issues." Plaintiffs did not file this statement, choosing instead to reference the "Statement of Material Facts" from their own motion for partial summary judgment. (Pls.' Br. in Opp'n to Defs.' Mot. For Summ. J. at 2.) Though this may have been a time-saving move for the Plaintiffs, it may not have been advisable in light of the previous rulings on the admissibility of the evidence submitted by the Plaintiffs. As a result, the court will consider the allegations of the Plaintiffs that dispute the Defendants' Statement of Material Facts to the extent they are supported by evidence that has not been excluded in Part III of this Entry. Those allegations will be discussed at the appropriate juncture in the analysis of each of the remaining claims. Otherwise, a summary of background facts, taken from the Defendants' Findings of Fact, is now in order.

A. Factual Summary

1. The Plaintiffs

The Indianapolis Minority Contractors Association, Inc. ("Contractors Association") was incorporated in 1971 as a not-for-profit corporation whose purpose was to donate to worthy causes, contribute to scholarship funds, and provide a meeting place to aid and assist minority businesses and contractors in the furtherance of their goals and the protection of their enterprises. (Defs.' Br. in Support of Mot. for Summ. J. [hereinafter "Defs.' Supp. Br."], App. B, Articles of Incorporation.) On September 12, 1994, approximately one month after this action was originally filed, the Indiana Secretary of State dissolved the Contractors Association for failure to file annual reports. (Defs.' Supp. Br., App. C.)

***33** Alonzo Harris is listed as an owner and controller of Kingdom Development Inc., which was certified as a Disadvantaged Business Enterprise ("DBE") in the State of Indiana under the provisions of 49 C.F.R. § 23 *et seq.* The certification, which must be renewed annually, lapsed in 1996. The DOA's Minority Development Division forwarded letters asking that Kingdom Development request recertification in February 1996, February 1997, April 1997, and May 1997. DOA records indicate that, to date, Mr. Harris has failed to respond to any of these notifications. (Decl. of Elena Looper ¶ 15.)

Fran Scott is listed as an owner and controller of Scott, Inc., which is currently certified as a DBE in the State of Indiana under the provisions of 49 C.F.R. § 23 *et seq.* ( *Id.* ¶ 16.)

Al Young is listed as owner and controller of Environ Unlimited, Inc., which is currently certified as a DBE in the State of Indiana under the provisions of 49 C.F.R. § 23 *et seq.* ( *Id.* ¶ 17.)

Robert T. Jackson, Jr., was listed as owner or operator of Nu World Builders which was certified from January 1993 to December 31, 1996 as a DBE in the State of Indiana under the provisions of 49 C.F .R. § 23 *et seq.* A diligent search of DOA records indicates that Mr. Jackson did not apply for recertification of the company after its DBE certification expired in December 1996. ( *Id.* ¶ 18.)

DOA's certification files indicate that Wrather Bennett filed an application for certification as a DBE on October 13, 1994, but he failed to include a resume, a listing of work experience, and copies of recent tax returns. He failed to respond to a request for additional information DOA sent to him in December 1994. ( *Id.* ¶ 19.)

DOA's certification files indicate that James Higginson filed an application for certification as a DBE on August 1, 1994, but he failed to include information necessary to process his application. He provided some information in response to a request for additional information DOA sent to him in September 1994, but never supplied a copy of his birth certificate, resume, or copies of recent tax returns. ( *Id.* ¶ 20.)

DOA's certification files indicate that William H. Powell filed an application for certification as a DBE on July 6, 1994, but he failed to include a copy of his birth certificate, a resume, a listing of work

experience, a list of vehicles and equipment owned by the company and titles thereto, and copies of recent tax returns. He failed to respond to a request for additional information this Office sent to him in September 1994. ( *Id.* ¶ 20.)

Records maintained by the DOA Minority Business Development Division indicate that James M. Johnson was the owner and controller of Mikeco Construction, Inc., a/k/a Mikeco Cement Contractors, a certified DBE. In the Fall of 1993, Mr. Johnson's certification was withdrawn at his request. On June 6, 1995, DOA certified James M. Johnson, Mikeco Construction, as a Minority Business Enterprise ("MBE"). His MBE status allowed him to participate as a minority contractor in state projects. ( *Id.* ¶ 14.)

***34* A diligent search of the certification files maintained by the DOA Minority Business Development Division, indicates that DOA has no record that Clyde Ashby and George Graham ever filed an application or certification as a DBE. ( *Id.* ¶ 21.)

2. The Defendants.

The Defendants are: Curtis A. Wiley, in his official capacity as Commissioner of the Indiana Department of Transportation; INDOT; Betty Cockrum, in her official capacity as Commissioner of the Indiana Department of Administration; DOA, and the State of Indiana. The court has already dismissed all claims under 42 U.S.C. § 1983 brought against the State, INDOT and DOA and all claims for damages against the state officials sued in their official capacity because, as this court observed, neither the state nor its agencies or officers are "persons" within the meaning of 42 U.S.C. § 1983. ( *See* Entry of April 1, 1996 at 4.) The DOA does not have any responsibility or authority to oversee and direct payment of funds to contractors and subcontractors engaged in programs financed in the State of Indiana by federal aid highway grant money. The DOA does not administer or disburse any of said funds. ( *Id.* ¶ 6.) Disbursement of the funds is handled by INDOT.

3. Indiana's DBE program meets all federal requirements.

INDOT has consistently followed and enforced the provisions of federal law and the applicable regulations to ensure participation by DBEs [FN13] in federally funded highway projects. (Decl. of Charlotte Leavell ¶ 4.) In furtherance of its commitment to the use of DBEs in all aspects of contracting, the Defendants have implemented a DBE program that contains all the elements set forth in 49 C.F.R. § 23.45(e) through (i). (Decl. of Charlotte Leavell ¶ 6, Ex. 2.) INDOT also has devoted seven professionals and support personnel and six district EEO officers to assist in its Civil Rights Division to administer the DBE, Title VI and Title VII programs. Among their duties, they are to provide supportive services to certified DBEs to ensure compliance with the provisions of the federal regulations that were enacted to increase the involvement of minorities and women in the road construction industry. ( *Id.* ¶ 8.) In addition, DOA has a staff of four professionals and support staff in its Minority Business Development Division who are responsible for the certification of DBEs under the federal regulations and minority business enterprises under state law. (Decl. of Elena Looper ¶ 8.)

FN13. Although 49 C.F.R. Part 23 refers to MBEs, the term DBE more precisely defines those whom the regulations intend to benefit. A DBE is a small business concern that is owned and controlled by one or more minorities or women or that has demonstrated that its owners and controllers are otherwise socially and economically disadvantaged.

The Federal Highway Administration ("FHWA") originally approved the State's DBE program in 1983. (Decl. of George Roney ¶ 5.) From time to time, INDOT has submitted improvements in its DBE program to FHWA, which FHWA has approved. ( *Id.* ¶ 6.) States are not required to update their DBE program every year, but federal officials do reassess the approval of existing DBE programs at least annually. 49 C.F.R. § 23.41(d)(2). Indiana last received federal approval for the program in 1996.[FN14] ( *Id.* ¶ 6.)

FN14. FHWA advised INDOT not to submit an update for fiscal year 1997, because it is revising its rules in light of the decision in *Adarand, 965 F.Supp. 1556*. (Decl. of George Roney ¶ 6.)

a. Policy Statement
    *35 INDOT's commitment to the DBE program is expressed in its policy statement. *See* 49 C.F.R. § 23.45(a). In this statement, issued by its Commissioner, INDOT expressly recognizes that the protection of each citizen's civil rights is the highest priority and that no person shall be denied equal opportunity. INDOT further expresses its commitment not to allow any person or business to be excluded from participation in, denied the benefits of, or otherwise be discriminated against in connection with the award and performance of any contract because of race, color, national origin, sex, age, or disability. (Decl. of Charlotte Leavell ¶ 9, Ex. 2, Att. 2.) INDOT also declares its commitment to use, to the maximum extent feasible, DBEs in all aspects of contracting; outlines various levels of responsibility; and states the objectives of the program. ( *Id.* ¶ 10, Ex. 2, Att. 2.) INDOT, through its Civil Rights Division, circulates the policy to INDOT staff, contractors, and to minority, female, and non-minority community and business organizations. ( *Id.* ¶ 11.)


b. Liaison Officer
    INDOT's Commissioner has designated Charlotte Leavell, the Chief of the INDOT Civil Rights Division, as DBE liaison officer to manage and coordinate the agency's DBE programs in accordance with 49 C.F.R. § 23.45(b). ( *Id.* ¶ 2, Ex. 2, Att. 3.) The liaison officer is authorized to implement and administer the DBE program. ( *Id.* ¶ 2, Ex. 2, Att. 3.) Her authority, responsibilities, and duties are described in detail in the DBE program manual. ( *Id.* ¶ 2, Ex. 2, Att. 3.) *See* 49 C.F.R. § 23.45(b)(2). She performs all duties assigned to her by the Commissioner of INDOT in accordance with 49 C.F.R. § 23.45(b)(2). These duties and responsibilities include implementing the DBE program on a day-to-day basis, carrying out technical assistance activities for DBEs, and disseminating information on available business opportunities so that DBEs are provided an equitable opportunity to bid on contracts. (Decl. of Charlotte Leavell ¶ 2, Ex. 2, Att. 3.)


c. Procedures to Ensure Equitable Opportunities to DBEs
    INDOT ensures that DBEs have an equitable opportunity to compete for contracts and subcontracts as mandated by 49 C.F.R. § 23.45(c). INDOT arranges solicitations, time for the presentation of bids, quantities, specifications, and delivery schedules to facilitate participation by DBEs. (Decl. of William Brown ¶ 5.) INDOT requires prime contractors to solicit bids from certified DBEs as part of its good-faith efforts requirements. Certified DBEs who request to be placed on INDOT's mailing list are provided notices of bids. These notices are also posted on the Internet and in Indiana Contractor's Association publications. ( *Id.* ¶ 6.)

    INDOT's Civil Rights Division has a Supportive Services Division, which includes a Manager. Through this Division, INDOT has provided managerial and technical assistance to DBEs since the 1970's. (Decl. of George Roney ¶ 7.) Prior to June 1990, these services were provided through contractual agreements with outside sources. The first consultant was the Indiana Contractors Educational Center, Inc ., which held the contract until 1983. Thereafter, the Indiana Department of Commerce, Minority and Women Business Development Office was awarded the contract. That office provided supportive services until June 30, 1990. Both of these services provided assistance through training workshops and one-on-one consultations in estimating, bidding, bookkeeping, marketing, financial issues and other areas directed by INDOT. ( *Id.* ¶ 8.)

    *36 From July 1990 through the present, INDOT's Supportive Services Office has provided or directed these services. DBE assistance is provided for business planning, bookkeeping, marketing, accounting, estimating, bidding, employee relations, contract negotiations, computerization, financial decisions and other business related issues. ( *Id.* ¶ 9.) Periodically, consultants are contracted to perform selected training or individualized assistance to DBEs. These consultants are continuously monitored by the Supportive Services Manager who attends the training or workshop sessions and is present during some of the one-on-one consultation sessions. ( *Id.* ¶ 10.) Specifically, INDOT has provided the following services to assist DBEs, at no cost to them:

    i. Conducted internal orientation sessions for newly certified Indiana DBEs in which INDOT staff present information on INDOT's procedures regarding pre-qualification, bidding, contracting, construction, subcontractor payment, and other processes. The purpose of this session is to familiarize

minority contractors with INDOT and how to conduct business with INDOT.

ii. Provided training on the metric system through Ivy Tech State College in 1995 and 1996. All certified DBEs were advised of this free training opportunity by letter in both 1995 and 1996. ( *Id.* Ex. 2.)

iii. From 1993 to 1995, a consultant, I.T. Business Corp., Inc., an African-American firm from Indianapolis, worked one-on-one with individual DBE firms to improve their business operations. I.T. Business Corp. provided training in finance and bookkeeping analysis, business plan preparation, job cost, cash flow preparation and analysis, bid estimation, recapitalization, computerization, strategic planning, management information systems, loan packaging assistance, and others.

iv. Attended trade fairs, organized meetings, and performed other outreach functions for the purpose of reaching non-certified DBE firms, informing them of INDOT DBE programs, and encouraging them to become certified.

v. Referred DBEs to established state and federal business assistance organizations when appropriate.

vi. Encouraged DBE firms to contact the civil rights office regarding any problems that arise on the job site or with respect to any aspect of their relationship with INDOT and prime contractors and respond and seek to resolve such problems and complaint in a prompt manner.

vii. In 1996, INDOT returned to the classroom style training workshops by contracting with W.C. Benton and Associates, Inc., an African-American consulting firm from Ohio. The consultant conducted a twelve-day work shop to instruct 25 to 30 Indiana DBEs on all aspects of operations of a construction business, including estimating, bidding, business plans, financial records and planning, etc. This same workshop was repeated for another group of DBEs in 1997, with a six-day supplement for the 1996 class. Three of the individual plaintiffs, Fran Scott, Robert Jackson, and Al Young took advantage of this training opportunity. ( *Id.* Exs. 3 and 4.)

  ***37** ( *Id.* ¶ 11.)

INDOT strives to remove barriers DBEs frequently encounter in other states by not requiring subcontractors to be bonded. In addition, INDOT is exploring using Supportive Services funding to provide direct financial assistance to DBEs. INDOT has submitted a proposal for DBE financing assistance to the FHWA and is awaiting a response. ( *Id.* ¶ 12.)

The funding for INDOT's Supportive Services is established by the FHWA. Typically, Indiana's yearly allocation for Supportive Services is generally between $150,000 and $180,000. INDOT has never refused such funds. After receiving notice of the FHWA's allocation of funds, INDOT submits a plan to utilize the funds to the FHWA for its approval. Supportive Services funds are used exclusively for the recruitment of DBEs, managerial and technical assistance to DBEs, and monitoring of DBE activities. INDOT has never returned unused portions of funds not used for any particular year. Any funds not used by Supportive Services are retained for use in subsequent years. ( *Id.* ¶ 13.)

INDOT has established a mentor-protégé program for contractors on INDOT contracts. ( *See* Decl. of Charlotte Leavell, Ex. 2, Att. 9.) This program encourages an established contractor to enter into an arrangement to train an existing DBE contractor on a per contract basis and has been available since July 1993. To date, only one contractor has submitted an application for mentor-protégé approval, but this application was not acted upon because the contractor did not get the contract. ( *Id.* ¶ 12.)

d. DBE Directory

From 1983 until approximately 1994, INDOT published a DBE directory monthly and distributed it to all prime contractors who requested bid documents on all federal-aid construction projects and to all other businesses or individuals who requested a copy. ( *Id.* ¶ 13.) The directory identified all certified DBEs by name, address and phone numbers and indicated the types of work performed, contact person and geographical area of desired work. *See* 49 C.F.R. § 23.45(e). After 1994, directories were published

at least quarterly and were available to all contractors upon request. (Decl. of Charlotte Leavell ¶ 14.) Since 1993, the DOA has published a directory of DBEs who are certified under the provisions of 49 C.F.R. Part 23 and will soon place the directory on the Internet. (Decl. of Elena Looper ¶ 23.)

e. Certification Procedures

Prior to August 1, 1993, INDOT determined applicants' eligibility for certification as DBEs and took the steps contained in 49 C.F.R. §§ 23.45(f)(3) and 23.53 to determine whether an applicant was qualified for the program. As of August 1, 1993, that task was transferred to the DOA's Office of Minority Business Development. (Decl. of George Roney ¶ 14; Decl. of Elena Looper ¶ 7.) The purpose of the certification investigation is to determine whether the applicant belongs to a group that is presumed to be socially and economically disadvantaged and whether the business is an independent business owned and controlled by a minority or woman applicant. All applicants are required to submit records such as birth certificates, visas, passports or driver's licenses to establish whether they fall within one of the presumptively disadvantaged categories. Also, all applicants must submit resumes, capital contribution documents showing how the individual acquired the ownership interest in the firm, loan agreements, lease agreements, individual and corporate income tax records, and titles to real estate and equipment connected with the firm. Each applicant must submit the same documentation, whether or not the applicant is presumed to be disadvantaged. (Decl. of Elena Looper ¶ 9.)

*38 The process for determining whether an individual or firm is disadvantaged consists of a desk audit of the documentation and an on-site review to verify the existence of the business. In the course of each investigation, certification staff perform on-site visits to the offices of the firm, and on occasion, to job sites, obtain resumes or work histories of the principal owners, interview the principal owners, analyze the ownership of the firm, determine the work history of the firm, compile a list of equipment owned or available to the firm, and obtain a statement from the firm of the type of work it prefers to perform. ( *Id.* ¶ 10.) A certification coordinator conducts the initial review and files a report and recommendation to the Deputy Commissioner for Minority Business Development. If the recommendation is to certify and the Deputy Commissioner concurs, a certification letter is sent to the firm. If the recommendation is to deny and the Deputy Commissioner concurs in the denial, the file is forwarded to the General Counsel for the DOA for final review. If the General Counsel concurs in the denial, the denial letter with cause and information on the appeals process is sent to the applicant. An applicant who is denied certification may appeal the denial to an administrative law judge in accordance with the State's Administrative Orders and Procedures Act, IND.CODE § 4-21.5-3. ( *Id.* ¶ 11.)

Any third party, however, may challenge the socially and economically disadvantaged status of a business owner that the State has certified under 49 C.F.R. Part 23. 49 C.F.R. § 23.69. The challenge must be made in writing to the recipient and include all information available to the challenging party relevant to a determination of whether the challenged party is in fact socially and economically disadvantaged. ( *Id.* ¶ 12.) None of the plaintiffs in this action have ever formally challenged the certification of any DBE through the § 23.69 procedure. (Decl. of William Brown ¶ 7; Decl. of Elena Looper ¶ 12.)

f. INDOT Meets its Overall 10% DBE Goal and Sets Practical Contract Goals.

Indiana has complied with the requirements of the federal acts and regulations to establish an annual DBE goal. Recipients are required to set overall goals based on two factors: (1) a projection of the number and types of contracts the recipient will award and a projection of the number of DBEs likely to be available to compete for the contracts; and (2) past results of the recipient's DBE efforts. These factors are used to implement the DBE program goal of supporting "the fullest possible participation of [DBE firms]." 49 C.F.R. § 23.1.

Since 1983, Indiana has set an annual overall ten percent DBE goal for all its federally funded highway construction projects. The annual goal is submitted to FHWA and a public notice published. (Decl. of William Brown ¶ 8.) In addition, since 1983, Indiana has consistently met or exceeded its annual goal of ten percent participation by DBEs on federal highway construction contracts. ( *Id.* ¶ 9; Pls.' Br. in Supp. of Mot. for Partial Summ. J., Ex. 37.) In fact, in federal fiscal year 1995, INDOT nearly doubled its ten percent DBE goal by achieving an overall 19.65 percent DBE participation in federally funded highway construction projects. (Decl. of William Brown ¶ 10, Ex. 3.)

*39 The regulations also require recipients to establish individual contract goals for DBE participation on specific prime contracts that have subcontracting possibilities. 49 C.F.R. § 23.45(g)(2). The regulations do not require the State to set ten percent as the goal on all contracts. Rather, as with the overall annual goal, individual contract goals must be practical and based on such specific criteria as the availability of *qualified* DBEs in desired areas of expertise and within a reasonable geographic area. *Id.* §§ 23.45(g)(1), (7), (8). This means that some contracts have 0% DBE goals and others have more than 10%.

In setting the goal, INDOT evaluates each contract individually. Factors considered include, but are not limited to, the geographic location of the contract, its size, the number of items that can be performed by certified DBEs, the number of certified DBEs that can perform the work, the relative location of certified DBEs who can and are willing to work in the area, the current workload of those DBEs and DBE prequalification limits. (Decl. of William Brown ¶ 12.) William Brown, INDOT's Contract Compliance Coordinator, wrote an article that was published in the Transportation Research Record that explained INDOT's method of setting individual contract goals prior to 1993. ( *Id.* Ex.4.) The same method has been used since 1993, but without a committee. The goals are set and reviewed by individuals from the Civil Rights Division and Technical Services Division. ( *Id.*)

Since September 1995, the Standard Specifications for each INDOT contract for federally funded highway projects includes the "Disadvantaged Business Enterprise Procedure." This provision advises the prime contractor of its obligations to meet the DBE contract goal and that its failure to do so, without demonstrating good faith efforts, will result in the loss of the contract and possible other sanctions. Prior to September 1995, this provision was inserted into each prime contract. ( *Id.* ¶ 11, Ex. 2.)

g. Assurance of Good Faith Efforts
These individual contract goals are not rigid requirements that contractors must meet under all circumstances. A bidder that fails to achieve an individual contract DBE goal may remain eligible to be awarded the contract if it can demonstrate that it has made good faith efforts to meet the goal. 49 C.F.R. §§ 23.45(g)(2)(ii), (h).

William Brown, Contract Compliance Manager, reviews all contract documents after each letting to assure that the contractor who submitted the lowest and best bid has met the DBE participation goal set for the contract. If the contractor failed to list enough DBEs to meet his goal or lists an uncertified company as a DBE, INDOT notifies the contractor in writing that it must demonstrate its "good faith efforts" to meet the participation goal within seven days and it will lose the contract if unsuccessful in doing so. The civil rights staff reviews these good faith efforts using the criteria set forth in Appendix A to 49 C.F.R. § 23.45 to judge whether the contractor has indeed made good faith efforts. A contractor must also demonstrate "good faith efforts" if he fails to meet the DBE contract goal in the performance of the contract. (Decl. of William Brown ¶ 14.)

*40 A prime contractor that fails to meet the contract goal either at the time the contract is awarded or in the performance of the contract is required to demonstrate that he has made "good faith efforts" to meet the contract goal and to document those efforts as outlined in 49 C.F.R. § 23.45 (including App. A). If a prime contractor has met the minimum participation goal in a contract or has met the stringent requirements for demonstrating good faith efforts, INDOT cannot lawfully deny the award of a contract or payment of a contract because it is required by statute to award each contract to the lowest and best bidder. IND.CODE § 8-23-9-3. INDOT has determined in only three cases out of the 723 federal highway contracts let since 1992 that a contractor demonstrated inability to meet the established DBE contract goals, despite good faith efforts. In two other cases, INDOT staff determined that contractors who met the minimum DBE participation goals within seven days after the letting had not taken good faith efforts prior to the bid. INDOT denied these two contracts. In one of those cases, an administrative law judge overturned INDOT's determination. In one other case, INDOT denied a contract because the prime contractor failed to make good faith efforts within seven days after the letting. ( *Id.* ¶ 15.)

Requiring a showing of "good faith efforts" does not necessarily mean that the contractor has failed to subcontract with any DBE firms. It merely means the contractor has fallen short of the contract

participation goal. Thus, if the participation goal is 10% and the contractor has achieved a participation goal of 9.98%, the contractor must demonstrate compliance with the good faith efforts requirements, even though it has employed at least one DBE firm. INDOT maintains records regarding its "good faith efforts" notifications and determinations. ( *Id.* ¶ 16.)

h. Methods to insure compliance

INDOT's six district offices monitor each federal highway project within their district for compliance with DBE requirements. The Project Engineer has primary responsibility for monitoring a project. ( *Id.* ¶ 17.) To ensure compliance, the District, with the assistance of the Project Engineer, interviews the prime contractor, each DBE sub-contractor, and even employees of the contractor to ensure compliance with the federal regulations. The District checks to see that the DBE firm selected by the prime contractor is actually performing the work. INDOT has given the Project Engineer the authority to stop the project if the DBE firm is not on the job site performing the work or if the prime contractor or some other sub-contractor is actually performing the work assigned to the DBE firm. ( *Id.* ¶ 18.)

On average, Mr. Brown conducts compliance reviews of approximately thirty (30) prime contractors and seventy (70) subcontractors annually. INDOT conducts a compliance review of most new prime contractors. INDOT conducts compliance reviews of all active prime contractors every two or three years. For each review, a formal report is prepared and submitted to FHWA. ( *Id.* ¶ 19.) In addition, each year, a staff member of the office of civil rights or supportive services conducts a tour of project job sites in each district where DBE firms are employed. This tour is conducted in conjunction with FHWA. At each job site visited, the state and federal personnel interview the Project Engineer, the DBE firm, the prime contractor, and employees on the site. ( *Id.* ¶ 20.)

***41** George Roney, INDOT Supportive Services Manager, visits project job sites and other INDOT locations to monitor compliance with DBE goals and to resolve disputes which arise involving minority subcontractors. George Roney also spends a significant amount of time at the INDOT central office working to resolve such disputes. (Decl. of George Roney ¶ 3.) The Civil Rights Division encourages minority contractors to contact the office regarding issues and problems concerning payment for work performed for the prime contractor. With the assistance of INDOT's Contract Support Supervisor, the office assists minority contractors to assure that they are paid. Disputes involving allegations of discrimination are rare; almost all are issues regarding slow pay, timing, or scope of work. ( *Id.* ¶ 17.)

INDOT performs a final compliance check at the end of each contract. Each prime contractor must submit a Disadvantaged Business Enterprise Utilization Affidavit, signed by both the prime contractor and the DBE sub-contractor, that acknowledges payment made and received. This process provides a final check to ensure prime contractors are contracting with the DBEs it listed in the bidding process. This form must be submitted to INDOT before the contract is closed. (Decl. of William Brown ¶ 21, Ex. 5.)

Prime contractors desiring to offer bids for the performance of contracts for the construction of highway and bridges in Indiana must first be prequalified by INDOT's prequalification committee. IND.CODE § 8-23-2-6; IND. ADMIN. CODE tit. 105, r. 11-2-1 *et seq.* INDOT's prequalification committee may impose sanctions upon prime contractors that fail to meet their DBE contract goal and fail to demonstrate and document good faith efforts. IND. ADMIN. CODE tit. 105, r. 11-2-8(a)(10). Since 1992, the prequalification committee has taken action against 17 prime contractors who failed to meet DBE goals or violated other DBE provisions, including 49 C.F.R. § 23.49. These adverse actions included issuing warning letters, suspensions, revocations and lessening the prime contractors' prequalification status. (Decl. of William Brown ¶ 22.)

i. Set aside contracts.

The federal implementing regulations permit states to use set-aside programs as one portion of an overall program to meet the goals set under STURAA. 49 C.F.R. § 23.45(k). The set-aside programs allow certain contracts to be awarded to the successful bidder from a pool of bidders limited exclusively to disadvantaged businesses. The regulations permit states to establish set-asides "[w]here not prohibited by state or local law and determined ... to be necessary to meet [federal] goals." 49 C.F.R. § 23.45(k).

INDOT in the past has designated DBE set-aside contracts approximately once a quarter. The Civil Rights Division reviews all federal aid contracts to establish a DBE goal and also to identify an appropriate contract to be designated as the DBE set aside. The Division has adopted guidelines for selection of set-aside contracts. (Decl. of Charlotte Leavell ¶ 15, Ex. 2, Att. 8.) FHWA has recommended, however, that the Division discontinue letting set-aside contracts pending the adoption of FHWA's final rules.FN15 (Decl. of William Brown ¶ 23.)

FN15. The Department of Transportation has issued a notice of proposed rulemaking proposing revisions of the DBE regulations in light of *Adarand.* 62 Fed.Reg. 29547 (May 03, 1997). Therein, DOT discouraged set-aside contracts observing:If race-neutral means are the first resort under this proposed section, then set-asides and other more intrusive means, such as a "conclusive presumption," are the last resort. By a set-aside, we mean a procurement practice that permits no one but DBEs to compete for a given contract. Only if the recipient documents that there are no other, less intrusive, ways to meet DBE goals, and only if the recipient has state or local authority independent of Part 26, should the recipient use means of this kind on a DOT-assisted contract.

*Id.* at 29560.

j. Reporting and Record Keeping Requirements Met

***42** As required by 49 C.F.R. § 23.49, INDOT maintains records of procedures adopted to comply with the federal regulations, awards to DBEs, and specific efforts to identify and award contracts to DBEs. (Decl. of Charlotte Leavell ¶ 20, Ex. 2, p. 4.) INDOT also submits quarterly reports to FHWA regarding contracts awarded to DBEs. (Decl. of William Brown ¶ 9, Ex. 1.; Pls.' Br. in Supp. Ex. 37.) These reports demonstrate that each year INDOT has met or exceeded its overall ten-percent DBE goal.

4. Complaint Investigations and Title VI Compliance

The Division of Civil Rights is responsible for enforcement and compliance in the following activities: Title VI, affirmative action (external), contract compliance, DBE supportive services and the DBE program. (Decl. of Charlotte Leavell ¶ 16.) The Chief of the Civil Rights Division, together with her Title VI specialist, are responsible for developing, coordinating, and implementing INDOT's overall Title VI program. Pursuant to Title VI, the Division processes, investigates and works to resolve informal and formal Title VI complaints in accordance with 49 C.F.R. Part 23. INDOT forwards formal written complaints under Title VI to FHWA and also conducts its own investigation. (Decl. of Shirley McCroy ¶¶ 5 and 7, Ex. 2, 3, and 4.)

INDOT's Civil Rights Office receives numerous requests for assistance as a routine part of its daily activities. These requests, which are generally unwritten, concern matters requiring immediate attention and usually involve contractual problems occurring on contract job sites. (Decl. of Charlotte Leavell ¶ 17 .) INDOT's Civil Rights Office seeks to respond to such requests and resolve them quickly. Sometimes a phone call resolves the entire dispute. These requests for assistance have not risen to the level of formal, written Title VI complaints to be submitted to FHWA, nor do they concern INDOT's administration of its DBE programs. INDOT's monitoring activities with respect to its MBE/DBE programs extends to all INDOT contracts and all local public agency highway contracts utilizing federal funds administered by INDOT. ( *Id.* ¶ 18.)

INDOT personnel typically are not notified which companies, including DBEs, bid on subcontracts let by prime contractors on federally funded construction contracts, unless bidders complain. INDOT personnel are notified of the subcontractors the low bidder chooses to meet the DBE goal. None of the Plaintiffs in this action has complained to INDOT that he bid on a subcontract to a construction contract administered by INDOT and was denied the bid on the basis of race-based discrimination. (Decl. of William Brown ¶ 24; Decl. of George Roney ¶ 18.)

INDOT administers all highway construction contracts directly, even those for cities and towns. The

only federal highway financial assistance that INDOT funnels directly to cities, towns or metropolitan planning organizations for their administration are funds to contract with consultants. None of the named Plaintiffs in this action are DBE consultants. (Decl. of Charlotte Leavell ¶ 19 .) The Title VI Specialist reviews state directives and conducts Title VI training for the Title VI designee in each of INDOT's divisions. INDOT submits to FHWA on an annual basis a Title VI Update, a Title VI Accomplishment Report, a Title VI Annual Work Plan, Title VI Assurance, and a Title VI Policy Statement. (Decl. of Shirley McCroy ¶ 6, Ex. 2, 3, and 4.) On November 22, 1993, Mr. Arthur Fendrick of the FHWA sent a letter to Mr. D.W. Lucas of INDOT commending INDOT for its Title VI programs as well as for its 1994 Title VI Update. ( *Id.* ¶ 8, Ex. 5.)

**43* INDOT's Title VI Specialist follows the procedures in the Compliance Officer's Manual to resolve deficiencies. This manual is prepared by the United States Commission on Civil Rights. ( *Id.* ¶ 5.)

INDOT has a Title VI Plan that includes a complaint review and investigation process. ( *Id.* ¶ 6, Ex. 2, pp. 11-13.) INDOT reviews all Title VI complaints, those alleging denial of access because of race, sex, religion, national origin, age or disability, it receives. INDOT's Title VI complaint process covers Title VII and ADA issues for all federal aid recipients. ( *Id.* ¶ 9.) In addition, the Title VI Specialist is responsible for reviewing compliance with Title VI by all INDOT divisions, consultants, contractors, subcontractors, and vendors. ( *Id.* ¶ 10.) Further, one week each July, INDOT requests employment statistics from all prime contractors and subcontractors performing highway contracts at the time and reviews them for compliance with Title VI. (Decl. of William Brown ¶ 19.)

INDOT's Division staff has made a diligent search for any Title VI complaint made by a DBE or any of the plaintiffs in this cause. To their knowledge, the only Title VI complaint that INDOT received from any of the Plaintiffs was one by Mr. William Powell in December 1993, pertaining to a bid on an Indianapolis Public Transit contract. (Decl. of Shirley McCroy ¶ 11, Ex. 6.) Although the complaint did not relate to any INDOT construction-related contract, Ms. McCroy met with a representative of the City of Indianapolis and Mr. Powell in an attempt to resolve the dispute. She urged him, if he was still dissatisfied, to file a formal complaint with FHWA. ( *Id.* ¶ 12, Ex. 7.) INDOT has never refused to act on or investigate such complaints. (Decl. of Charlotte Leavell ¶ 16.)

B. Section 1983 Claim for State Wide Plan in Compliance with Regulations

The above section comprehensively details the methods by which the State of Indiana complies with both Title VI and the regulations at 49 C.F.R. Part 23 with regard to its receipt of federal highway transportation dollars.[FN16] It is against this well-supported factual statement that the Plaintiffs argue that the State of Indiana does not have a state wide plan in compliance with federal requirements. Upon reviewing the admissible evidence submitted by the Plaintiffs, the court finds that the following arguments remain in Plaintiffs' effort to show that Indiana's state wide plan is not in compliance:

> FN16. As noted above, the summary of background facts in this case was supplied by the Defendants as the Statement of Material Facts accompanying their motion for summary judgment.

1. The State does not have a bonding or financial assistance program in place. (Pls.' Amend. Br. in Supp. of Mot. for Summ. J. at 11.)

2. The State does not always conduct site visits as part of the DBE certification process. ( *Id.*)

3. Indiana has never met the ten percent goal requirement. ( *Id* . at 13.)

1. Bonding and Financial Assistance Programs

The Plaintiffs allege that the State does not now, and never has had, a bonding or financial assistance program in place. The State counters this argument by stating that INDOT does not have a bonding program because, in an effort to remove barriers confronting DBEs, it does not require subcontractors to be bonded. INDOT has also discussed the possibility of putting bonding and financial assistance programs into place and has submitted a financing assistance program to the FHWA and is

awaiting approval. ( *See* Ex. 19 of Pls.' Amend. Br. in Supp. of Partial Summ. J., Interrogatory No. 14; Decl. of George Roney, ¶ 12.) Further, the Defendants also allege that bonding or financial assistance programs are not required and the failure to establish them has no evidentiary value. (Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J. at 5.)

***44** The court has reviewed the regulations at 49 C.F.R. Part 23 and concludes that the Defendants are correct in their assertion that such programs are not mandatory requirements of state wide plans. Although such plans are mentioned in 49 C.F.R. § 23.45(c)(2) as a procedure to ensure the DBEs have opportunities to compete for contracts and subcontracts, they are not a mandatory requirement per § 23.41. Under that section, recipients of federal assistance are to follow the general requirements listed under § 23.43 and implement a state program "containing the elements set forth in *§ 23.45(e) through (i)*. 49 C.F.R. § 23.41(a)(2) (emphasis added). As bonding and financial assistance programs are not included in § 23.45(e) through (i), whether the State has such a program is not probative of a failure to comply.

2. The State Does Not Always Conduct Site Visits in the Certification Process

The Plaintiffs allege that the State does not always conduct site visits in connection with the DBE certification process. To support this argument, the Plaintiffs cite to page 50 of Exhibit 32, the deposition of Marie McNelis, president of Tri Mack Barricades, a company which the Plaintiffs claim is a "sham" or "front" company. However, Ms. McNelis' deposition is actually Exhibit 31 and there is no reference whatsoever to site visits on page 50. The closest reference to site visits is on page 59 of the deposition. But the testimony there does not conclusively establish that site visits are not conducted. Ms. McNelis testified only that she had no knowledge of a site visit prior to her firm's initial certification. This does not conclusively establish that a site visit was not conducted, only that Ms. McNelis was not aware of one. Further, even if a site visit was not conducted in this instance, it would be an "isolated incident" in an otherwise compliant plan, which would not be redressable through § 1983. *See* Part IV.C. *supra.*

The Plaintiffs also attempt to bolster their argument by pointing to the fact that many of the firms listed as DBEs in the directories required under 49 C.F.R. § 23.45(e) have post office box numbers rather than street addresses. This, Plaintiffs allege, indicates that the State, through the DOA or INDOT, did not conduct site visits in the certification process. However, the Plaintiffs cite no regulation to show that street addresses are required by federal law and the court could find no such requirement in the regulations at 49 C.F.R. Part 23. Further, the Plaintiffs belie their own argument by stating that many of the firms allegedly receiving the largest of the federal awards, firms Plaintiffs claim are fronts, are listed by post office box number. ( *See* Pls.' Amend. Br. in Supp. of Partial Summ. J. at 11.) However, a review of the DBE directories shows that each of these firms is listed not only by post office box number, but also by street address. Again, these allegations are not probative of non-compliance. 3. Indiana Has Never Met the Ten Percent Goal Requirement

***45** The primary argument Plaintiffs make regarding compliance with the federal requirements is that the State of Indiana has never met the ten percent goal of DBE participation. Related to this argument, Plaintiffs submitted Exhibit 37 with their brief in support of their motion for summary judgment. Exhibit 37 is made up of the quarterly financial reports submitted by the State to the USDOT that show the federal funds awarded and a breakdown of the percentages awarded to DBEs. According to the Plaintiffs, they "contend that Indiana has never met the ten percent requirement, including first quarter 1997 when *two* black contractors received contracts as did two Hispanic, native American and Asian-Pacific contractors, none of which groups approximate the percentage of the Indiana population comprised by African-Americans. And given the numbers reflected in Exhibit 37, plaintiffs vigorously dispute that the numbers ... is (sic) accurate."

The Plaintiffs fail to support this accusation with any facts, however, and conclusory statements or beliefs offered without factual support do not create genuine issues. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994); *Cusson Cobb,* 953 F.2d at 1081. Further, examining only one quarter of 1997 is not probative, as the ten percent goal is an *annual* one. In examining the four quarterly reports for 1996, for example, it is clear that the ten percent goal for DBEs was exceeded. Further, Plaintiffs have submitted no evidence to show that the USDOT, which has the primary responsibility for monitoring compliance, has ever criticized Indiana's performance under the program.

In fact, INDOT was praised by the FHWA for almost doubling the ten percent goal in fiscal year 1995, when it achieved a 19.65% DBE goal. ( *See* Decl. of William Brown, Ex. 3.) Without specific factual support, Plaintiffs have not established any genuine issues of fact related to Indiana's failure to meet the ten percent goal.

Of course, Plaintiffs, at the core of their complaint, continue to maintain that Indiana uses "front" companies to meet the ten percent goal. But the evidence shows that the Plaintiffs have never followed the challenge procedure under 49 C.F.R. § 23.69 to challenge any certifications. (Decl. of William Brown ¶ 7; Decl. of Elena Looper ¶ 12.) Additionally, although the Plaintiffs claim that the State had information in their possession that should have rebutted the presumption of DBE status for the firms they claim are fronts, the Plaintiffs have made no showing that the State actually had such information in their possession. Again, Plaintiffs must make more than conclusory allegations to create genuine issues of fact.

In light of the foregoing, the court finds that the Plaintiffs have failed to show any genuine issues of fact regarding the Defendants' compliance with the requirements for the DBE plan necessary to receive federal transportation funds. As such, the Defendants' motion for summary judgment as to this claim will be GRANTED.

C. Section 1983 Claim for Violations of the Fourteenth Amendment

*46 Plaintiffs have asserted an additional claim under § 1983, claiming that the State's administration of the required DBE program violates their rights under the Equal Protection Clause of the Fourteenth Amendment. U.S. CONST. Amend. XIV, § 1. The Defendants move for summary judgment, asserting that the claim fails for lack of standing and that the Plaintiffs cannot show a discriminatory intent.

1. Standing

Standing is necessary for a federal court to assert jurisdiction, thus district courts have a continuing obligation to insure that standing exists. *See* *Allen v. Wright,* 468 U.S. 737, 750 (1984) (standing "is perhaps the most important of [the jurisdictional] doctrines."). Plaintiffs, as the party asserting the claim, have the burden to show they have standing, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992), and must do so by "clearly [alleging] facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin,* 422 U.S. 490, 518 (1975). If Plaintiffs fail to affirmatively show, from the record, facts that support standing, they cannot maintain their claim. *See* *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990).

To establish standing, Plaintiffs must show three elements:

First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical." Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan,* 504 U.S. at 560-61. Further, "each element must be supported in the same way as any other matter on which the [Plaintiffs] bear[ ] the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561 (citations omitted). Thus, Plaintiffs, as required by FED. R. CIV. PRO. 56(e), must set forth, by affidavit or other admissible evidence, facts to show that the elements of standing are established. *See id.* This is the reason the court noted that the Defendants could reassert their standing argument, even though the court found Plaintiffs sufficiently alleged the elements of standing to withstand the Defendants' original motion to dismiss. ( *See* Entry of April 1, 1996, at 10.)

The Defendants argue that the Plaintiffs, now at the summary judgment stage, have not set forth specific facts to show that any one of the three necessary elements have been met. Further, the

Defendants argue that the standing of Contractors Association limits its claims to declaratory and injunctive relief. The standing of the Contractors Association will be examined first, then that of the individual Plaintiffs.

a. Standing of the Contractors Association

*47 An organization may have standing to bring an action in one of two ways. First, it may bring an action if the organization itself has suffered an actual injury in fact. Second, an organization may bring an action in a representative capacity for its members upon a showing that certain requirements are met. *See* Warth, 422 U.S. at 511. In this case, the Contractors Association has standing only in a representative capacity.

The Plaintiffs have alleged no facts showing a concrete injury to the Contractors Association itself. Though a goal of the Contractors Association is to fight discrimination, Third Amend. Compl. ¶ 2, "an injury to an organization's 'abstract social interests' is not enough to confer standing." *Organization of Minority Vendors, Inc. v. Illinois Central Gulf R.R.*, 579 F.Supp. 574, 589 (N.D.Ill.1983) (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39-40 (1976)). The Contractors Association's "relatively general interest in furthering the economic and civil rights of its members is not enough ... to imply an injury in fact." *Id.* at 590. Thus, it has no independent standing to maintain this action.

Nevertheless, the Contractors Association may have standing derivatively as a representative of its members. Warth, 422 U.S. at 511; *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). In order to assert this derivative or representational standing, three requirements must be met. First, the Contractors Association's members must otherwise have standing to sue in their own right. Second, the interests sought to be protected must be "germane to the organization's purpose." Third, neither the claims asserted or the relief requested must require the participation of individual members. Hunt, 432 U.S. at 343.

The court agrees with the Defendants that the Contractors Association's claim for damages fails the third prong of *Hunt's* standing requirements. The damages the Plaintiffs seek are not common to the membership of the Association, nor would they be shared in an equal degree. Individual participation would be necessary to resolve the damage action as each individual member would have to show he or she is a certified DBE and qualified to bid on highway contracts. *See* Warth, 422 U.S. at 515-16. Thus, the Contractors Association has no standing to assert damage claims. However, because the participation of the individual members is not necessary to fashion declaratory or injunctive relief, the Contractors Association does have standing to seek such equitable remedies. *Id.* at 515; *Organization of Minority Vendors*, 579 F.Supp. at 590.

b. Standing of Individual Plaintiffs

The Defendants also argue that the individual Plaintiffs do not have standing to maintain this action because they fail to meet any one of the three requirements for standing. The Defendants argue that the first element, an injury in fact, has not been met because no Plaintiff has shown that he or she bid on a construction contract and was denied the bid on the basis of race. They argue the second element, a causal connection between the injury and the State's conduct, has not been shown. They claim standing is lacking because the causal connection depends on the independent decisions of third parties, e.g., prime contractors. Because the State cannot set specific quotas or goals for specific groups and, consequently, cannot control which subcontractor a prime contractor chooses to fulfill its DBE goal, the Defendants argue that the Plaintiffs cannot show that the State, rather than third parties not before the court, caused any injury suffered. Finally, the Defendants argue that the Plaintiffs cannot show that any injury would be redressed by a favorable decision. Defendants argue that, to the extent Plaintiffs claim entitlement to ten percent of the federal highway funds received in the past, or desire a separate program or pool of funds to benefit only African-American contractors in the future, Congress has foreclosed that relief by determining that *all* DBEs are to compete equally.

*48 As explained the Entry on State Defendants' Motion to Dismiss, an " 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of [a discriminatory] barrier, not the ultimate inability to obtain a benefit.... [T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of the contract."

*Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 666 (1993). Thus, to establish standing, the Plaintiffs "need not allege that [they] would have obtained the benefit but for the barrier," *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211 (1995) (citing *General Contractors,* 508 U.S. at 666), but "demonstrate that [they are] able and ready to bid on contracts and that a discriminatory policy prevents [them] from doing so on an equal basis." *General Contracts, supra.*

The Defendants argue that the Plaintiffs have produced no evidence that they are qualified DBEs who are ready, willing and able to bid on federally funded highway contracts but that a race-based barrier impairs their ability to compete on an equal basis with other contractors. While it is true that several of the Plaintiffs are not currently certified DBEs, the State itself has shown that at least two of them, Fran Scott and Al Young, are certified. (Decl. of Elena Looper ¶¶ 16, 17.) Thus, at least two of the Plaintiffs are qualified DBEs who bid on highway contracts, and thus, these two Plaintiffs could establish standing.

However, the Defendants are correct in their contention that the Plaintiffs have produced no evidence that shows a race-based or discriminatory policy of the state, or barrier otherwise imposed by the State, impedes their ability to bid on contracts. They have not shown how they are treated differently from all other qualified DBEs in their efforts to obtain contracts. The State of Indiana does not have the power to modify the Congressional mandate that all certified DBEs are to compete on an equal basis. Thus, the Plaintiffs' argument, *i.e.,* because women-owned DBEs are receiving a disproportionate share of federally funded contracts a discriminatory practice must be in place, has no merit.

As has now been repeatedly pointed out, the Plaintiffs must do more than allege some barrier or discriminatory policy in a conclusory fashion. They must show such by specific facts to survive a motion for summary judgment. Without such a showing, Plaintiffs have not demonstrated an injury in fact, and thus, do not have standing to maintain their Equal Protection claim.

2. Plaintiffs Cannot Show Discriminatory Intent

Alternatively, assuming Plaintiffs do have standing, their Equal Protection claim would still ultimately fail because the Plaintiffs have not shown that the Defendants acted with a discriminatory intent. The establishment of such an intent is necessary to maintain the Plaintiffs' claim under § 1983. As the Seventh Circuit recently explained:

***49** The Equal Protection Clause grants to all Americans "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). When a state actor turns a blind eye to the Clause's command, aggrieved parties such as [Plaintiffs] can seek relief pursuant to 42 U.S.C. § 1983.... In order to establish liability under § 1983, [Plaintiffs] must show that the defendants acted with a nefarious discriminatory purpose, *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), and discriminated against [them] based on [their] membership in a definable class.... As we explained in *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982):

The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Id.* at 1104 (citations and internal quotations omitted). A showing that the defendants were negligent will not suffice. [Plaintiffs] must show that the defendants acted either intentionally or with deliberate indifference.

*Nabozny v. Podlesny,* 92 F.3d 446, 453-454 (7th Cir.1996) (other citations omitted); *see also Johnson v. City of Ft. Wayne, Ind.,* 91 F.3d 922, 945 (7th Cir.1996) (stating plaintiffs are required to demonstrate that defendants acted with discriminatory intent).

Plaintiffs generally allege that Defendants have raised barriers to their participation in contracts funded by federal dollars and that they have not received their fair percentage of the contracts compared to non-African-American DBEs. However, as previously explained, the Plaintiffs have failed to sufficiently demonstrate with admissible facts that such barriers exist. Nor have they demonstrated how they have been treated differently than the other similarly situated minority and disadvantaged enterprises served by the DBE program.

The allegation of a disproportionate impact will not save the Plaintiffs' claim. Though not irrelevant, a showing of a disproportionate impact is not enough as a state's "official action will not be held unconstitutional solely because it results in a racially disproportionate impact.... *Proof* of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264-65 (1976) (reaffirming the holding of *Washington v. Davis,* 426 U.S. 229 (1976)) (emphasis added). That proof, sufficiently established as required under FED.R.CIV.P. 56, is lacking in this case.

***50** Finally, the Plaintiffs have not challenged the constitutionality of the DBE program,[FN17] which was created by federal statute and federal regulations, but have challenged only the state's administration of that program. In their challenge, the Plaintiffs have failed to show how the state's administration is not in compliance with federal law. *See* Part VII.B., *supra*. Thus, if the DOA and INDOT are only doing "what federal law requires, [their] conduct is constitutional, at least where, as here, the constitutionality of the federal program is not challenged." *Converse Constr. Co., Inc. v. Massachusetts Bay Trans. Auth.,* 899 F.Supp. 753, 761 (D.Mass.1995) (citing *Milwaukee Co. Pavers,* 922 F.2d at 423 ("Insofar as the state is merely complying with federal law, it is acting as the agent of the federal government and is no more subject to being enjoined on equal protection grounds than the federal civil servants who drafted the regulations.")). As noted by the District Court of Massachusetts, the Second, Sixth, and Tenth Circuits have reached this same conclusion. *See Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 57 (2d Cir.1992); *Tennessee Asphalt Company v. Farris,* 942 F .2d 969, 975 (6th Cir.1991); *Ellis v. Skinner,* 961 F.2d 912, 915 (10th Cir.1992).

FN17. The constitutionality of this program is in question following the district court's decision on remand in *Adarand Constructors, Inc. v. Pena,* 965 F.Supp. 1556 (D.Col.1997), where the court found that the statutes and regulations creating the DBE program violated the Equal Protection Clause under the strict scrutiny test. The constitutionally of the program has not been challenged by any party in this case; thus, the court will not address this aspect of the DBE program or make any judgment regarding the constitutionality of it.

Thus, because the Plaintiffs have not shown they have standing to bring this claim and, alternatively, have not shown the required discriminatory intent, summary judgment will be GRANTED in favor of Defendants on the claim under § 1983 for violations of the Equal Protection Clause.

D. Claim for Violation of Title VI

Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI itself only directly reaches instances of intentional discrimination. *Lindley,* 66 F.3d at 827 (citing *Alexander v. Choate,* 469 U.S. 287, 293 & n. 8. (1985)). As such, the Supreme Court has concluded that, in light of the legislative history of Title VI and its expressed purposes, "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *University of California Regents v. Bakke,* 438 U.S. 265, 287 (1978). As noted in the previous section, no violation of the Equal Protection Clause has been shown. Consequently, the Plaintiffs cannot prove a direct claim under Title VI.

However, " 'actions having an unjustifiable disparate impact on minorities [may] be redressed through agency regulations designed to implement the purposes of Title VI.' " *Lindley,* 66 F.3d at 827-28 (quoting *Alexander,* 469 U.S. at 293 & n. 9). Plaintiffs have asserted a disparate impact claim under the regulations at 49 C .F.R. Part 23, which were implemented by the USDOT pursuant to Title VI. ( *See* Br. in Opp'n to Defs.' Mot. for Summ. J. at 7; Pls.' Amend. Br. in Supp. of Partial Summ. J. at

15-25.)

***51** Under a theory of disparate impact, only limited prospective relief is available. Proof of intentional discrimination is required for compensatory relief. Craft v. Board of Trustees of the Univ. of Ill., 793 F.2d 140, 142 (7th Cir.1986); *see also* Smith v. Metropolitan Sch. Dist. of Perry Township, 128 F.3d 1014, 1031-1032 (7th Cir.1997) (discussing necessity of proof of intentional discrimination to award money damages under Spending Clause legislation). Thus, as no intentional discrimination has been established, Plaintiffs are limited to prospective relief under this claim.

Plaintiffs' disparate impact claim rests largely on their allegations that women owned DBEs are receiving a disproportionate share of the federally funded contracts and that the percentage of contracts awarded to African-American firms is disproportionately low with regard to the African-American population in the State of Indiana. This argument suffers from several flaws.

First, Plaintiffs have not factually supported the disparate impact claim. Although they attempt to make comparisons of contracts awarded to different DBE groups, these claims rely largely on Exhibits 22 and 23, which have been ruled inadmissible. Without a factual foundation, the Plaintiffs cannot establish a disparate impact.

Second, a comparison of the percentages awarded to African-American DBEs as compared to the African-American population within the state is not necessarily probative of a disparate impact. As noted in Section III.D. of this entry, a state wide demographic may be a statistical pool larger than the number of firms qualified for construction work. As Justice O'Connor opined in *Croson,* "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Croson,* 488 U.S. at 501; *see also* *Aiken v. City of Memphis,* 37 F.3d 1155, 1163 (6th Cir.1994) (stating that the relevant statistical pool is composed of all persons qualified for position at issue).

Finally, even if an adverse disparate impact could be shown, the Plaintiffs have not shown that the Defendants chose or continued their conduct at least in part " 'because of', not merely 'in spite of,' its adverse effects upon an identifiable group.' " *Feeney,* 442 U.S. at 279; *see also* *Guardians Ass'n v. Civil Service Comm'n of the City of New York,* 463 U.S. 582, 610-611 (1983) (Powell, J., concurring in judgment); *id.* at 612-13 (O'Connor, J., concurring in judgment). If, as noted in the previous section, the DOA and INDOT are simply complying with federal law, and cannot be enjoined under the Equal Protection Clause, it follows that their conduct would not be enjoinable under Title VI.

The court notes that Plaintiffs have made a related argument under this claim that faults the State of Indiana for not having yet performed a disparity study as directed by the Supreme Court's opinion in *Croson,* 488 U.S. 469. However, the Defendants have alleged, and Plaintiffs have not provided facts to dispute, that set-aside contracts were used only with regard to the federal highway funds and not with any state funded contracts.[FN18] As the disparity study would only be necessary to justify set aside contracts funded by *state* dollars to justify the State's voluntary MBE program, the fact that a disparity study has not been performed has no relevance to this case.

FN18. INDOT no longer uses any set-aside contracts as the FHWA has recommended that this practice be halted pending adoption of final rules following the Colorado district court's decision on remand in *Adarand.*

***52** In light of the foregoing, the court finds that summary judgment should be GRANTED in favor of the Defendants for Plaintiffs' claim under Title VI.

E. Claim for Conspiracy to Violate Plaintiffs' Civil Rights under 42 U.S.C. § 1985(3)

The Plaintiffs have also asserted a claim of conspiracy to violate their civil rights under 42 U.S.C. § 1985(3), which provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). The Plaintiffs allege that the Defendants planned and agreed to prevent and obstruct them from competing for, participating in, and receiving the benefits of the DBE program and federally funded highway construction projects. Further, Plaintiffs allege they "reasonably believe" this conspiracy included "certain favored majority race private contractors." (Third Amend. Compl. ¶ 35.)

The Defendants move for summary judgment in their favor on this claim based on several alternative arguments: (1) the Plaintiffs have failed to provide evidence of the conspiracy; (2) the Defendants are not "persons" within the meaning of Section 1985(3); (3) the Eleventh Amendment bars the Section 1985 claim against the State; and (4) the intra-corporate conspiracy doctrine precludes Plaintiffs' conspiracy theory. The court need not address all of these arguments as it finds Plaintiffs' claim fails on two alternative grounds.

To establish a violation of § 1985(3), Plaintiffs must allege and prove four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of America v. Scott,* 463 U.S. 825, 828-829 (1983). To establish the first element, a civil conspiracy, the Plaintiffs must establish "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir.1987).

***53** Summary judgment is warranted in favor of Defendants as the Plaintiffs have not shown any facts establishing an express or implied agreement among the Defendants or one that includes the private contractors. Nor, as discussed above, have they shown actual deprivations of their rights in the form of overt acts in furtherance of any conspiracy agreement. As the first element necessary to prove a § 1985 conspiracy has not been established, Plaintiffs cannot withstand a motion for summary judgment on that claim.

Further, Plaintiffs do not have a § 1985(3) claim as the court has determined that their claims under § 1983 and Title VI are without merit and warrant summary judgment in favor of the Defendants. "Absent an underlying violation of federal law, there can be no actionable claim alleging a conspiracy to achieve that end ." *Jones v. Clinton,* No. LR-C-94-290, 1998 WL 148370, at *16 (E .D.Ark. Apr. 1, 1998) (citations omitted). Consequently, summary judgment in favor of Defendants on the § 1985(3) will be GRANTED.

VIII. Conclusion

The Plaintiffs have consistently and publicly alleged serious violations of their civil rights with regard to the State's compliance with the USDOT's DBE program, a program of questionable status with regard to its constitutionality. However, they have failed to establish, with specific facts, the legal grounds necessary to sustain their allegations. Further, although the core of their complaints is that certain companies receiving federally funded contracts are "shams" or "fronts" for non-disadvantaged enterprises, they have failed to show that the Defendants have any information in their possession that would cause them to question the presumption of disadvantaged status accorded minority- and women-owned construction firms under the regulations at 49 C.F.R. Part 23. The evidence also shows that, although the challenge procedure under 49 C.F.R. § 23.69 has long been available to the Plaintiffs, they have not availed themselves of this procedure to challenge any of the certifications of which they complain. Unfortunately for the Plaintiffs, their chosen course to litigate this action brings them no relief, because they need much more than conclusory allegations and hearsay to prove their case in a court of

1998 WL 1988826 https://web2.westlaw.com/result/documenttext.aspx?service=Find&r...

law.

For the foregoing reasons, the court finds that there are no genuine issues of material fact in dispute, and the Defendants' motion for summary judgment should be and hereby is GRANTED. Judgment will be entered accordingly.

ALL OF WHICH IS ORDERED this 13th day of May 1998.

Not Reported in F.Supp., 1998 WL 1988826 (S.D.Ind.)

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

41 of 41 8/15/2008 1:38 PM