# Declaration Of Christopher Ho In Support Of Plaintiffs' Motion To Exclude Testimony Of Dr. Gerald Barrett

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

MARTHA RIVERA, MAO HER, ALICIA ALVAREZ,
EVA ARRIOLA, PEUANG BOUNNHONG, CHHOM CHAN,
BEE LEE, PAULA MARTINEZ, MARIA MEDINA,
MAI MEEMOUA, MARGARITA MENDOZA, BAO
NHIA MOUA, ISIDRA MURILLO, MARIA NAVARRO,
VATH RATTANATAY, OFELIA RIVERA, SARA RIVERA,
MARIA RODRIGUEZ, MARIA RUIZ, MARIA
VALDIVIA, SY VANG, YOUA XIONG, and SEE YANG,

                    Plaintiffs,

          vs.                        No.   CIV F-99-6443 AWI SMS

NIBCO, INC., an Indiana corporation,

                    Defendant.

COPY

Deposition of

GERALD V. BARRETT, Ph.D., J.D.

Thursday, September 30, 2004

Volume I
(Pages 1 -283)

Reported by LESLIE TANIMURA, CSR No. 5796

1

1    between -- I'll use man as a generic word -- man and

2    machine and its environment.

3        Q.   So you're providing an expert opinion as an

4    industrial organizational psychologist; is that right?

5        A.   Yes, including statistics and some legal

6    framework.

7        Q.   So is it your understanding that you're being

8    hired as a statistician in this case?

9        A.   Well, statistics is part of what I do, but

10   I'm not -- there's no designation of me as a

11   statistician in this case, per se, but I have done a

12   lot of statistical work in the past.  I've not been

13   asked to do any in this case, in particular.  I mean I

14   have -- in my report, I reviewed statistics, but I've

15   not been hired to do, for example, an adverse impact

16   analysis.

17       Q.   Well, maybe that will help us focus the

18   questions, Dr. Barrett.

19            So the question is what have you been hired

20   to do in this case?

21       A.   To respond to the Complaint and particularly

22   the issue of the Z-Level Test.

23       Q.   And so aside from being designated as an IO

24   psychologist, are there any other areas of expertise

25   that you expect to be designated to provide expert

                                                       31

1    opinion in this case?

2            MR. HAHESY:  Other than what's in his report?

3            MS. CHANG:  I'm asking Dr. Barrett a

4    question.

5        Q.    You can refer to the report.  I'm asking you

6    a question about what you expect to be designated as an

7    expert to provide in this case.

8        A.    Well, I assume I'd be designated as an

9    industrial organizational psychologist, and that's a

10   broad area, and there will be some human factors

11   aspects of it, also; and there will be some statistical

12   aspects, also.  And of course, you always respond to

13   the opposing experts' reports, also.  So they may bring

14   up issues to which I can respond.

15       Q.    You indicated that, in preparing your report,

16   you reviewed the materials listed in Appendix A, and

17   there is an Appendix A in both the preliminary and the

18   supplemental reports; is that right?

19       A.    I assume so, yes.

20       Q.    Have you reviewed anything else since then in

21   preparing for this case?

22       A.    Well, I'll have to answer your question this

23   way.  Every day, when I'm able at work, I try to review

24   five to 10 professional articles and outline them and

25   put them in my database.  We have a database, so some

                                                    32

sure we discussed anything from that. We might have
discussed things in general. I had the other reports,
but we didn't go into depth, I don't think, in any of
the reports.

Q. Dr. Barrett, have you been retained as a
legal expert for this case?

A. No.

Q. Now, you indicated earlier that you've been
retained to provide an expert opinion as an IO
psychologist.

Would you please briefly detail your
qualifications to do so?

MR. HAHESY: You mean what does an IO
psychologist do or -- "qualifications" is vague and
ambiguous.

MS. CHANG: Q. What prior experience you've
had as an IO psychologist.

A. So you're asking about my personal
qualifications; not qualifications in general of the
field of IO psychology. Is that correct?

Q. I'm asking for your qualifications to testify
as an IO psychologist.

A. Okay. I received a Master's degree in
Psychology from Case Western Reserve University in
1959. I received my Ph.D. in Industrial Psychology

1    Q.   So just so I understand, were the tests

2    changed over the years or was it the same test that you

3    concluded --

4    A.   The tests were always different.

5    Q.   The tests were always different.

6    A.   Yes, different in terms of content, not in

7    terms of format or type of test.

8    Q.   And in this case, have you been retained to

9    assist the employer in remedying any adverse impact

10   that you find?

11   A.   No.  At this point in time, there's not any

12   issue about remedy.  In fact, we're not at that stage

13   at all.  The issue has to do with, first, is there

14   adverse impact?  Second, are the tests valid?  Third,

15   is there bias in the test of some sort?  Fourth, are

16   there alternative selection procedures which would be a

17   better -- which would be more valid and have less

18   adverse impact?

19       In general, those are the issues in this

20   case.  Now, we have not -- there's no remedy issues at

21   this point in time.

22   Q.   And what positions -- you described two

23   additional cases that you're consulting for at this

24   point that both involve allegations of disparate impact

25   based on race.

                                                    58

1    litigation?

2        A.   Yes, all four or five cases I gave you all

3    involve litigation.  I thought -- again, maybe I

4    misunderstood what you're asking about.  The only time

5    we usually do a formal adverse impact analysis is in

6    the context of some litigation or anticipated

7    litigation, I should say, also.

8        Q.   Well, let's take that one step at a time.

9            So in a case involving litigation, what steps

10   do you take after determining that a selection device

11   has created an adverse impact?

12       A.   I might try to narrow down the -- I might do

13   differential item functioning, for example.

14       Q.   Sorry?

15       A.   Differential item functioning.  Now, again,

16   I'm talking in generalities.  I have to, because each

17   case is different, and you have to have a big enough

18   sample size.  You have to have a lot of technical

19   issues, but I assume you don't want to hear about that.

20       Q.   No, if you could just describe for me

21   generally the steps that you would take.

22       A.   Okay, generally, you say, all right, now, is

23   there -- as an example, say, let's look at differential

24   item functioning.  And you look at each and every item

25   on the test to see if there's any differences between

                                                      61

1   the two groups.

2           If there are differences, then you would look

3   and see what the exact item was which may have caused

4   that difference.  Then you examine that item for any

5   obvious issues in terms of what is often called bias.

6           Is there any reason that there was this

7   difference?  For example -- I'll just give you one

8   example -- in Chicago -- doing a test in Chicago -- and

9   these are reported cases -- Adams, for example, for the

10  city of Chicago, in which I was involved, we found that

11  for some minority officers who were trying to be

12  sergeants, there was a question having to do with

13  radios where there is a construction site with

14  explosives.

15          And for some reason, there was an SOP which

16  very specifically said you cannot turn your radios on

17  and transmit in a construction site where there's

18  explosives, because that can set off the explosives.

19          And for some reason, the minority officers

20  missed that question a lot more often than the

21  non-minority officers.

22          Now, this is usually what occurs, by the way,

23  that you can't understand why.  This is a job knowledge

24  question.  It's obviously job relevant, and it's

25  important, but why there's that difference.  And the

                                                        62

1      MS. CHANG:  Sure.  Go ahead.  Let's take a

2  short break.

3          (Recess taken.)

4      MS. CHANG:  Q.  Dr. Barrett, awhile back, you

5  listed for me the different manufacturing settings in

6  which you reviewed or developed testing devices.

7          In any of these settings, were there

8  languages other than English that was spoken at the

9  plants?

10     A.  I have no personal knowledge of their using

11  any language other than English in the actual operation

12  of the plant.  I know one of the plants was in

13  California, so I assume that there were people who

14  spoke other languages, but it never was an issue in

15  terms of our work, and no one ever said to us anything

16  about other languages being spoken.

17          We've -- one plant is in Alabama.  Possibly

18  language -- different languages were spoken there,

19  too.  Again, the plants I've worked in with various

20  manufacturers were so dispersed, there's always a

21  possibility.  But I have no personal knowledge of a

22  second language being used in a plant.

23     Q.  Which one was the California plant?

24     A.  I just said it was a California plant, but

25  there's a client confidentiality --

wouldn't say I could read French and comprehend it very

well. But there's no question, you have to be able to

see the word, recognize it, and say, yes, this matches

the word here. It belongs over here.

(Mr. Nguyen leaves deposition room.)

MS. CHANG: Q. So you're saying that reading

is not necessary for the Z-Test, because someone who

could not read, but who could word match, would be able

to pass the Z-test.

(Mr. Nguyen enters deposition room.)

THE WITNESS: I'm saying it looks like, to

me, it would be possible for somebody who's not

really -- couldn't really comprehend such -- could

probably look at a sheet of paper and say, all right,

this here over here is what -- in other words, the word

might be, as I said, "danger" or it might be "Doug" --

is the right word for the manager -- but it's very

minimal reading. It's not what is called reading

comprehension, all right, in terms of being able to

pass the test, because you have in front of you -- in

other words, if I had in front of me, when I was taking

that French exam, a translation, that would have been

great, you know. I would have been able to do it much

easier. But I'm just saying --

MS. CHANG: Q. A translation into English?

85

1    A.  Yes, the French into English.

2    Q.  Well, that wasn't the situation in this case,

3    right?

4    A.  Well --

5    Q.  There wasn't a translation provided.  It was

6    another document that was also in English.

7    A.  Yes, which it tells you exactly what it was

8    in terms of here's how you go from here to here, okay?

9    Q.  Okay.  Now, if you had an individual who was

10   taking this test, who could not read the words and was

11   word matching, as you've just described it, how would

12   that test assess the individual's job knowledge?

13   A.  Well, I assume, for example, they say, all

14   right, there's a sign here, and it says "danger."  Over

15   here, it says "danger."  They had some idea what

16   "danger" meant, so they had some minimal knowledge of

17   what that meaning was.  When you see a safety sign that

18   says "danger," they had to know that's a warning for

19   them.  Or if the sign said, you know, "lockout,

20   tagout," they had some idea what that meant if that was

21   on the test.

22   Q.  So then you are saying that in order to

23   demonstrate job knowledge on the Z-Test, you would have

24   to be able to look at a word and associate some meaning

25   or definition to that word.

that, in fact, that the standards you should use for
those is not the same as you would use for a
standardized test, because this is not a standardized
test. It's not one where you're testing thousands of
people, developing norms, developing a reliability
coefficient. It's not that type of test. This is a
content-related test, content-oriented test, content
relevant test, so.

Q. Well, let me rephrase the question.

How do you determine whether the content is
related to the job?

A. Each one is -- each situation is different,
but the basic thing is -- and this is a relatively
simple issue, because you can look at the job knowledge
required for the job and look at the test and see if,
in fact, it's relevant and if there's various sources
of evidence for that; is it relevant or not.

Q. What kind of evidence do you look at?

A. Well, for example, there's the testimony of
the plaintiffs who, in effect, said that the test was
relevant, the questions were relevant; that they were
not irrelevant; these are things you should know in the
factory. So that's one piece of evidence.

The second piece of evidence is that the
managers who were there said, yes, this is relevant

information. What these questions are -- simple as they might be -- are things which the employees -- the production associates should know.

You can look at the process of developing this Z-Test, this training test, and the process is one where you had, over a period of months, the various -- I believe it's called the leadership team -- go through and devise questions and items to use in this Z-Level Test and come back to the group -- as I understand the process -- come back to the group and review these items to see if, in fact, they were relevant to the job. So they had an ongoing integrative process with, I assume, Connie Hitt -- is it Hitt (height) or Hitt (hit) --

Q. Hitt.

A. -- Hitt in the center of the process on this management team, which included first level supervisors who were very familiar with the job. So they were saying, yes, this is the sort of job knowledge that's relevant. And there are safety issues involved. There are other things involved here. They should know this. This is sort of the minimal amount of knowledge a production associate should have.

So it was a process of one where, yes, these people knew the job quite well. They watched the job.

1   theoretical --

2        A.   Yeah, I'm using it as an example.

3        Q.   So you're saying that in this example with

4   the mechanical assembly test that was constructed as a

5   simulation, right; in a job knowledge test, if you were

6   creating a job knowledge test for that same position,

7   what would it look like?

8        A.   It would be very similar to the Z-Level Test,

9   except it would be much more complex.  It would be,

10  "Can you read this manual for this machine?"  One part

11  of that job is to do some assembling.  Another part is,

12  "Can you learn to set it up and use the computer

13  controls?"  So the job knowledge portion, which would

14  be paper and pencil, would be, "All right, now, can you

15  read and understand this and do it and answer these

16  questions?"  That's what it is.

17       Q.   So in that context, a job knowledge test

18  would be a paper and pencil test?

19       A.   Yes.

20       Q.   And that would test reading comprehension?

21       A.   It would be part of it, yes, if you had to

22  read the instructions.

23       Q.   So the reading comprehension is --

24       A.   But it's not the purpose of the test, reading

25  comprehension.  You have to some minimal reading

                                                        105

1    skills --

2        Q.    Right.

3        A.    -- to read the instructions, but the real

4    test is the knowledge.

5        Q.    Is whether you know how to do it?

6        A.    Yes.  If I wanted to give a reading

7    comprehension test, it would be a different test.  This

8    is a job knowledge test.

9        Q.    Right.  But a job knowledge test, in that

10   context -- if you could read the question, and if you

11   could write out an answer which indicates that you

12   could follow the directions given -- would that

13   actually tell you whether the person taking the test

14   could assemble the product if you gave them the

15   materials?

16        MR. HAHESY:  I'm going to object.  It's

17   ambiguous.

18        MS. CHANG:  Q.  Do you understand the

19   question?

20        A.    I think I'll try to clarify it.  In other

21   words, the job knowledge test would not be a test of

22   whether or not you could assemble something.  In this

23   hypothetical, it would be a situation, could they have

24   the knowledge to use that computer device on this

25   machine, and that's what it would be a test of.

possible -- one state of the world is that they're very
much similar to people who are born in the United
States whose national origin is in the United States.

And the reason they could not pass the test
is because their general -- maybe they couldn't read in
any language; maybe they could not read, for example,
Hmong, white or green -- whatever it might be --
assuming there's a language -- a written language in
Hmong.  I'm not sure there is.  But assuming that's
true, see, we never tested these individuals, the
plaintiffs.

So one possibility is that if you gave this
test in their language, they couldn't pass it.  So I
don't know this.  So I'm just saying that's the reason
I'm assuming that's one possibility.  In other words,
we don't know that unless there's maybe something I
don't know about; that we never tested these
individuals to see if their reading comprehension in
their own native tongue is bad.  So they would be in
the same playing field as someone born in the United
States, and they couldn't -- a lot of people in the
United States can't read beyond the third grade level,
and they can't compute.  So they could be no different
than that, and I don't know that, see.

Q.   Well, how does one's literacy in another

1  language impact the Z-Test, which was in English?

2      A.   Well, my point would be that they never

3  learned their own language.  If they couldn't read --

4  for example, reading comprehension at all in their own

5  language, why would you believe you could transfer and

6  learn English?  The analogy is if someone is born in

7  the United States and can't read beyond the third grade

8  level, for example, how are they any different?

9      See, I don't know what the level is.  Maybe

10  they -- maybe possibly they couldn't learn or did not

11  want to learn.  I don't know, see?  But I'm just saying

12  that in terms of your question -- I think was what

13  other evidences were there of training -- there was an

14  avenue for the plaintiffs to go into a language

15  training program in English, but you have to assume

16  that would be helpful, and it would not -- probably not

17  be helpful if they did not have any proficiency in

18  their native tongue.  That's all I'm saying.

19      Q.   So you're saying the assumption that the ESL

20  classes would have improved the test taker's ability to

21  pass the Z-Test would not be accurate unless this test

22  taker was literate in another language?

23      A.   What I'm saying is -- I'm just talking that

24  that's one possible state of the world, okay?  That's

25  all I'm saying.  Let's assume -- take the

                                                    124

1    hypothetical -- let's assume someone could not read in

2    Spanish. Now, how do you teach them? Usually you go

3    from, "All right, this is what it means in Spanish.

4    Here's what it means in English." That's the usual

5    technique.

6        What technique would you do for an adult who

7    doesn't have that language skill in Spanish? Now, they

8    can't read in Spanish, so how do you teach them to read

9    in English? It can be a much more difficult process

10   would be my assumption. Maybe for some reason, they

11   couldn't learn to do it. I don't know why, but let's

12   just say they do not have that skill.

13       Q.   Well, let's assume that -- I mean I guess I'm

14   trying to focus on this assumption that you've

15   identified, and it seems to me the assumption that

16   you're pinpointing is that improving one's English

17   skills would improve one's ability to pass the Z-Test.

18       A.   Yes, there is -- if that is the issue, if

19   someone, for example, cannot do the minimal reading and

20   if they could learn these words, better understand

21   them, if they couldn't understand the word at all, it

22   would certainly help.

23       Q.   So that assumption is true, in your opinion.

24       A.   The assumption is that if, in fact, that is

25   the reason -- see, all my point is is that's one state

                                                      125

1    Q.   So in evaluating the Z-Test, did you not

2    think it would be helpful to determine whether the

3    developers of the Z-Test conducted a job analysis?

4    A.   Well, I know they did conduct a job analysis.

5    Q.   And what is your understanding of the job

6    analysis that they conducted?

7    A.   What I had was a job description, as I

8    recall, and I had the job description of Dr. Scontrino,

9    and I had the job description from the Dictionary of

10   Occupational Titles, and they all converge.

11         Now, it would be impossible for me in some

12   sense to go back and do a job analysis, because the

13   plant doesn't exist.  The people are not there.  It's a

14   different plant, so I did not do a retrospective job

15   analysis if that's what you're asking.

16   Q.   No, I believe what I asked you was if NIBCO

17   did a job analysis, what did it consist of, and you've

18   indicated that they developed job descriptions.

19         Is that all that's necessary for a job

20   analysis?

21   A.   Well, some people confuse the terms.  You may

22   have confused this term.

23         Job analysis is a process you go through, and

24   a product is a job description and maybe job

25   requirements.  So if there is a job description, the

                                                    139

1  process of doing a job analysis must have occurred.

2      Now, I have no information about when or how

3  this job analysis was completed, but clearly some

4  process was gone through to obtain information about --

5  which go into the job description, and it's verified by

6  the fact that Dr. Scrontino also did his job analysis,

7  and it appeared to have the same sorts of behaviors,

8  and it's consistent with the <u>Dictionary of Occupational</u>

9  <u>Titles</u>.

10     So we have, again, converging evidence that

11 there was a job analysis, and you did produce a job

12 description, and it was consistent with what I -- my

13 own experience has been, so it seemed like, yes, there

14 was a job analysis.

15     Q.   So you believe there was a job analysis, but

16 you don't have any specific information about the job

17 analysis that you believe was conducted.

18     A.   Well, I'll say it again.  Some form of job

19 analysis was conducted --

20     Q.   Right.

21     A.   -- in the process.

22     Q.   The question that I'm asking you is what did

23 that form take?

24     A.   As I said before, I do not know.  There is no

25 information that I saw in terms of the exact process,

                                                     140

1      A.    I'm sorry, how do I know the job description

2    was --

3      Q.    -- reflected what their jobs actually

4    required?

5      A.    And I assume you're talking in reference to

6    the Z-Level Test, not in general.

7      Q.    No, I asked you whether a job analysis was

8    conducted.  You said, "Yes, I believe a job analysis

9    was conducted, because there are job descriptions

10   here."

11            And I'm asking you how do you know that this

12   is a good job analysis?  How do you know that this is

13   job description was actually accurate?  How do you know

14   it was accurately describing the jobs at NIBCO?

15     A.    I just thought I went through the five

16   converging areas of evidence.  I can go through them

17   again for you if you want me to, but that's how I

18   determined that.

19     Q.    But how do those five areas that you

20   described link to the actual jobs at NIBCO?  I mean the

21   only thing that you described that, for me, link to the

22   jobs at NIBCO is your own observation.

23            And I guess the question is --

24     A.    I never observed any jobs at NIBCO, so

25   don't -- I didn't do that.

145

1          Q.   Well, maybe you can answer my question first,

2     and then --

3          MR. HAHESY:   He's entitled to explain,

4     Counsel.   He gave his answer, and he's entitled to

5     explain.

6          MS. CHANG:   Q.   Well, I'd like to hear a

7     "yes" or "no" answer if you can, and then you can

8     explain.

9          A.   "Yes" or "no" about what?

10         MS. CHANG:   Leslie, could you read back the

11    question?

12         THE REPORTER:   "So your conclusion is that a

13    job analysis was actually not necessary in developing

14    the Z-Test."

15         THE WITNESS:   Yes.

16         MS. CHANG:   Q.   Okay.   Would you like to

17    explain that answer?

18         A.   The reason is that the people in the plant

19    who were devising this test, in fact, knew the job

20    perhaps better than anyone else.   They knew what was

21    done on these jobs, and they were devising a very

22    simple job knowledge test, nothing complex; a very

23    simple job knowledge test.

24         And the real issue is whether or not that job

25    knowledge is relevant to that job.   Now, you don't have

                                                      149

1   is the sort of information, job knowledge, that these

2   associates should have.

3          And as I said, it was an integrative process

4   where -- my evidence I reviewed was -- people would

5   bring an item from their area and say, "This is what we

6   should know about scrap. This is what we should know

7   about safety. Here's what we should know."

8          They also relied upon the safety quizzes. So

9   part of the process was incorporating some of the

10  content of the relevant safety quizzes into developing

11  the test. So you have a process which is an

12  integration of using multiple things. You have the

13  already existing safety test. You have the information

14  from the supervisors and those under them. You have

15  them reviewing it in a meeting and deciding, yes, this

16  is what we want to have in the test, and that's how the

17  final test was evolved.

18     Q.   So are you saying that there was a Z-Test

19  that was intended for probationary employees, but then

20  it was modified to be the Z-Test that the plaintiffs in

21  this case took?

22     A.   As my understanding was, it would be very

23  similar or the same test; in other words, trying to

24  determine the skill level -- in this case, the

25  knowledge of people in the organization.

                                                    170

Q.   Do you know whether it was the same test or a similar test?

A.   I have never seen everything exact -- I don't know.

Q.   You don't know.

A.   I have never seen, "Here's the test we gave. Here is the test we gave here."  But I understand it is essentially the same test.  The difference, I think, would be in terms of the materials that they gave out, the training materials.

Q.   And what was the difference; that probationary employees were or were not given training materials?

A.   It wasn't clear.  They were trained clearly, but I didn't read whether or not they had these sheets when they took the test.  I didn't read whether or not they had it or not.  I only read a discussion where they had it when they were given to the plaintiffs and others in the plant when it was extended out to everyone.

Q.   So I just want to make sure I understand your testimony.

So your understanding is that there was a Z-Test developed for the probationary employees, and then there was a process that this leadership team

1  job analysis of a hundred people, and you write up a

2  specific job description, and then we're going to

3  decide what this job knowledge test should be about on

4  federal tax law."

5      They'd laugh at me. You know, they would

6  say, "This is crazy. We know." You're trying to take

7  a process, see. The process is only there for one

8  reason, and that is can you identify some relevant job

9  knowledge.

10      In the case of the Z-Test, it's very obvious

11  and logical. There's no question. Your experts say

12  it. Your plaintiffs say it. These are content valid

13  tests. The information is relevant.

14      The same way is true of the Bar exam for

15  federal taxation and certification examinations. It's

16  never been questioned as not being relevant. But

17  there's no job analysis. There's no job description,

18  none.

19      Q.  We're not talking about the Bar examination,

20  Dr. Barrett.

21      A.  I'm using an analogy for you.

22      Q.  Right, so let me give you an example.

23      I come to you. I would like to hire you as a

24  consultant. I'm an employer. I'm developing an

25  in-house test, and the test is to assess whether or not

182

something, okay -- because my problem would be I don't

want to say something to an organization and say they

get sued later on, and they say, "Dr. Barrett told me

to do this," you know, that's not the way I operate.

I would say, "You want to hire me to develop

a content valid test, fine." But if you want to force

me into a hypothetical where I have to say something to

somebody, I'd say, "Look, you have people in the

organization. You want to develop a simple job

knowledge test, do it the way NIBCO did it." They knew

the jobs. They had a team of people that reviewed the

items. There's no -- it's so simple, because they're

obviously job relevant. Ask yourself. It's a very

simple question, "Does this job knowledge" -- is it

relevant for the job?"

Q. I'm not asking you about the test right now,

Dr. Barrett.

A. I thought you were asking me about what I

would do.

Q. No, I'm asking you about how you would

develop a valid test.

Now, it sounds like the first step that

you've outlined is that you need to find people who

know the jobs; is that right?

A. I'm not outlining anything. I just told you,

they would spend four hours a day commuting.  I told

the counsel that my rule was never to spend more than

15 minutes in a commute.  I always had a home near my

office, and so I can't imagine anybody would spend more

than 15 minutes a day or a half-hour a day traveling.

It doesn't make any sense to me.  I mean there must be

something wrong with people who do this.

And I guess Bill says he sometimes would do

40 minutes or an hour and a half.  And I said to

myself, "Well, Bill, why are you doing this?"

Q.   Did you discuss the substance of your

testimony today during the break?

A.   I don't think we discussed anything about my

testimony.  I can't recall anything.

Q.   I want to ask you some more questions about

subject matter experts, Dr. Barrett.

My understanding is that they're typically

useful in providing content for tests; is that right?

A.   SME's are useful for providing content, yes.

Q.   Are there any problems resulting from relying

on SME's to develop test questions?

A.   Yes.

Q.   And what are those problems?

A.   I'm referring now to my experience in large

testing situations, and it's usually in the safety

forces. You usually don't find it in the private
sector, but in the -- and I'm referring to the times
when I'm hired -- I assume you're talking about when
I'm hired as a consultant and my problems with that?

Q. Sure.

A. The problems you have is the fact that they
may give you questions which are not framed correctly
or it might be ambiguous or it's not in the format --
it's too complex of a format.

I can think of, for example, the attorneys
who write -- federal taxation, as an example -- they
have -- their hypotheticals would be very complex,
which is fine, but then they'll try to make one
hypothetical into two or three questions. In other
words, you have one hypothetical, ask one question, and
they'll say, "All right, now, let's change it a little
bit and do this."

And I tell them, "This is not good testing
practice to do this; that you should not have multiple
hypotheticals, because people get confused about
this." And they might think -- and the response to
one -- the first -- the first question might bias the
response to the second question, because they're
thinking, "Well, this is what -- I've done this thing.
I should also do this in the second stage." So it

1   deposition, I thought she said she was a teacher, and

2   she had some sort of knowledge of test writing

3   practices as a teacher -- I think something akin to

4   your expert, Dr. Bowerman, who claims that she works in

5   an educational institution, so she writes a lot of

6   tests.  So she had, I assume, some practical knowledge

7   and some related course work, but I don't have any

8   details.  I've never seen Dr. Hitt's vita.  I've never

9   looked at her course material, but that's what I

10  recall.

11       Q.  Do you know if the group that developed the

12  Z-Test had any general guidelines or practices that it

13  was following when it developed the test questions?

14           MR. HAHESY:  Object.  It's ambiguous.

15           THE WITNESS:  I don't recall reviewing any

16  business record which talked about item writing

17  practices or anything else like that.

18           MS. CHANG:  Q.  Can you tell me how much it

19  would cost to hire a consultant like yourself to do a

20  training on test item writing?

21       A.  Well, I charge 350 an hour, so according to

22  how long the training session was and what preparation

23  time I'd have to take and -- and how long the training

24  time was.  Travel time would be added into it.  So

25  that's hard to estimate, again, because I have not done

                                                      214

1    from your context, but I think it's something which

2    should be a requirement.

3            Q.    So if I were a worker at NIBCO, and I said,

4    "I do that yesterday," do you think the supervisor

5    would understand what I meant?

6            A.    No.

7            Q.    No?

8            A.    I wouldn't understand it.  I have no idea

9    what you're saying.

10           Q.    And there's nothing that you could do to

11   clarify that.

12           A.    Well, I'd tell them to speak English

13   perhaps.  I don't understand what you are saying.

14           Q.    That is not speaking English, in your

15   opinion.

16           A.    I don't understand what you said.

17           Q.    So that's not speaking English, in your

18   opinion.

19           A.    It is not understandable.  It says right

20   here, "Speak simple sentences, using normal word order,

21   and present and past tenses."  I don't know what you're

22   talking about.

23           Q.    So you're telling me that if my grammar is

24   not correct, that there is no way you can communicate

25   with me?

                                                    247

validity of your test?

A. No, I would not have a concern about the validity of the test, because it's obviously job relevant. This is knowledge to have in terms of being able to communicate, understand certain things on the job.

Q. But if you developed a test, and a large group of the employees who took the test failed it, you would have no concerns whatsoever about the validity of your test?

A. Well, I have given tests to large numbers of people who have failed, you know. So my concern is that they don't have the knowledge they should have. That's my concern. When, for example, large numbers of people fail the Ohio State Board Certification examination for federal tax, yes, I'm concerned. I'm not concerned about the validity of the test. I'm concerned about the level of knowledge of the federal tax practitioners out there. That's my concern. I'm concerned and say, wait a minute, they missed these items, knowledge they should have, and they're out practicing federal tax. So yes, I'm concerned, but I'm not concerned about the validity of the test.

Q. And you are not concerned that the test might be too difficult?

1          (Mr. Nguyen enters deposition room.)

2          THE WITNESS:  These are -- using the example

3     now of the federal tax -- no, I'm not concerned it's

4     too difficult.  I'm not concerned, because this is what

5     these individuals went through who are practitioners

6     and are recognized as such, and this is the sort of

7     knowledge they believe to be adequate -- to be

8     required.

9          And beyond that, I have read every test item,

10    and they appear to be relevant to me and accurate, and

11    we do -- yes, I would say, yes, there's a concern, but

12    I would not be concerned about the validity of the

13    test.

14         MS. CHANG:  Q.  And back to the example of

15    NIBCO, you would not be concerned about the validity of

16    the test if it is your job incumbents that are failing

17    the test.

18         A.  When we give tests and -- which are valid

19    tests, and employees fail, yes, we will look and see,

20    well, what occurred?  But I'm not concerned about the

21    validity, because we've already established that.

22         Q.  So what do you mean when you say you would

23    ask what has occurred?

24         A.  No, I'm sorry, what did I say?  I'm not sure

25    what you're saying I said.

REPORTER'S CERTIFICATE

1  REPORTER'S CERTIFICATE

2  I, the undersigned, a duly qualified

3  Certified Shorthand Reporter of the State of

4  California, do hereby certify:

5  That the witness in the foregoing deposition

6  named, was present at the time and place therein

7  specified;

8  That the said proceeding was taken before me

9  at the said time and place and was taken down in

10  shorthand writing by me;

11  That I ambiguous a Certified Shorthand

12  Reporter of the State of California, and that the said

13  proceeding was thereafter transcribed by means of

14  computer-aided transcription, and that the foregoing

15  transcript constitutes a full, true and correct report

16  of the proceedings which then and there took place;

17  That I ambiguous a disinterested person to

18  the said action.

19  IN WITNESS WHEREOF, I have hereunto set my

20  hand this 6th day of October 2004.

21

22

23  *Leslie Tanimura*

24  LESLIE TANIMURA, CSR 5796

25  State of California

283

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4

5

6   MARTHA RIVERA, MAO HER, ALICIA ALVAREZ,
    EVA ARRIOLA, PEUANG BOUNNHONG, CHHOM CHAN,
7   BEE LEE, PAULA MARTINEZ, MARIA MEDINA,
    MAI MEEMOUA, MARGARITA MENDOZA, BAO
8   NHIA MOUA, ISIDRA MURILLO, MARIA NAVARRO,
    VATH RATTANATAY, OFELIA RIVERA, SARA RIVERA,
9   MARIA RODRIGUEZ, MARIA RUIZ, MARIA
    VALDIVIA, SY VANG, YOUA XIONG, and SEE YANG,

10            Plaintiffs,

11      vs.                    No.  CIV F-99-6443 AWI SMS

12  NIBCO, INC., an Indiana corporation,

13            Defendant.

14

15

16

17            Deposition of

    GERALD V. BARRETT, Ph.D., J.D.

18        Friday, October 1, 2004

19

20            Volume II
            (Pages 284- 593)

21

22

23

24

25  Reported by LESLIE TANIMURA, CSR No. 5796

                                        284

MR. HAHESY:   You don't want him to finish his
answer then.
          MS. CHANG:   Q.   No, I would, but I'm asking a
question that I thought of as you were providing your
answer.
          A.   Well, I'm not sure what you want me to do.
Do you want me to keep answering the question or answer
the new question?
          Q.   You indicated that part of job knowledge is
performing mathematical functions; is that right?
          A.   I said add and subtract.
          Q.   So part of job knowledge is the ability to
add and subtract; is that right?
          A.   For some jobs, yes.
          Q.   And my question was did the Z-Test test one's
ability to add and subtract?
          A.   Regrettably, it did not.
          Q.   Please continue with your description of
evidence of lack of job knowledge among those employees
who failed the Z-Test.
          A.   Now, I think you've -- so you're saying those
who failed by lack of knowledge; lack of knowledge in
general.
          Q.   The original question was asking you to
provide evidence that those who failed the Z-Test

1    Q. Well, so how do you know, then, that the
2    problems were caused by what you characterize as a
3    level of English ability below proficiency?
4    A. Well, because of the fact that was the
5    testimony that people, managers and others in the plant
6    who said that they couldn't, for example, tell them
7    what was wrong with the machine. They couldn't
8    communicate. In other words, if it's a bad product
9    coming out, they might not be able to tell the
10   maintenance department and/or they really couldn't
11   articulate what the problem was. So as the maintenance
12   people said, they spent hours trying to figure out what
13   was wrong, because if the person said, "Look, the
14   orifice is too small when it comes out, this is -- and
15   it appears to be because the heat is not hot enough
16   when you make the orifice, and that's my perception of
17   what's wrong" -- if the production people had said
18   this, then it might be a big help to the maintenance
19   people. That's a hypothetical, of course, you
20   understand.
21       So that is certainly direct evidence saying,
22   look, they couldn't articulate what the problem was.
23   That's one example.
24   Q. So your testimony is that the evidence
25   indicates that they were unable to articulate the

389

1    that they were not at the level in terms of any

2    language -- it could be that they had not learned, for

3    example, to read or write in Hmong.  So if they

4    couldn't read or write in Hmong, they couldn't read or

5    write or read in English.  That's certainly a

6    possibility.  So they just didn't have any -- any

7    reading skills at all, and so that would be a

8    possibility.

9         Another possibility is they didn't want to

10   avail themselves of some sort of language training so

11   that they could increase their reading comprehension

12   for this test to be able to at least read the open book

13   material and match that with the Z-Level Test.  It

14   could be that they were very proficient.  Maybe they're

15   high school graduates, and -- and they said, "Well,

16   wait a minute.  I think the plant should be bi-,

17   trilingual.  I want somebody to tell me in Spanish.  I

18   want a translator."

19        I think there's some evidence that some

20   people asked for translators.  They wanted to have it

21   translated for them.  It could be that some people were

22   proficient in, say, Spanish and never learned enough

23   English to read the open book material and read the

24   test questions.  That's a possibility.

25        Maybe some felt that they were proficient

1   question was?

2           MS. CHANG:   Q.   Yes.

3       A.   Beyond what I learned.   So are you saying

4   that, for example -- well, let me say first, I didn't

5   measure anybody's limited English ability, and I didn't

6   correlate -- since I didn't measure that, I could not

7   correlate that with any safety concerns.   So all I

8   basically have is testimony of NIBCO people,

9   employees.   So I don't have any -- any sort of

10  empirical information or data where I measured

11  someone's English proficiency and then correlated that

12  to their safety.   I've never done that.

13          MS. CHANG:   Q.   And you haven't seen any

14  documents, reports, statistics, or any other business

15  records that would document such a link?

16      A.   When you say a link, there's a logical link.

17  If you want to talk about a link, there's certainly a

18  logical link.   If, in fact, you cannot read a safety

19  sign, the inference is that, in fact, you may perform

20  an unsafe act.   And what you often do is do safety

21  tests.

22          In the past, occasionally we've done -- been

23  involved in safety training programs, and we've had a

24  safety test.   And the issue is it's a necessary, but

25  not sufficient condition for safe behavior in a plant

                                                        418

1  or factory to be able to understand and read the

2  warning signs.  Can you read the warning signs?  Can

3  you do this at all?  Are the warning signs things which

4  they should be able to read?  Well, they're very simple

5  signs.  And if the Z-Level Test tests for that job

6  knowledge, then the inference is, in fact, you could

7  have unsafe acts, so it's a logical inference.

8       Q.   Dr. Barrett, I really need you to listen to

9  my questions, okay?  I'll repeat the question.

10      MR. HAHESY:  Counsel, you asked him for a

11  link.  You didn't say --

12      MS. CHANG:  Don't point at me, Mr. Hahesy.

13      MR. HAHESY:  No, I'm going to use my finger

14  to demonstrate my point, all right?

15      MS. CHANG:  Well, don't point at me.

16      MR. HAHESY:  You asked him if there was a

17  link, and he's telling you that there's a logical link.

18      You didn't define what type of link.  Your

19  question was a link.

20      MS. CHANG:  I asked --

21      MR. HAHESY:  So if you want to make your

22  questions more specific, then you make them, but don't

23  accuse Dr. Barrett of not answering your question when

24  you framed the question in that manner.

25      MS. CHANG:  Q.   I asked you, Dr. Barrett,

419

whether there were any documents, reports, statistics
or any other business records that would provide a link
between the plaintiffs' limited English ability and the
incidence of safety problems at the Fresno plant.

MR. HAHESY: And I have the same objections
in terms of safety problems. You haven't -- it's
ambiguous, as framed. It's also vague.

THE WITNESS: The answer is yes.

MS. CHANG: Q. What evidence is that?

A. Well, for example, the Z-Level Test had job
knowledge about safety issues, and the people -- some
of the people -- and that's not talking about
limited -- I'm not saying we measured that -- did not
have that knowledge to interpret the safety signs.

Now, if OSHA were to come in and say, "Wait a
minute. You had an accident here, and the accident was
caused by the fact that your employees did not
understand the fact that you when you have a lockout,
tagout, they're supposed to do something" -- well, that
would be very bad.

There is a distinct link between knowledge,
intentions and behavior which is understood in the
safety field. If you don't have the knowledge about
what lockout, tagout means, you have a problem.
Because if that employee, then, encounters that

1 situation and makes the wrong move, then you well could

2 have a safety problem.

3 So other safety problems talk about not just

4 the actual behavior. To understand and study the

5 safety area, you often have to rely not only on the

6 actual accidents, but other behaviors and knowledge, so

7 you often test the knowledge of the safety procedures

8 first, and there, you draw an inference that the

9 probability is higher that there could be an accident

10 if the person did not understand the safety warning.

11 So there is documents, reports, from the

12 Z-Level Test that people did not have this knowledge.

13 Now, I don't know. I never measured those individuals'

14 English proficiency. I did not measure that.

15 Q. Other than the Z-Test, are there any other

16 documents, reports, statistics or business records that

17 support the, quote, unquote, "logical link" that you

18 are making?

19 A. In the previous question, you talked about

20 beyond the NIBCO employees' depositions. Are you still

21 saying that as a qualifier?

22 Q. That's right.

23 A. So you're still qualifying it, even though

24 you didn't say it in this question.

25 No, I would have to go back to the employee

421

1   depositions.  So no, this is the only one I would think

2   of at this point in time, but I'll think about it.

3          Q.   So the Z-Test is the only document or

4   business record then.

5          MR. HAHESY:  Other than the employee

6   depositions that he reviewed.

7          MS. CHANG:  Well, employee depositions are

8   not business records; are they?

9          MR. HAHESY:  Well, it's a document.

10         MS. CHANG:  They're not business records; are

11  they?

12         MR. HAHESY:  But your question wasn't limited

13  to business records.

14         MS. CHANG:  Right.  I'm talking about

15  documents that are business records.

16         MR. HAHESY:  Well, you've used them both.

17         MS. CHANG:  I apologize.  I could have been

18  clearer.

19         THE WITNESS:  At this point, I don't recall

20  any other business records except, of course, the

21  quizzes -- safety quizzes which were the ones which

22  were -- I assume this a business record from your point

23  of view -- the quizzes and the fact that these quizzes

24  contained important information about safety.

25         MS. CHANG:  Q.  And did you review

                                                        422

1  information regarding the plaintiffs' performance on

2  the safety quizzes?

3      A.   No.

4      Q.   Was that evidence available to you?

5      A.   As far as I know, it was not.  But what I did

6  review was the Z-Level Test, which were very similar or

7  the same at times to the quizzes.  So what you have is

8  the various quizzes, and they could not answer the

9  questions on the Z-Level Test which were actually from

10 the quizzes often.  I believe I have a table or I think

11 I have a chart in my report which shows the

12 correspondence between the quizzes and the Z-Level

13 Test.  So there is that sort of link between the two.

14      And it's a reasonable inference to believe

15 that if they couldn't answer the ones on the Z-Level

16 Test, they probably could not answer the previous

17 questions in the quizzes.  And, of course, the quizzes,

18 I assume, covered more material than what -- and I

19 assume at some point in time, they covered more

20 material than what I actually had access to.

21      Q.   But you haven't looked at those safety

22 quizzes, right?

23      A.   I just told you I didn't look at the safety

24 quizzes.

25      Q.   You haven't looked at the performance --

                                                    423

1     linguistics area.

2              What's your background in the area of

3     linguistics?

4         A.   You mean the formal, academic linguistics

5     you're talking about or just in terms of something

6     else?

7         Q.   Formal, academic.

8         A.   I've never taken, as far as I know, a course

9     labeled "linguistics."

10        Q.   That's not what I asked.  I asked you have

11    you taken -- what is your experience in the area of

12    linguistics?

13        A.   Oh, not the educational experience.

14        Q.   Excuse me, I'm still talking.

15             I was talking about not just courses that are

16    called linguistics.  I'm talking about any experience

17    in the formal, academic area of linguistics.

18        A.   So you're going beyond education.  You're

19    talking about experience in linguistics.  Teaching, for

20    example, in linguistics or in terms of --

21        Q.   Just what it says; training, education,

22    experience.

23        A.   Training, education, experience.  In 1973 --

24    no, I'm sorry, 1967, I worked for the University of

25    Pittsburgh and the University of Rochester, and we had

                                                         437

```
 1    money from the Ford Foundation which funded a program
 2    of management development in Europe, South America and
 3    Asia.  And part of that project involved us developing
 4    simulations for managers to train managers, and we had
 5    to translate all the material which was in English into
 6    Spanish, Japanese, German, Italian, etcetera.  So that
 7    was the main area of my experience in linguistics in
 8    terms of that project.
 9        Q.   Any other project?
10        A.   It's linguistics, you're talking about still.
11        Q.   Yes, same question.
12        A.   Occasionally, we translate, if I recall, for
13    one company.  We will do a test, and we'll have it
14    translated into Spanish.  My people are the ones who do
15    that, and they translate it and so forth, so
16    occasionally, we'll do a test in English and in
17    Spanish.
18        Q.   Do you do the translation yourself?
19        A.   No, I do not.
20        Q.   Who does the translation?
21        A.   Dr. Miguel.
22        Q.   Who is he or she?
23        A.   She.  She is a vice president of my firm.
24        Q.   So you're not involved in that, correct?
25        A.   I'm involved in overseeing it and so forth.
```

438

1      Q.   Do you speak any languages other than
2   English?
3      A.   Not really.
4      Q.   When you say "not really," what do you mean?
5      A.   I mean I'm not proficient in any language,
6   except English, and I'm not sure I'm proficient in
7   that.
8      Q.   That was a project in 1967 or '73.
9      A.   Between those times, I should say.
10     Q.   Fine.  Were you involved in the translation
11  that took place there or did you just oversee it?
12     A.   I oversaw it.
13     Q.   Have you ever been qualified to testify as an
14  expert on linguistic issues?
15     A.   No.
16     Q.   Will NIBCO seek to so qualify you in this
17  case?
18     A.   That's a question I cannot answer.
19     Q.   What's your background in the area of
20  sociolinguistics; sociolinguistics, S-O-C-I-O,
21  linguistics?
22     A.   Since I don't know what it means, I'm not
23  sure I -- I have any background.
24     Q.   Are you aware of the term "qualitative
25  linguistic analysis"?

1    referenced in her report?

2         A.   No, I don't believe so.

3         Q.   Do you believe that issues of second language

4    acquisition and second language testing have any

5    relevance to the issues in this case?

6         A.   I think they have a very limited role as to

7    the issues in this case.

8         Q.   Can you explain that, please?

9         A.   Well, in other words, what is the focus of

10   our issue is the Z-Level Test.

11             It is a job knowledge test, and there's no

12   question that the plaintiffs were offered an

13   opportunity to have their language instruction paid for

14   by the company.

15             Now, it's not clear how many people availed

16   themselves of that opportunity.  I know some did.  And

17   this is really something which is an extra the company

18   gave them.  It doesn't speak to the validity of the

19   Z-Test.  It only speaks to the fact that these

20   individuals who believed they had a problem in this

21   area had an opportunity to have their training,

22   teaching -- be taught more English, better English

23   skills by the company.

24         Q.   Well, I will return to the subject of ESL

25   classes latter on, Doctor.

                                                   445

didn't pass it, and they're all at Level 1.  That's the

reason they didn't do it.  That's a very viable

hypothesis.  That could be true, but it's not a test of

language proficiency, though.

Q.  When you said "that could be true," can you

tell me that --

A.  Well, it could be some of those people -- the

reason they could not pass the test is because of the

fact they couldn't read the material.

Q.  And not necessarily because they didn't

understand the content, per se, correct?

A.  No, I wouldn't agree with that.  If they

understood the content, they could pass the test.

Q.  Maybe it's the difference in the way I'm

using the word "content."

Even though they might know the substantive

knowledge tested for, it hadn't been presented to them

in a language they understood.

A.  I'll try this hypothetical and see if it's

what you are trying to get at.

Someone knows only Spanish.  They're given --

that's all they know.  They don't know English at all.

They're given a test in English; and therefore, they

can't answer any of the questions.  I would agree that

can occur, sure.

1    Q.   That, you'd agree with.

2    A.   That could occur, yes.  In other words, that

3    would -- if that was the hypothetical we have, it would

4    be understandable they could not pass a test in English

5    if all they knew was Spanish.  And I think they sort of

6    talk about it in the standard.

7    Q.   And that person could fail the test for that

8    reason even though that person might understand the

9    substantive knowledge required to pass the test if that

10   knowledge were presented to him or her in Spanish,

11   correct?

12   A.   Yes.  In other words, it could be a test in

13   physics, and the person knew physics very well, but

14   only knew Spanish, and you asked questions in English

15   about physics, and they can't answer the questions.

16   Q.   Now, would you have taken into account the

17   language needs of the NIBCO jobs had you designed the

18   Z-Test or designed the tests?

19   A.   I would make a test like they have and make

20   it job relevant.  That's the key thing, and clearly

21   there was some certain amount of minimal English

22   required on the job in terms of reading, speaking and

23   understanding the material.  So I would probably not

24   say, okay, now, somebody here has absolutely no English

25   or literacy in any language.  That would not be part of

473

1   the process.

2       Q.   But if you, Dr. Gerald Barrett, were creating

3   the test, you would take pains to ensure to your

4   satisfaction, that the level and modality of English --

5   or that the level of English was job appropriate,

6   correct?

7       A.   Yes.

8       Q.   I believe in your report, you made the

9   statement that a quantitative linguistic analysis was

10  the best way to approach such a task rather than

11  psychological assessment.

12      A.   I don't recall saying that to be honest about

13  it.

14           MR. HAHESY:  What report are you referring

15  to?

16           MR. HO:  I don't have a page reference right

17  now.

18      Q.   Could you define readability for me?

19      A.   It usually is in terms of some sort of grade

20  level, unless you do a qualitative -- again, it's

21  translated back to a grade level, so qualitative or

22  quantitative, it usually goes into a grade level.

23      Q.   In other words, you would assess the

24  readability of some sample in terms of whether somebody

25  in X grade ought to be able to read.

1     A.   Yes.

2     Q.   Are you an expert in readability analysis?

3     A.   Well, I'm not sure what you mean by an

4 expert, because I've been using readability analysis

5 and analyzing documents for 30 years at least, as it is

6 involved in employment.

7          Sticht, for example -- you know how to spell

8 that -- Sticht, for example, back in the Army, when I

9 was working in the human factors area, that was always

10 a concern, also, about the readability of materials,

11 because what we did, we developed materials for the

12 military to train and -- for instructions, so part of

13 the man machine system concept -- am I going too fast

14 again -- is to be sure that the people who are reading

15 the material -- say it's maintenance instructions,

16 which are often the most difficult -- that the reading

17 level is not too high.  So it's been a concern of mine

18 for a long time.

19          If you were to ask me if I do original

20 research in the area, usually not.  I use the tools,

21 and I read the research, but I don't think I've ever

22 published -- I can't recall -- well, what I might do

23 when I do a paper about content validity, I might talk

24 about this is important or I might do it in terms of my

25 graduate courses.

475

1    Q.   I understand, thank you.

2         So what would be your response to those

3    critiques?

4    A.   Well, my response would be that most of the

5    measures give similar grade levels.  That's not

6    often -- even the quantitative is similar in some ways

7    to the Flesch-Kincaid, which I tend to use as a marker,

8    which is ironic, of course.  So we're doing a measure

9    which is certainly not enormously precise.  We know

10   that.  But it's become sort of the standard.  Here's

11   what we use, and people can compare and understand it,

12   so that's -- I guess when Microsoft came out and made

13   it very easy to do by putting it in Word, that's what

14   sort of occurred.  It's sort of a de facto standard.

15   So you have to say, "What's better?  What can you use

16   that's better?"

17   Q.   When you say de facto standard, whose de

18   facto standard?

19   A.   Well, I would say the industrial

20   psychologist, as Dr. Scontrino said.  That's what he

21   uses.  I would say most of the people in industrial

22   psychology would use the Flesch-Kincaid approach.

23   Q.   As it's offered in Microsoft Word?

24   A.   Yes.

25   Q.   Does it take any special expertise to use the

                                                        485

Flesch-Kincaid on Microsoft Word?

A.    I don't think so.

Q.    You basically point and click to the right spot in the menu and press "go."

A.    Right.

Q.    Now, it's my understanding that quantitative methods, including Flesch Kincaid, will look primarily at word and sentence length; is that right?

A.    That's part of it, yes.

Q.    What are the other parts?

A.    Well, I don't know the exact formula.  If you asked me 30 years ago, I used to do it by hand.  I don't do it by hand.  In fact, to be clear about this, I don't do it myself.  I have one of my associates, "Go take a sample here and do this.  I don't do it myself."

Q.    Now, let me give you a hypothetical.

Suppose I wanted to ask you to measure the readability of a very short sentence with very short words, and the sentence was, "The onus is on you."

Now, wouldn't that come out as being a pretty low level of readability, because of the shortness of the sentence and of the words?

A.    To be clear, I'm not sure, because I would have to put it in and see what happened.  It's an empirical question you're asking, and I don't know the

486

1      A.   Yes, there is always an issue in measurement

2   about that.  From my experience, there is not that much

3   of a difference.  See, what -- the important point is

4   this.  Is there a correspondence?  See, you're using

5   the same measure.  In other words, let's assume, for

6   example, the SMOG differs from the Flesch-Kincaid, but

7   you're using the SMOG here and the SMOG here and the

8   Flesch here and the Flesch here.  And see, your

9   question is what?  It's not the absolute readability

10  grade level; is it?  It really is the fact the test is

11  at the level of the material or below.  So you could

12  argue, so they're off, so SMOG says five -- fifth

13  grade, and the Flesch says fourth grade; but also, SMOG

14  over here on this thing says fifth grade, also.  And so

15  there really isn't -- you can say the absolute value

16  doesn't matter that much in this context, because as

17  the standards say, is there comparability between the

18  two?  So if it's equally inaccurate -- or accurate

19  here, it's equally accurate over here, and so that's

20  the issue.

21      Q.   So what you're saying is that even though

22  SMOG may vary from Flesch-Kincaid, what you're looking

23  at is the difference between SMOG results and other

24  SMOG results that's relevant, correct?

25      A.   That's right.

1          MR. HAHESY:  Read the entirety of 754?

2          THE WITNESS:  Now, are talking about 754 or

3     756?

4          MR. HO:  There's no 756 yet.

5          THE WITNESS:  Oh, okay.  I see.

6          MR. HAHESY:  He doesn't have exhibit stamps.

7          MR. HO:  Yes, I'm sorry, Dr. Barrett.  This

8     one is 755.  Pardon me.

9          MR. HAHESY:  Let's do this to make it clear.

10    This is Exhibit 755, and then he referred to this as

11    Exhibit 754.

12         THE WITNESS:  Okay.

13         MR. HAHESY:  So why don't you restate that,

14    Chris, so we're clear.

15         MR. HO:  Could you read back the question,

16    please.

17         THE REPORTER:  "But you would need to have

18    some level of English proficiency in order to read

19    754 -- comprehend 754 to deduce what the answer was to

20    number 1 and then write it down, correct?"

21         THE WITNESS:  You either have to read -- if I

22    understand what you're saying -- read 14 and match it

23    to 1 and be able to do this or you've been taught that,

24    in fact, that is what the correct answer is from the

25    supervisor, and you put it in there, so yes.

                                                  513

1        A.    No, I don't think so.

2        Q.    Why is that?

3        A.    Well, because there are still a lot of

4   material which is relevant, which we used, and it's

5   true that perhaps the reading level might have gone

6   up.  For example, if you go over to the one having to

7   do with the computer screen, there is some, you know --

8   if it was really in sentence form, a lot of this stuff

9   might be more complex.  But it's not (examining

10  document) -- I can't read it.

11         So, often, like, for example, the computer

12  screen, if we already had all the complete information,

13  and you could actually read it, it may have increased

14  the reading level.  So I don't think that there's

15  anything here which would have made much of a difference.

16       Q.    Why would charts or documents that consisted

17  of fewer than two sentences raise a grade level

18  assessment?

19       A.    Well, because there is -- it just could.  I

20  mean, see, I'm just saying I don't know for sure.  I

21  have no way of knowing, because I can't read it.  It's

22  a possibility.  And at the most, what you would have

23  done is you would have had -- there's three states of

24  the world basically.

25         One state of the world is that if, in fact,

there's enough of the material here to analyze, that it
would have gone down slightly because of the average or
it could have been the same or gone up slightly.  So I
can't testify in terms of what actually would have
occurred in terms of reading material, comprehension
material.

     Q.   Now, you mentioned that you had difficulty
reading the screen shot exhibit, correct?

     A.   Yes.

     Q.   Let's go, for example, to what has been
marked as Exhibit 762, the Standard Production Order.

          Is this a document that is more legible?
It's a four-page --

     A.   Yes, I see it.  Yes, it is more legible.

     Q.   Do you have an opinion as to how including
this in your Flesch-Kincaid analysis might have
impacted the results of your analysis?

     A.   No.  At this point, I do not, but what we
could do -- or I could go back and do it -- I can
combine, for example, Flow Head Only (Blue) and put
comma and perhaps try to somehow get enough words
together, like Quad Bubbler.  Maybe it's not possible,
but you could try -- try somehow to make something
which would approximate enough words, enough sentences,
but it would be sort of artificial, Diaphragm For Quad

```
 1   because there's a lack of motivation.  I gave you an

 2   example.  I gave a test maybe three weeks ago, where

 3   somebody on a hundred-item test handed in the answer

 4   sheet blank.  So what do I infer from that?  There's

 5   certain behavior that I see, so you infer lack of

 6   motivation to do it.  I don't know what else it might

 7   be.  That's one possible explanation.  And so I've this

 8   before.  I've seen it in other court cases.

 9        I've seen it in people who take our tests.

10   I, for example, will tell people, you know, "Time is

11   running out.  It's time.  You know, be sure you answer

12   all the questions.  There's no penalty for answering

13   any questions -- no penalty for guessing."  And for

14   some reason, they don't respond, okay?  They only do

15   half the questions, for example.  They won't even make

16   a mark.  There's the Lanny case, for example, where you

17   have testimony that people don't try to do a certain

18   test.

19        In this case, we have testimony from -- that

20   one person saw one of the individuals not even trying

21   to put anything down, not even trying to do anything.

22   So that's an inference.  So I didn't directly measure

23   motivation.  I'm making one possible inference as to

24   why people don't do well.

25        Q.   Assuming that the inference carried some
```

link it to a national group.  Now, if you're going to

talk about in generalities --

Q.  No, I'm not asking you to link it to a

particular group.  You can do so if you'd like, but

that's not what I'm asking.

What I'm asking you, if lack of motivation

was a factor in the NIBCO situation, don't you find it

curious that it only manifested itself with Latinos and

Southeast Asians?

MR. HAHESY:  Object.  It's vague.

THE WITNESS:  Well, I don't know.  And as I

just said, I have done no analysis, and it is strange

that perhaps, as you're saying that -- in your

hypothetical, that, in fact --

MR. HO:  Q.  I'm talking about the NIBCO

situation.

A.  Oh, now, I'm to take it for a fact that

they're the only ones who failed entirely -- the

Northeast Asians and the Latinos failed, and one

potential factor is motivation, and why was it only --

could it be a factor for those individuals.  I don't

have a good answer for you.  I don't -- I don't have

any empirical data in terms of this issue.

Q.  With respect to the NIBCO situation.

A.  With respect to the NIBCO situation, you

1  know.  If it was more general, I could say, "Well,

2  here's X, Y, and Z, you know.  Here's the reasons."

3      Q.  Is there anything that you can point to in

4  the record that, in fact, demonstrates that lack of

5  motivation was a factor with respect to those who

6  failed the test?

7      A.  Well, there are certain things which you can

8  look at.  For example, there is that one testimony

9  about someone who did not attempt to do anything, so

10  that is just one case.  Somebody just sat there during

11  a training program and made absolutely no effort to

12  fill in the test or do the test.  So that's one

13  indication, you can infer that's it's lack of

14  motivation, lack of effort, whatever construct you want

15  to use.

16      Q.  Or it might have been that the person thought

17  it was futile to do it, because they didn't understand

18  the language.

19      A.  Well, I don't know.  It could be -- okay,

20  that's good.  That's good.  I like that.  They might

21  have felt that it's futile.  "I don't want to make an

22  effort, because it's -- I don't want to do it."  That

23  is motivation.  I like that.  That perhaps some people

24  thought, "Hey, I can't do this.  I don't want to do

25  it."

REPORTER'S CERTIFICATE

1                    REPORTER'S CERTIFICATE

2         I, the undersigned, a duly qualified

3 Certified Shorthand Reporter of the State of

4 California, do hereby certify:

5         That the witness in the foregoing deposition

6 named, was present at the time and place therein

7 specified;

8         That the said proceeding was taken before me

9 at the said time and place and was taken down in

10 shorthand writing by me;

11         That I am a Certified Shorthand Reporter of

12 the State of California, and that the said proceeding

13 was thereafter transcribed by means of computer-aided

14 transcription, and that the foregoing transcript

15 constitutes a full, true and correct report of the

16 proceedings which then and there took place;

17         That I am a disinterested person to the said

18 action.

19         IN WITNESS WHEREOF, I have hereunto set my

20 hand this 6th day of October 2004.

21

22

23        _Leslie Tanimura_

24        LESLIE TANIMURA, CSR 5796

25        State of California