UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTHA RIVERA, *et al.*,<br><br>                 Plaintiffs,<br><br>           v.<br><br>NIBCO, Inc.,<br><br>                 Defendant. | 1:99-CV-06443 OWW SMS<br><br>MEMORANDUM DECISION AND RE PLAINTIFFS' MOTION FOR REVIEW OF CLERK'S TAXATION OF COSTS (DOC. 741) |

I. <u>INTRODUCTION</u>

    This Title VII and FEHA employment discrimination case was tried before a jury starting in October 2008.  On November 26, 2008, the Jury returned verdicts in favor of Defendant on all causes of action submitted to them.  Doc. 696.  On October 7, 2009, the Clerk of Court taxed costs in the amount of $84,434.40.  Doc. 739.  Plaintiffs, who timely objected to the bill of costs, Doc. 706, now move for review of the Clerk's taxation of costs. Doc. 741.

    Plaintiffs first argue that, under *Association of Mexican-American Educators v. State of California*, 231 F.3d 572, 592 (9th Cir. 2000)("*AMAE*"), the district court should exercise its discretion to refuse to award costs here, because the case involved issues of substantial importance, the losing parties have limited financial resources, there is great economic disparity between Plaintiffs and Defendant, the issues in the

1

case are close and difficult, and the imposition of high costs may cause a "chilling effect" on future civil rights litigants. In addition, Plaintiffs maintain that the "majority" of the specific costs taxed are not compensable under Federal Rule of Civil Procedure 54(d).

Defendant opposes the motion for review, Doc. 744, and raises a number of evidentiary objections, Docs. 746 & 759. Plaintiffs replied.  Doc. 749.  The motion was heard March 1, 2010.

## II. STANDARD OF DECISION

A district court reviews the clerk's taxation of costs de novo.  *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 1000-1001 (N.D. Cal. 2005).

## III. DISCUSSION

A.    Evidentiary Objections.

Defendant raises objections to:

> (1) Paragraph 6 of the Declaration of Carole Vigne,
> Doc. 705, filed December 22, 2008 along with
> Plaintiffs' objections to Defendant's cost bill, Doc.
> 706; and

> (2) The Declarations of William R. Tamayo and John T.
> Affeldt, Docs. 750-756, filed December 7, 2009 along
> with Plaintiffs' Reply Re: the Motion for Review, Doc.
> 749.

1    **1.    Objections to Paragraph 6 of the Vigne Declaration.**

2        Defendant objects to paragraph 6 of the Declaration of

3    Carole Vigne, one of several attorneys who represented

4    Plaintiffs, which states:

5
6        Plaintiffs have limited financial resources. As evidenced by
         Plaintiffs' discovery responses related to the mitigation of
         damages and declarations in support of Plaintiffs'
7        Oppositions, Plaintiffs have either been unemployed, held
         low-wage jobs, or retired since their layoffs from Defendant
8        NIBCO, Inc. in 1998.

9    Doc. 705 at ¶6.  Nibco first objects that counsel lacks personal

10   knowledge of the matters stated therein under Federal Rule of

11   Evidence 601, asserting that "Plaintiffs have not submitted any

12   evidence concerning their financial resources independent of

13   their claimed historical wages."  Doc. 746 at 2.

14
15       Defendant ignores that Vigne's Declaration references a wide

16   range of information, including:

17       ... information from plaintiffs' sworn discovery
         responses concerning []:

18
19       1) the plaintiffs' current wages [],

20       2) their annual income from all sources for every year
         from 1999 through 2007;

21       3) detailed information about their employment after
         they were fired by Nibco, including:

22
23            a) a specification of each subsequent employer,

            b) their dates of subsequent employment,
24
             c) their rates of pay, and
25
             d) the total wages paid them by each subsequent
26           employer; and

27       4) plaintiffs' mitigation efforts subsequent to their
         termination by Nibco.

28
                                    3

Doc. 760 at 1.  Counsel had personal knowledge of the content of those discovery responses, which were all verified.  Even if, *arguendo*, Vigne's statement itself is inadmissible hearsay, the evidence attached to her declaration speaks for itself and could have been challenged on its merits by Defendant.  No contrary evidence was submitted.

Defendant further objects that this paragraph constitutes improper opinion testimony by a lay witness prohibited by Federal Rule of Evidence 701.  Defendant overreaches.  In summarizing the content of the sworn discovery responses, Vigne is serving a proper role as a fact witness.  As attorney for plaintiffs, it is her job to research and present facts underlying the financial condition of plaintiffs.  The remainder of the declaration lays the foundation for the discovery responses, which were verified by each plaintiff, to which Defendant raises no objections.

Defendant objections to Paragraph 6 of the Vigne Declaration are OVERRULED.

    2.   <u>Objections to the Tamayo and Affeldt Declarations.</u>

        a.   <u>Motion to Strike the Declarations in their Entirety as Untimely.</u>

Local Rule 78-230 provides:

> The moving party shall file a notice of motion, motion, accompanying briefs, affidavits, if appropriate, and copies of all documentary evidence that the moving party intends to submit in support of the motion.

Defendant suggests that the Tamayo and Affeldt declarations, filed with Plaintiffs' <u>reply brief</u>, were untimely under Local

Rule 78-230 because they were not filed with Plaintiffs' <u>opening</u>
<u>brief</u> requesting review of the cost bill.

Defendant's reading of 78-230 is far-fetched, particularly
in light of the fact that Plaintiffs filed the Tamayo and Affeldt
declarations in response to Defendant's arguments, raised for the
first time in opposition, that a cost award would have no
chilling effect, that this case had no public importance, and
that AMAE, 231 F.3d 572 requires detailed and exhaustive
evidentiary proof of plaintiffs' "indigency" or inability to pay
costs.  Defendant has made no request to file a surreply
addressing these declarations.

> b.    <u>Remaining Objections to the Tamayo and Affeldt</u>
> <u>Declarations.</u>
>
> (1)  <u>Relevance Objections.</u>

Defendant also objects on relevance grounds to paragraphs 4-
14 of the Tamayo Declaration and 3-16 of the Affeldt Declaration.
Federal Rule of Evidence 401 provides that "[r]elevant evidence"
means "evidence having any tendency to make the existence of any
fact that is of consequence to the determination of the action
more probable or less probable than it would be without the
evidence."  The relevance standard is a "liberal one."  *Dukes v.*
*Wal-Mart, Inc.*, 509 F.3d 1168, 1179 (9th Cir. 2007).

Paragraphs 4-8 of the Tamayo Declaration express counsel's
opinions regarding the vulnerability of low-wage workers to
discrimination and the potential deterrence that would be caused

by imposing costs upon unsuccessful low-wage litigants in civil rights cases.  Paragraphs 9-12 explain the nature of this litigation in the broader context of similar language-based discrimination cases.  These statements arguably address the question of whether this case was of "substantial public importance."

Likewise, Paragraphs 3-13 of the Affeldt Declaration offer for the district court's consideration various judicially noticeable documents from the AMAE litigation.  Paragraphs 14-16 offer Mr. Affeldt's opinions as to the interpretation of those documents, e.g., that the AMAE court did not require specific evidence that the plaintiffs in those cases were unable to pay costs.

Defendant's relevance objections are OVERRULED.

### (2)  702 Objections.

Defendant also objects to Paragraphs 4-14 of the Tamayo Declaration under Federal rule of Evidence 702, for "lack of foundation" and as "improper opinion evidence."  Tamayo declares, among other things, that in the course of his extensive practice experience, he has become familiar with the "challenges of bringing private litigation on behalf of civil rights plaintiffs, notably including those who are low-wage workers or other persons of modest or limited financial means."  Doc. 750 at ¶4.  Tamayo opines that "the possibility of being held liable for defendants'

6

costs of suit, in the event they do not prevail, has served to deter many potential plaintiffs from bringing suit on their discrimination claims, even where those claims appear to be supported by evidence...."  *Id*. at ¶5.  Tamayo has personal experience sufficient to support these assertions.  He is an attorney with considerable experience as counsel for civil rights plaintiffs.  Although his statements arguably offer legal opinions, they are also factual in nature.  There is no other mechanism by which such evidence may be presented.  Defendant's objections are OVERRULED.

B.    <u>Would an Award of Costs in This Case be Inequitable Under *AMAE*?</u>

1.    <u>Legal Standard.</u>

The starting point for any analysis of a challenge to the taxation of costs is Federal Rule of Civil Procedure 54(d)(1), which provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  "By its terms, the rule creates a presumption in favor of awarding costs to a prevailing party, but vests in the district court discretion to refuse to award costs." *AMAE*, 231 F.3d at 591.  "That discretion is not unlimited. A district court must 'specify reasons' for its refusal to award costs."  *Id*.

In *AMAE*, minority educators alleged that the use of a particular employment test ("CBEST") as a prerequisite to

employment in California public schools, violated Title VI and VII of the Civil Rights Act of 1964 because the test had a disproportionate, adverse impact on minority candidates.  *Id.* at 578.  Following a bench trial, the district court entered judgment in Defendant's favor.  *Id.* at 578-79.  Defendant subsequently presented the district court with a costs bill in the amount of $216,443.67.

The district court denied the costs bill in its entirety, giving the following four reasons:

> (1) the case "involve[s] issues of substantial public importance," specifically "educational quality, interracial disparities in economic opportunity, and access to positions of social influence";

> (2) there is great economic disparity between Plaintiffs, who are individuals and "small nonprofit educational organizations," and the State of California;

> (3) the issues in the case are close and difficult; and

> (4) Plaintiffs' case, although unsuccessful, had some merit, as evidenced by the [later] modification of the [employment qualification test] to eliminate "higher order" mathematics questions.

*Id.* at 592 (footnote omitted).

Rejecting defendants' argument that the only proper reason for denying costs to a prevailing party is to punish misconduct by that party, the Ninth Circuit noted that the Circuit "previously ... held that district courts may consider other, nonpunitive reasons for denying costs to a prevailing party." *Id.* (citing *National Org. for Women v. Bank of Cal.,* 680 F.2d

1  1291, 1294 (9th Cir. 1982)).  The Ninth Circuit also saw "no

2  basis for limiting district courts' discretion in the manner that

3  Defendants suggest."  *Id*.

4
5          The rule itself contains no such limitation; it
           provides simply that costs shall be allowed to the
6          prevailing party unless the district court "otherwise
           directs." The requirement that district courts give
           reasons for denying costs flows logically from the
7          presumption in favor of costs that is embodied in the
           text of the rule; if a district court wishes to depart
8          from that presumption, it must explain why so that the
           appellate court will be able to determine whether or
9          not the trial court abused its discretion....

10         Federal Rule of Civil Procedure 54(d)(1) establishes
           that costs are to be awarded as a matter of course in
11         the ordinary case. Our requirement that a district
           court give reasons for denying costs is, in essence, a
12         requirement that the court explain why a case is not
           "ordinary" and why, in the circumstances, it would be
13         inappropriate or inequitable to award costs. Misconduct
           on the part of the prevailing party is one factor that
14         might render a case "extraordinary." But it is not the
           only such factor. Here, the reasons that the district
15         court gave for denying costs reflect what is clear at a
           glance: This is an extraordinary, and extraordinarily
16         important, case. Plaintiffs are a group of individuals
           and nonprofit organizations. The record demonstrates
17         that their resources are limited. They have brought an
           action that presents issues of the gravest public
18         importance, and the action affects tens of thousands of
           Californians and the state's public school system as a
19         whole. The issues in the case are close and complex.
           Although Plaintiffs have not prevailed in this action,
20         their claims are not without merit. Indeed, as the
           district court pointed out, Defendants substantially
21         altered the [employment test] during the pendency of
           this litigation. Finally, costs in this case are
22         extraordinarily high. ...[W]e note that divesting
           district courts of discretion to limit or to refuse
23         such overwhelming costs in important, close, but
           ultimately unsuccessful civil rights cases like this
24         one might have the regrettable effect of discouraging
           potential plaintiffs from bringing such cases at all.
25
26         We do not mean to suggest that the presumption in favor
           of awarding costs to prevailing parties does not apply
           to defendants in civil rights actions. Nor are we
27         attempting to create an exhaustive list of "good
           reasons" for declining to award costs. We simply hold
28         that the reasons that the district court gave for

> refusing to award costs in this case were appropriate under Rule 54(d)(1) and that, considering those reasons, the court did not abuse its discretion in refusing to award costs to Defendants.

*Id*. at 592-93.  The reasons given in *AMAE* do not constitute an exhaustive list.  *Id*. at 593.

### 2.  Were the Issues In the Case of Substantial Public Importance?

One permissible consideration in evaluating whether a cost bill should be denied outright is whether the issues in the case were of substantial public importance.  *Id*. at  592.  In *AMEA*, the Ninth Circuit explained:

> [Plaintiffs] have brought an action that presents issues of gravest public importance, and the action affects tens of thousands of Californians and the state's public school system as a whole.

*Id.* at 593.  In addition, *AMEA* resulted in the defendant making substantial changes to the teacher qualification examination given statewide to thousands of people.  *Id*.

Defendant attempts to distinguish *AMAE*, arguing that this case is not as important because its impact was limited to "23 Plaintiffs who took a test at a single manufacturing plant in Fresno."  Doc. 744 at 5.  This description of the case is overly myopic.

In this case Plaintiffs' central claim was that Nibco's administration of certain tests in English only, and subsequent termination of employees based on the results of those tests, intentionally caused an adverse, disproportionate impact on

10

persons of Hispanic and Asian national origins.  Language-based

discrimination is often closely aligned with national origin

discrimination, and has been recognized as being worthy of close

scrutiny by the courts.  *See, e.g., Yniguez v. Arizonans for*

*Official English,* 69 F.3d 920, 948 (9th Cir. 1995), vacated on

other grounds, 520 U.S. 43 (1997) ("Since language is a close and

meaningful proxy for national origin, restrictions on the use of

languages may mask discrimination against specific national

origin groups or, more generally, conceal nativist sentiment");

*Fragante v. City and County of Honolulu*, 888 F.2d 591, 596 (9th

Cir. 1989) ("Accent and national origin are obviously

inextricably intertwined in many cases.  It would therefore be an

easy refuge in this context for an employer unlawfully

discriminating against someone based on national origin to state

falsely that it was not the person's national origin that caused

the employment or promotion problem, but the candidate's

inability to measure up to the communications skills demanded by

the job.  We encourage a very searching look by the district

courts at such a claim.").[1]

      The U.S. Equal Employment Opportunity Commission, the agency

charged by Congress with interpreting and enforcing Title VII,

_____

[1] Defendant's argument that "English-Only" cases typically involve bans on the
speaking of languages other than English at all or at certain times in the
workplace is unavailing.  Plaintiffs never claimed this was such an "English-
Only" case.  Moreover, just because the claims in this case do not exactly
mirror the majority of language-discrimination cases does not make this case
insignificant.  In fact, a strong argument exists for the contrary
proposition.

recognizes that language discrimination in the workplace is a serious problem by, among other things, prioritizing efforts against workplace "speak-English only" policies, a form of language discrimination.  *See, e.g.*, Doc. 710, Ho Declaration, Exhs. A-C (Sept. 1, 2000 EEOC press release announcing settlement of English-only case against a manufacturing plant (stating that "[c]ases involving language issues, accent discrimination, and restrictive language policies or practices are a strategic enforcement priority for the Commission"); Sept. 19, 2000 EEOC press release announcing settlement of English-only case against a telephone operator service ("Cases involving English-only rules, restrictive language policies, and language or accent discrimination are litigation priorities for the Commission. Employers must refrain from targeting workers for discrimination based on myths, fears, and stereotypes regarding their primary language and country of origin."); April 20, 2001 EEOC press release announcing settlement of class action against a private university concerning workplace English-only rule ("For more than 15 years, the EEOC has taken the firm position that English-only rules run afoul of Title VII ... This settlement should put other employers on notice that the EEOC is committed to rooting out discrimination against low-wage earners, language minorities, and other groups most vulnerable to civil rights abuses", and also noting a nearly 500% increase in English-only charges during

1996-2000 period.")).  The EEOC has followed the progress of this litigation since its inception, and sent its attorneys to observe trial proceedings.  *See id*. at ¶5.[2]  This was a significant case involving the disparate impact of English-only proficiency tests in the workplace on employees who the employer knew to have limited English language skills.  The use of such potentially national origin discriminatory tests had the potential to cause the termination of foreign language-speaking employees.

Defendant's other arguments to the contrary are not persuasive.  Defendant's floodgates argument manifestly overstates the risk that in denying its cost bill, every losing plaintiff could conceivably seek to avoid payment of costs in every employment discrimination case.  This will not happen, as *AMAE* expressly permits challenges by civil rights litigants to the imposition of costs and, correspondingly, grants district courts broad discretion to deny costs on a case by case basis.

---

[2] Plaintiffs place great weight on the fact that, in addition to bringing the case to combat workplace language discrimination, substantial party and judicial resources were devoted to litigating Defendant's vigorous efforts to discover Plaintiffs' immigration status.  In 2004, on appeal from the district courts' discovery rulings, the Ninth Circuit rejected Defendant's argument that discovery of Plaintiffs' immigration status was necessary to its defense, becoming the first Court of Appeals to interpret *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), a decision that called into question whether undocumented workers could assert statutory protections against workplace discrimination.  *See Rivera v. NIBCO, Inc*, 364 F.3d 1057 (9th Cir. 2004).  The Ninth Circuit's opinion has been cited in numerous federal court decisions, law review articles, practice guides, and casebooks.
    However significant this discovery decision became, Plaintiffs concede that whether or not immigration status was discoverable was not among the reasons this case was initially brought.  Doc. 741 at 5.  Moreover, none of the costs being sought by Defendant relate to that discovery dispute, on which Defendants did not prevail.  It is not necessary to decide here whether a finding of substantial public importance can be based upon a collateral issue raised as a defense to discovery, as the underlying claims are of substantial public importance on their own.

13

1    Defendant also emphasizes that, unlike *AMEA*, this case was

2  not a class action.  But, class action status is not a

3  prerequisite to denial of costs outright.  *See, e.g., Washburn v.*

4  *Fagan*, 2008 WL 361048 (N.D. Cal. 2008) (Denying costs under *AMEA*

5  in case brought by a single Plaintiff in an excessive force case

6

7  against the San Francisco Police Department).

8    The language/national origin claims raised in this case,

9  although ultimately unsuccessful, were of substantial public

10  importance.

11

12    3.   Plaintiffs' Financial Resources.

13    A court abuses its discretion when it awards costs against a

14  losing plaintiff without considering the plaintiff's limited

15  financial resources.  *AMAE*, 231 F.3d at 592; *Stanley v.*

16  *University of Southern California*, 178 F.3d 1069, 1079-80 (9th

17  Cir. 1999) ("[d]istrict courts should consider the financial

18  resources of the plaintiff and the amount of costs in civil

19  rights cases.").  It is not necessary to find that the plaintiffs

20  in question are currently indigent; rather, the proper inquiry is

21  whether an award of costs might make them so.  *Stanley*, 178 F.3d

22

23  at 1079-80 (referring to the possibility that the plaintiff

24  "would be rendered indigent should she be forced to pay" the

25  amount assessed against her); *see also Mansourian v. Board of*

26  *Regents of the Univ. of California at Davis*, 566 F. Supp. 2d

27  1168, 1171 (E.D. Cal. 2008) (refusing to award costs against

28

student plaintiffs, noting their "limited financial resources"
and that they were barely able to cover their monthly living
expenses).

Defendant points to cases from the Seventh Circuit that
place the burden on the losing party to provide the district
court with sufficient documentation to support a specific finding
that he or she is "incapable of paying the court-imposed costs at
this time or in the future," and that this evidence should come
in the form of an affidavit or other documentary evidence of both
income and assets.  *See Rivera v. City of Chicago*, 469 F.3d 631,
635 (7th Cir. 2006).  But, in light of *AMAE* and *Mansurian*,
Defendant has failed to demonstrate that such a specific standard
of proof applies in this circuit.  In fact, there was sparse
evidence supporting the finding that the AMAE plaintiffs had
limited financial resources.  The dissent specifically noted:

> There is no evidence in the record of the exact
> financial condition of any of the plaintiffs. The
> majority opinion's conclusion that Plaintiffs have
> limited resources seems to be inferred from evidence in
> the record which merely indicates what jobs are held by
> the individual plaintiffs and the amount of dues the
> organization plaintiffs receive from their members. The
> district court merely found a disparity of resources
> between the State and the Plaintiffs. Presumably that
> disparity would almost always exist, regardless of who
> litigated against the State.

*AMAE*, 231 F.3d at 599 (Fernandez, J., concurring in part and
dissenting in part).  Likewise, in *Mansurian*, the district court
noted that "plaintiffs have not presented evidence of actual

indigence," relying instead on plaintiffs' demonstration "that they are graduate students and recent college graduates with limited financial resources."  566 F. Supp. 2d at 1171.

Here, the Plaintiffs have demonstrated that they are low wage workers, employed in hourly jobs, who do not have substantial financial resources.  *See* Vigne Declaration, Doc. 705, ¶¶ 5-30.  Exhibit A to the Vigne declaration summarizes wage and earnings information for each Plaintiff for a ten year period, produced in discovery; and reveals that most of the Plaintiffs earn less than $20,000 per year, with a handful earning approximately $25,000 per year.  In the Fresno metropolitan statistical area, it is probable that the Plaintiffs' average incomes for the past several years would place them in the "low income," if not the "very low income," classifications used by the U.S. Department of Housing and Urban Development ("HUD").[3]

Plaintiffs have limited financial resources.

4.   Economic Disparity.

The financial disparity between the parties is also a relevant consideration.  *See AMAE*, 231 F.3d at 592 (denial of costs appropriate where there exists inter alia a great economic disparity between the plaintiffs, who were individuals and small

---

[3] 2009 Adjusted Home Income Limits, State: California, U.S. Department of HUD, Mar. 2009, available at, http://www.hud.gov/offices/cpd/affordablehousing/programs/home/limits/income/2009/ca.pdf.

16

nonprofit educational organizations, and the defendants).  It is undisputed that Nibco is a multinational corporation that operates 12 manufacturing plants, and additional "global distribution and plant shipping facilities," in both the United States as well as in Mexico and Poland.  In 1999, the last year for which Nibco's annual reports were produced in discovery, its net income surpassed $22 million.  Vigne Decl., ¶¶ 31-32.  In fiscal year 2008, Nibco reported sales of $590.2 million.[4]

There is significant disparity between the resources of the parties in this case.

### 5.   Were the Issues Close and Difficult?

The district court denied the parties' voluminous cross motions for summary judgment in a detailed, 96-page memorandum decision.  Doc. 436.  The pretrial proceedings and trial were lengthy and complex.  Defendant correctly points out that after a nearly two-month trial, the jury took less than one day to reject Plaintiffs' claims.  However, the jury's ultimate rejection of the Plaintiffs' claims does not undermine the legal and factual complexity of the underlying claims and that summary judgment could not be granted.

The case consisted of the testimony of twenty three Plaintiffs and reviewed their employment history and the testing and performance evaluations and policies of the employer, NIBCO,

---

[4] Nibco Inc. company profile, Hoover's, Inc., 2008, available online at http://www.answers.com/topic/nibco-inc. (last visited February 26, 2010.).

for its Fresno, California plant.  NIBCO produced all its records

and policies concerning the evaluation and treatment of each

Plaintiff and many other employees.  The employer offered

exhaustive testimony from its supervisors and from human

resources officers to explain and justify its treatment and

termination Plaintiffs.  Extensive expert testimony about

linguistics, employment standards and practices, and economics

was offered.  Further, the business and financial history of

NIBCO's unsuccessful endeavor to acquire and operate the Fresno

plant, resulting in significant business losses, was presented to

show that NIBCO's layoffs of Plaintiffs were caused by business

necessity.  This major causation issue was the primary reason

Defendant succeeded in persuading the jury that even if language

discrimination occurred, a supervening cause, the financial

reverses of NIBCO's Fresno operations caused Plaintiffs to lose

their jobs.

> 6.   **Would an Award of Costs have a Serious "Chilling Effect" on Future Civil Rights Litigants?**

One district court's recent review of the available caselaw

applying *AMAE* concluded that, while there are cases in which

courts have awarded costs to prevailing defendants in civil

rights litigation,

> those cases involved relatively small awards that did
> not pose a risk of chilling future litigation.  *See
> Save Our Valley v. Sound Trans it*, 335 F.3d 932, 945
> (9th Cir. 2003) ($5,310.55); *Estate of Le Blanc v. City
> of Lindsay*, 2007 U.S. Dist. LEXIS 76428, at *10, 2007

WL 2900515 (E.D. Cal. Sept. 28, 2007) ($8,460.21); *Sorgen v. City of San Francisco*, 2007 U.S. Dist. LEXIS 14489, at *8-10, 2007 WL 521235 (N.D. Cal. Feb. 15, 2007) ($4,987); *Ardalan v. Monterey Institute of Int'l Studies*, 2004 U.S. Dist. LEXIS 18765, at *12-14, 2004 WL 2047593 (N.D.Cal. Sept. 14, 2004) ($2,838.35). By contrast, larger cost awards ...  have been denied to prevailing defendants based on a combination of [] reasons [cited in AMAE].  *See Mexican-American Educators*, 231 F.3d at 591 ($216,443.67); *Bowoto v. Chevron Corp.*, 2009 WL 1081096, at *2 (N.D.Cal. Apr.22, 2009) ($485,159.49); *Washburn v. Fagan*, 2008 WL 361048, at *2 (N.D.Cal. Feb.11, 2008) ($16,268.71).

*Darensberg v. Metro. Transp. Com'n*, 2009 WL 2392094, *2 (N.D. Cal., Aug, 4. 2009); *see also Mansourian*, 566 F.Supp.2d at 1171-72 (cost award "would lead to a harsh result that could chill student litigants from vindicating important rights under Title IX.").

     Defendant argues that there would be no "chilling effect" here because the costs taxed, $84,434.40, be divided among the 23 Plaintiffs in this case, for a total cost of $3,671.06 for each Plaintiff.  Defendant cites *Arakaki v. Lingle*, 477 F.3d 1048 (9th Cir. 2007), in which a group of Hawaiian residents brought a civil rights action challenging state programs, which gave preferential treatment to persons of Hawaiian ancestry in violation of equal protection principles.  The Ninth Circuit upheld the district court's imposition of costs, holding that plaintiffs had not demonstrated that an award of costs, "divided among multiple plaintiffs," amounted to a chilling effect.  *Id*. at 1069.  *Arakaki* is distinguishable.  *Id.*  The total cost award in *Arakaki* was $5,300.  Divided among the fourteen named

19

Plaintiffs, the plaintiff liability for costs was less than $400. Moreover, there is no suggestion in *Arkakai*, that those Plaintiffs demonstrated financial extremis.

Here, even imposing the costs bill on a per-plaintiff basis risks a chilling effect.  For a low wage-worker, the threat of a $3,600 cost bill, representing approximately 14% of the annual income of Plaintiffs, is a significant disincentive.

## IV. CONCLUSION

Plaintiffs' motion objecting to the Clerk's taxation of costs is GRANTED.  Defendant shall not recover costs in this case for the reasons stated above.


SO ORDERED
Dated:  March 22, 2010
                                    /s/ Oliver W. Wanger
                                     Oliver W. Wanger
                              United States District Judge

20